**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 19-CR-00394-1-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**PATRICK DOYLE,**

      Defendant.

---

**MOTION FOR VARIANT SENTENCE**

---

      Defendant Mr. Doyle, by and through counsel, Martin Stuart, and pursuant to Title 18 U.S.C. Section 3553, respectfully moves this Court to sentence Mr. Doyle to a non-guideline sentence (variance) of 72 months incarceration followed by 3 years of supervised release with conditions the Court deems just. In support of said Motion, Mr. Doyle states as follows:

      **I.**      **Introduction**

      On July 15, 2021, Mr. Doyle pled guilty to Counts 1, 3, 4, 5, 6, 7 and 8 of the Indictment, charging violations of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and § 846, Distribution or Possession with Intent to Distribute a Controlled Substance – MDMA (3,4-methylenedioxymethamphetamine) (Counts 1 and 3), and the Attempt to Distribute or Possess with Intent to Distribute a Controlled Substance -- MDMA (3,4-methylenedioxymethamphetamine) (Counts 4 through 8). Sentencing is scheduled for December 1, 2021. Mr. Doyle also admitted to the forfeiture allegation pursuant to 18 U.S.C. § 982(a)(1), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853.

As part of the plea agreement, the government agreed to dismiss Count 2 at the time of sentencing. (Doc. 43 at p. 3). The government agreed to recommend that Mr. Doyle receive full credit for acceptance of responsibility and agreed to recommend a sentence at the low end of the guideline range at the time of sentencing. (Doc. 43 at p. 3). Further, the parties agreed that Mr. Doyle meets the criteria set forth in (2) – (4) of 18 U.S.C. § 3553(f) and USSG §5C1.2(a). (Doc. 43 at p. 8). Accordingly, if the facts known to the parties regarding the defendant's criminal history are correct and he satisfies criteria (5) prior to sentencing, he is eligible for a 2-level decrease in offense level pursuant to USSG §2D1.1(b)(18). (Doc. 43 at p. 3; Doc. 45 at p. 6). Finally, the plea agreement reserved Mr. Doyle's right to argue that a different MDMA-to-converted-drug-weight ratio should be applied in this case. (Doc. 43 at p. 7).

The facts underlying the offense are set out in in both the Plea Agreement (Doc. 43 at pp. 5-7) and the Presentence Report ("PSR") (Doc. 45 at pp. 3-5). According to the Plea Agreement, Mr. Doyle is responsible for 26,451 grams of MDMA, which is equivalent to 13,225 kg of converted drug weight using the 500:1 marijuana equivalency ratio contained in USSG § 2D1.1 Commentary 8 (A)-(D) (Use of Drug Equivalency Tables). (Doc. 43 at p. 7).[1] The PSR determined Mr. Doyle's Base Level Offense to be 34, his Total Offense Level to be 29, and classified his Criminal History as category I. (Doc. 45 at pp. 7-8). Mr. Doyle has been in custody since his arrest on August 22, 2019.[2]

---

[1] The total weights in the Plea Agreement vary slightly from the total and converted drug weights indicated in the PSR (Doc. 45 at p. 5), but the variation does not change the Base Offense Level and therefore is not at issue here.
[2] According to the PSR, the Defendant is entitled to 832 days of presentence confinement credit as of December 1, 2021.

According to the PSR, the maximum statutory penalty for Counts 1 and 3 through 8 is between 0 years and 20 years imprisonment, and between 3 years and life for supervised release. (Doc. 45-1). The Guidelines Provision for a Total Offense Level 29 and Criminal History category I is between 87 -108 months imprisonment, and the Probation Department recommended the Court impose 87 months imprisonment and 3 years of supervised release on each count to run concurrently. (Doc. 45-1).

Mr. Doyle does not dispute the guideline calculation in the PSR and Plea Agreement. The math is correct. However, for the reasons set forth below, including the authority vested in the Court under *Kimbrough v. United States*, 552 U.S. 85 (2007) and *Spears v. United States*, 555 U.S. 261 (2009) (per curium), Mr. Doyle urges the Court to reconsider the appropriateness of adhering to the empirically flawed U.S. Sentencing Guideline for MDMA (hereinafter "MDMA Guideline") and determine an appropriate initial sentencing range for Mr. Doyle that is based on consideration of more recent scientifically documented properties and harms of MDMA. He submits that a variant sentence that comports with a guideline range associated with a converted drug ratio of less than or equal to that of cocaine (200:1), which he argues is more harmful than MDMA, is sufficient but not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2).

If the Court adopted a 200:1 converted drug ratio, Mr. Doyle's Base Offense Level would convert to 32, his Total Offense Level to 27, and his guideline range to 70-87 months for Criminal History category I. For the reasons set forth below, Mr. Doyle requests the Court, after calculating his applicable guideline range as required under *Gall v. United States*, 552 U.S. at 49-50 (2007), grant a variance here based upon a

policy disagreement with the MDMA Guideline, and the other sentencing factors in 18 U.S.C. § 3553(a).

As this Court is aware, a "variant" sentence results when a "a court enhances or detracts from the recommended Guidelines range through the application of §3553(a) factors." *United States v. Atencio,* 476 F.3d 1099, 1101 n.1 (10th Cir. 2007), overruled in part on other grounds by *Irizarry v. United States*, 533 U.S. 708 (2008). Mr. Doyle respectfully suggests a sentence of 72 months imprisonment followed by 3 years of supervised release with conditions the court deems just is the appropriate sentence in this case.

**II.     Because the MDMA Guidelines were devised based on empirically unsound data, a flawed analysis of relative social harms, and without the benefit of recent studies showing the benefits of MDMA-assisted therapy to treat Post-Traumatic Stress Disorder (PTSD), they should be rejected by this Court.**

**A.     History**

MDMA emerged in the 1970s, before it became associated with raves, as a possible treatment for mental disorders. *See* Alyssa C. Hennig, *An Examination of Federal* Sentencing Guidelines *' Treatment of* MDMA *("Ecstasy")*, 1 BELMONT L. REV. 267, 279 (2014). Developed in Germany over one hundred years ago, the drug became the focus of studies in the 1970s. *Id*. Before the drug was added to Schedule I, which thwarted scientific and therapeutic advancements, psychiatrists believed that it helped in therapy for depression. *See* Benedict Carey, *A 'Party Drug' May Help the Brain Cope with Trauma*, N.Y. TIMES (Nov. 20, 2012). Now, it is becoming widely known for its promise to treat patients suffering from Post-Traumatic Stress Disorder.

*MDMA-Assisted Therapy for PTSD Edges Closer*, ALCOHOL & DRUG FOUND. (June 25, 2020).[3]

Nonetheless, the current MDMA Guideline ignores the benefits of MDMA, both previously known and as developed in modern science. The MDMA Guideline was established twenty years ago in response to public panic during the War on Drugs and based on faulty science that has since been repudiated. Prior to 2001, the Guidelines provided that one gram of MDMA was equivalent to 35 grams of marijuana, a 35:1 ratio. In 2000, Congress passed the Children's Health Act of 2000, which included the Ecstasy Anti-Proliferation Act of 2000. (Children's Health Act of 2000, Pub. L. No. 106-310, §§ 3661–65, (codified at 42 U.S.C. §§ 290aa-5b)). The Ecstasy Anti-Proliferation Act directed the Sentencing Commission to review and increase penalties for any offense relating to the manufacture and trafficking of MDMA and required the Commission to submit a report on the resulting amendments to Congress. Pub. L. No. 106-310, 114 Stat. 1101, 1241-45.

The Commission filed its report in May 2001. The report determined that penalties for MDMA offenses should be more severe than those provided for powder cocaine, which had a 200:1 marijuana equivalency ratio, but less severe than those for heroin, which had a 1,000:1 marijuana equivalency ratio. *U.S. Sent. Comm'n, Report to the Congress: MDMA Drug Offense, Explanation of Recent Guideline Amendments* (May 2001) (hereinafter referred to as "Report".)  A copy of the Report is attached hereto as Exhibit A.

---

[3] Per https://adf.org.au/insights/mdma-ptsd/ (last checked November 11, 2021).

The Report first compared MDMA to heroin. Based on five factors, it determined MDMA was less harmful. Report at 5.

> (1) there are many more heroin cases in the federal system than MDMA cases, (2) heroin is more addictive than MDMA, (3) heroin has many more emergency room visits and deaths associated with its use than MDMA because, unlike MDMA which generally is taken orally, heroin is injected, (4) heroin has more violence associated with both its users and distribution system than MDMA, in part because MDMA users typically do not resort to violence to support their drug use, and (5) heroin causes greater secondary health effects, such as the spread of HIV and hepatitis, because it is injected.

The Commission then compared MDMA and cocaine and offered three reasons for imposing higher sentences for MDMA. Report at 5.

> (1) unlike MDMA, powder cocaine is not neurotoxic; (2) powder cocaine is not aggressively marketed to youth in the same manner as MDMA, and (3) powder cocaine is only a stimulant, but MDMA acts as both a stimulant and a hallucinogen.

Ultimately, the Commission established an MDMA-to-marijuana equivalency of 500 grams. Report at 5.

Among its many flaws, the Commission relied on several studies that were not able to be replicated and a scientist whose work was fraught with methodological problems. For instance, Dr. George Ricaurte, who was cited and relied upon as "[a] leading researcher in MDMA toxicity studies" in the Commission's 2001 report (Report at 8), had to retract multiple studies after it was discovered that they mistakenly had been performed with mislabeled vials of methamphetamine, rather than MDMA. (Science Vol. 301 no. 5639 p. 1479, September 12, 2003.)  After this error came to light, in 2003, the journal Science retracted a Ricaurte study purporting to show that a single dose of MDMA could cause brain injury. McNeil, *Research on Ecstasy is Clouded by*

*Errors*, N.Y. Times, Dec. 2, 2003, at F1. 1   The mislabeled vials corrupted several of

Ricaurte's other studies, as well, and he was forced to withdraw four other papers. *Id*.

Even scientists Ricaurte named in defense of his work were quoted in the New

York Times as saying that "some of his best-known work has nonetheless been 'sloppy'

or 'not as methodologically rigorous as you might want.'" McNeil, *Research on Ecstasy*

*is Clouded by Errors*, *Id*., at F-2.

The Commission principally relied upon Ricaurte's work to conclude that MDMA

is likely neurotoxic, in that it causes the loss of serotonin transmitters throughout the

brain, which affects memory and other brain functions. Report at 8-9. The Commission

attributed a variety of other harms to MDMA, including memory loss, increases in heart

rate and body temperature, and even death. Report at 7-9. Subsequent studies

disputed the severity of these effects.[4]

Ultimately, the Commission adopted a ratio of 500:1, in between the 200:1 ratio

for cocaine and 1,000:1 ratio for heroin. In so doing, it stated its findings were based on

"the unique pharmacological and physiological harms of ecstasy, the fact that the drug

is aggressively marketed to and used by our youth, and its importation and trafficking

pattern." Report at 5.

The vast leap from 35:1 to 500:1, a 1428% increase, resulted in a doubling of the

length of the average MDMA sentence. Report at 6 (noting increase in average

sentence from just under 3 years to just over 6 years.)  The current drug conversation

ratio has not been reevaluated since 2001.

---

[4] See Jager et al., *Incidental Use of Ecstasy: No Evidence for Harmful Effects on Cognitive Brain Function in a Prospective MRI Study*, 193(3) Psychopharmacology (Berl.) 403 (2007); Rogers et al., *The harmful health effects of recreational ecstasy: a systematic review of observational evidence*, Health Tech. Assessment, Jan. 2009, at xi; Jerome, (+/-) 3,4-methylenedioxymethamphetamine (MDMA, "Ecstasy") Investigatory Brochure 12 (2007).

The Commission did not take into account past sentencing practices. Instead, the MDMA Guideline, much like the crack cocaine Guideline that the Supreme Court considered in *Kimbrough v. United States*, supra, was the result of the Commission's response to a congressional directive that was issued in the midst of an uninformed panic about MDMA. The dangers of MDMA were grossly overstated and the studies upon which the Commission relied have since been undermined.

The obvious unwarranted disparity in Guideline of MDMA as related to more dangerous drugs received only the briefest of mention in the Government's sentencing statement, "While the overdose risks of MDMA are not equivalent to, for instance, fentanyl, it is nevertheless a dangerous drug." (Doc. 47 at p. 3). Such a gross over generalization is paramount to saying that while BB guns are not as dangerous as AKA-47s, they are still dangerous weapons. The Government's sentencing statement goes on to state, "One of the most common effects of an MDMA overdose is hyperthermia, which can result in multiple organ failure and death." *Id*. Yet, the Government failed to note that non-fatal MDMA overdoses are extremely rare, let alone fatal overdoses.[5]

## B.  Other Courts have rejected or called into question the validity of the MDMA Guideline

Recent scientific research and federal case law indicate that the 500:1 MDMA to marijuana equivalency ratio is empirically unsound. Several courts have exercised their discretion and rejected the 500:1 ratio, finding that it was based on a faulty and incomplete analysis of empirical data and erroneous assessment of the drug's social

---

[5] Gina Martin et al., "Nonfatal overdose from alcohol and/or drugs among a sample of recreational drug users," *Journal of Substance Use* 19, no. 3 (2013): 239-44.

harms. *See United States v. McCarthy*, 2011 WL 1991146 (S.D. NY, May 19, 2011); *United States v. Qayyem*, 2012 WL 92287 (S.D.NY, Jan. 11, 2012); *United States v. Sanudo*, S.D. Fla., Case Number 11-cr-20559-Seitz); *United States  v. Phan*, W.D. Wa., Case Number 2:10-cr-00027-RSM;  *United States v. Chong*, 2014 U.S. Dist. LEXIS 135664 (E.D. NY, 2014). These courts have held that defendants sentenced under the current MDMA Guidelines, like defendants sentenced under the 1987 crack cocaine Guidelines, are receiving sentences that are greater than necessary to adequately protect the public, serve as an effective deterrent, and provide sufficient retribution.

Recently, the Third Circuit expressed its "appreciation" of a district court's authority to depart from the guidelines in light of the problems underlying the marijuana-to-MDMA ratio. *See United States v. Sepling*, 944 F.3d 138 (3rd Cir. 2019) (approving of the district court's decision to award a downward variance in a case involving methylone based on a rejection of the marijuana-to-MDMA ratio). Other courts that have declined to outright reject the guidelines have acknowledged that "considerable uncertainty exists as to the science and policies underlying the marijuana-to-MDMA ratio." *See e.g., United States v. Thompson*, 2012 WL 1884661 (S.D. Illinois May 23, 2012) (citing *United States v. Kamper,* 860 F.Supp.2d 596 (E.D.Tenn. May 8, 2012) (disapproved in later appeal by *U.S. v. Kamper*, 748 F.3d 728 (6th Cir. 2014) (finding district court erred by concluding that it did not have the power to exercise discretion to reject the MDMA-to-marijuana ratio in the Sentencing Guidelines but such error was harmless)).

In *United States v. McCarthy*, *supra*, Judge William H. Pauley, III held a two-day evidentiary hearing with expert testimony from four expert witnesses, two for the Government and two for the defense, regarding the soundness and validity of the

empirical studies on which the Commission based the new MDMA drug equivalency ratio, the physiological effects of MDMA, and the social harm associated with it. A copy of the hearing transcript is attached hereto and incorporated herein as Exhibit B.[6]

At the hearing, experts from both sides rejected outright the Commission's premise that MDMA is more harmful than cocaine. As a result, the district court varied downward, rejecting the Commission's unsupportable 500:1 ratio. *McCarthy*, at *5. After the two-day hearing, the district court concluded that "the Commission's [2001] analysis of [MDMA's] impacts—particularly as compared to cocaine—was selective and incomplete." *Id*. at *3. "[T]he Commission ignored several effects of cocaine that render it significantly more harmful than MDMA." *Id*. The court explained that the evidence presented to it demonstrates that "[c]ocaine is [] far more addictive than MDMA." *Id*. A government expert testified that "MDMA is 'one of the least addictive drugs.'" *Id*. In addition, MDMA does not cause cardiovascular effects, respiratory effects, or neurological effects. *Id.* By contrast, the Commission has found that cocaine causes all of these side effects.[7]

Judge Pauley concluded that the 500:1 MDMA to marijuana equivalency would give rise to a sentence that is greater than necessary to serve the objectives of sentencing. *Id*. at *1-2. He also determined that the Commission's justification for the ratio was "incompatible with the goal of uniform sentencing based on empirical data." *Id*. at *4.

---

[6] An extensive discussion of the hearings, the court's findings, similar findings by later courts considering the issue, and the history of MDMA and the Sentencing Commission's classification of it, are contained in a 2014 law review article, Hennig, Alyssa C., *An Examination of Federal Sentencing Guidelines' Treatment of MDMA ('Ecstasy')* (2014), 1 Belmont Law Review 267 (2014). A copy is attached hereto as Exhibit C.

[7] United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* ("Cocaine Report") 65 (2007).

Judge Pauley particularly took issue with the Commission's comparison of MDMA to cocaine, stating it ignored evidence concerning the risks associated with cocaine. "Rather than comparing the full range of health effects of MDMA and cocaine, for example, the Commission focused only on a single health effect: neurotoxicity." *Id*. at *8. He found the Commission ignored several effects of cocaine that render it significantly more harmful than MDMA. Specifically, Judge Pauley found: (1) there are far more cocaine-related emergency room visits than there are MDMA-related emergency room visits; (2) cocaine use causes health risks not caused by MDMA use, such as "cardiovascular effects, including disturbances in heart rhythm and heart attacks; respiratory effects, such as chest pain and respiratory failure; and neurological effects, including strokes and seizures"; and (3) cocaine trafficking, unlike MDMA tracking, is connected with "substantial violence." *Id*. at **8-10.

He stated while there have been "statistically significant" reports of memory loss, they were all "relatively minor." *Id*., at * 6. Judge Pauley also cited the Commission's incorrect characterization of MDMA as a hallucinogen. Judge Pauley also said the issue was irrelevant, since whether a drug is classified as a stimulant or hallucinogen has no bearing on its relative harm. *Id*. at *7-8.

Judge Pauley called the Commission's approach to comparing MDMA to cocaine "an opportunistic rummaging" (referring to its use of an entirely different set of factors to compare MDMA to heroin.) *Id*. at *11. He concluded "The Commission's selective analysis is incompatible with the goal of uniform sentencing based on empirical data," referring to the need to avoid disparity when defendants with similar records are sentenced for similar conduct. *Id*. at *12. He said, "This fundamental principle is violated

11

when disparate drug equivalencies are established for similar narcotics based on an incomplete analysis." *Id*. He noted that not one witness had testified MDMA is more harmful than cocaine. *Id*. at *12.

There were two Commission findings Judge Pauley did not reject: While there was conflicting information about whether MDMA was neurotoxic, he said he was not prepared to disregard that claim. *Id*. at **5-7. He also said there was some validity to the Commission's claim that MDMA is aggressively marketed to youth. *Id*. at *7. Based on this, and the fact that he had not been presented with evidence concerning the harmfulness of MDMA as compared to marijuana, he rejected the 500:1 ratio, and set a new ratio of 200:1, the same ratio that applies to cocaine. *Id*. at *12-13.

### C. Two reports by the American Civil Liberties Union (ACLU) rejected the scientific foundation for the 500:1 MDMA Guideline based on its misguided analysis of relative harmfulness

In 2012, the Sentencing Commission called for public comments on proposed guideline amendments, one of which pertained to whether the Commission should adopt the 500:1 MDMA-marijuana ratio for BZP, a substance similar to MDMA. In response thereto, the ACLU submitted a lengthy letter, a copy of which is attached hereto as Exhibit D, urging the Commission to re-evaluate the 500:1 marijuana to MDMA ratio as lacking scientific foundation and overstating the harm associated with the drug. Therein, the ACLU highlighted the underpinnings of the *McCarthy* and *Qayem* decisions, and noted data from the U.S. Department of Health that undermined the theory that MDMA is more harmful than cocaine:

> [E]mergency room data confirms that MDMA is not more harmful than cocaine. In fact, "cocaine is responsible for far more emergency room visits per year than MDMA." According to the U.S. Department of Health and Human Services, cocaine abuse was responsible for 553,530 emergency room visits, or 29.4% of

drug-or alcohol related emergency room visits in 2007, while MDMA was responsible for only 12,748 visits, or 0.7%.[8] [9]

In sum, the ACLU opposed the Commission's adoption of the 500:1 MDMA marijuana equivalency ratio for BZP because "the MDMA ratio is itself empirically unsound and exceptionally problematic." "[T]he Commission seriously overestimated the harmfulness of MDMA at a time when little was known about the substance." The ACLU argued, "the empirical evidence supports a 1:1 marijuana equivalency ratio, and we therefore recommend that the Commission at the very least adopt the pre-2001 ratio of 35:1."

On July 15, 2013, in response to the Sentencing Commission's request for public comments on proposed amendments for 2014, the ACLU again addressed the scientifically unsound and flawed social harm analysis in the Commission's Report on the 500:1 MDMA-marijuana equivalency ratio. A copy of its response is attached hereto as Exhibit E. The ACLU emphasized, as it did in its 2012 letter, that while a 200:1 ratio, such as that established in *McCarthy* and *Qayyem*, *supra*, is preferable to a 500:1 ratio, it is too high because it does not accurately reflect the current state of MDMA research or associated harms. It also referenced a 2007 study published in the prominent British medical journal, The Lancet, which was cited in the *Qayyem* decision.[10] A copy of the

---

[8] U.S. Department of Health and Human Services, *Drug Abuse Warning Network 2007: National Estimates of Drug–Related Emergency Department Visits* ("DAWN") 22 (2010).

[9] In 2014, the last year the Drug Abuse Warning Network published data on emergency room visits involving drugs use and misuse, the group found that cocaine and marijuana were the most commonly involved illicit drugs, with 505,224 (40.7%) and 455,668 (36.4%) emergency department visits respectively. To the contrary, MDMA resulting in only 22,498 visits (1.7%). The total number of emergency department visits on account of drug use was greater than 2.5 million, with approximately half (1.25 million) on account of illicit drug use. Per https://www.samhsa.gov/data/sites/default/files/DAWN2k11ED/DAWN2k11ED/DAWN2k11ED.pdf (last visited Nov. 11, 2021).

[10] *See* David Nutt et al., *Development of a rational scale to assess the harm of drugs of potential misuse*, 369 The Lancet 1047, 1051 (2007); and Nutt et al., *Drug harms in the UK: a multicriteria decision analysis*, 376 The Lancet 1558, 1561 (2010).

study is attached as Exhibit F. The Lancet study assessed the relative harmfulness of illicit drugs based on the harmfulness of the drug to the individual user, the tendency of the drug to induce dependance, and the effect of the drug use on society.[11] It found MDMA to be the eighteenth most harmful out of twenty drugs, whereas heroin and cocaine ranked as first and second respectively.[12] Marijuana and ketamine, which the guidelines treat as equivalent to marijuana for sentencing purposes, also ranked as more harmful than MDMA, at eleventh and sixth respectively.[13] The Lancet study suggested that an empirically sound MDMA marijuana equivalency ratio would be 1:1. (Exhibit F, at 21.)

### D.  Studies show that Marijuana and Ketamine are relatively more harmful than MDMA

The 2007 Lancet study found heroin, cocaine, marijuana, and ketamine to be more harmful than MDMA. Similarly, a study conducted in 2010 by prominent Dutch researchers reached similar conclusions as the studies noted above.[14] The Dutch study's aggregate harm scores for the individual and social harm posed by cocaine nearly doubled the harm posed by MDMA.[15] While powder cocaine was ranked sixth on its list of harmful drugs, MDMA was fourteenth. [16]Again, both Marijuana and Ketamine were classified as more harmful than MDMA.

---

[11] David Nutt et al., *Development of a rational scale to assess the harm of drugs of potential misuse*, 369 The Lancet 1047 (2007).
[12] *Id*. at 1049-50.
[13] *Id*.
[14] *See* van Amsterdam et al., *Ranking the Harm of Alcohol, Tobacco and Illicit Drugs for the Individual and the Population*, 16 Eur. Addiction Research 202, 204 (2010).
[15] *Id*. at 204.
[16] *Id.*

There is a lot of scientific support for treating MDMA as less harmful than both marijuana and ketamine. Studies have shown that unlike MDMA, a single dose of ketamine can produce schizophrenia-like symptoms, dissociative effects, and broad ranging cognitive dysfunction.[17] Also in stark contrast to MDMA, ketamine use has been shown to cause destruction of the lower urinary tract, including ulcerative cystitis and blood in urine.[18]

Smoking marijuana increases health risks associated with smoking cigarettes. Citing many of these same harms in addition to the greater potential for addictiveness of marijuana compared to MDMA, an expert who has worked with and published on all three substances—MDMA, ketamine, and marijuana—gave unchallenged and unrefuted testimony at the *McCarthy* hearing that MDMA was no more harmful than ketamine or marijuana. Ex. B at 7-8, 41-46 (Curran, defense expert). In addition, marijuana is frequently referred to as a "gateway drug" while MDMA is not, and as demonstrated infra, marijuana use is far more prevalent among teens than MDMA.

Since MDMA is no more harmful (and in many respects less harmful) than ketamine or marijuana, MDMA should not be sentenced more harshly than either of these drugs, each of which has a 1:1 ratio. Since MDMA is considerably less harmful than cocaine, it should not be sentenced more harshly, as is the case under the current guidelines.

### E. Cocaine ranks high among those drugs most commonly resulting in overdose deaths in the United States from 1999-2019.

---

[17] *See* Morgan et al., *Consequences of Chronic Ketamine Self-Administration Upon Neurocognitive Function and Psychological Wellbeing: A 1-year Longitudinal Study*, 105 Soc. For the Study of Addiction 121 (2009).

[18] *See* Shahani et al., *Ketamine-Associated Ulcerative Cystitis: A New Clinical Entity*, 69(5) Urology 810, 811 (2007).

The National Center for Health Statistics (NCHS) and the Centers for Disease
Control and Prevention (CDC) collect information on drug overdose deaths and the
drugs of abuse most commonly resulting in overdose deaths. Overall, drug overdose
deaths rose from 2018 to 2019 with 70,630 drug overdose deaths reported in 2019.[19]
Deaths involving synthetic opioids other than methadone (primarily fentanyl) rose
significantly from 2015 to 2019 with nearly 40,000 overdose deaths in 2019. Other top-
ranking drugs include cocaine, prescription opioids, heroin, benzodiazepines,
antidepressants, and psychostimulants with abuse potential ("primarily
methamphetamine").[20] Notably, drug overdoses involving cocaine have been on the rise
since 2010, with nearly 16,000 deaths in 2019.[21] Cocaine is involved in nearly 1 in 5
overdose deaths.[22] In 2019, more people died from Cocaine overdose than from use of
all psychostimulants with abuse potential (which includes ecstasy and "primarily
methamphetamine").[23] By this metric alone, cocaine is considerably more harmful than
MDMA, yet it carries a less severe punishment under the guidelines.

In its Sentencing Statement, the government claims that "one of the most
common effects of an MDMA overdose is hyperthermia, which can result in multiple
organ failure and death." (Doc. 47 at p. 3). While hyperthermia is a known side effect of
MDMA overdose, far fewer people die from MDMA overdose than from cocaine
overdose, which causes hypertension, tachycardia, coronary vasospasm, and heart

---

[19] Per https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates (last checked November 18,
2021).
[20] Importantly, the statistics incorporate MDMA in the category of "psychostimulants" but note that the category
"primarily" consists of deaths from methamphetamine use.
[21] *Id.*
[22] Per https://www.cdc.gov/drugoverdose/deaths/other-drugs.html (last checked November 18, 2021).
[23] Per https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates (last checked November 18,
2021).

arrhythmias.[24] Further, hyperthermia is a known side effect of cocaine overdose.[25] If death by hyperthermia is persuasive to this Court, that cocaine produces far more overdose deaths and is treated less severe under the guidelines should too be persuasive.

### F.  Concerns about the "dangers to youth" cited by the Commission to justify the 2001 MDMA Guidelines were overstated and refuted by subsequent data.

In addition to the faulty science and false assumptions of serious and permanent health hazards, the Commission justified its 500:1 ratio on the danger to youth, finding that the United States stood on the precipice of an MDMA epidemic, particularly among teenagers and young adults. The Commission noted that MDMA is especially marketed to teens, who were drawn to it as a "feel good" drug. (Report, Exhibit A, at 14-15.) While the *McCarthy* and *Qayyem* courts found there was evidence of the drug's marketing to youth, more recent data supports the conclusion that there has been no wave of youthful MDMA users, and no reason to think that one is about to occur.

In 2013 the DEA reported an overall decline in MDMA use among the youth demographic since 2010.[26] A 2014 Monitoring the Future report, published by the National Institute on Drug Abuse and which tracks and reports on drug use among teens, found that among eighth, tenth, and twelfth graders, MDMA use declined from

---

[24] Peter M. Marzuk, et. al, *Ambient Temperature and Mortality from Unintentional Cocaine Overdose,* JAMA 1998; 279.

[25] Bauwens JE, Boggs JM, Hartwell PS. *Fatal hyperthermia associated with cocaine use.*  West J Med.1989;150:210-212.

[26] DRUG ENFORCEMENT ADMIN., NAT'L DRUG THREAT ASSESSMENT 2013, 17 (2013), *available at* http://www.justice.gov/dea/resource-center/DIR-017-13%20NDTA%CC20Summary%Cfinal.pdf [hereinafter NAT'L DRUG ASSESSMENT 2013] (drawing its conclusion from Monitoring the Future data, which showed a decline in MDMA use from 3.06% in 2010 to 3.1% in 2011, and National Survey on Drug Use and Health data, which showed a decline in MDMA use from 1.7% in 2010 to 1.9% in 2011).

2.8% in 2013, to 2.2% in 2014.[27] This represented a steep reduction from 2001, the peak year of use, when the rate was 6%. It also found that marijuana use was much more prevalent than use of MDMA, with 11.7% of eighth graders and 35.1% of twelfth graders, respectively, reporting that they had used marijuana in the past year. The same report showed that approximately 1% of college students and other young adults ages 19-28 reported using MDMA in the past month, compared to 21.6% using marijuana and 64.9% using alcohol.

The 2019 Monitoring the Future report found that MDMA use among high school seniors remained steady at 2.2%.[28] MDMA was the second least used illicit drug, used more among high school students than only heroin (0.4%) and at the same rate as cocaine (2.2%). Used more frequently than MDMA among high school students were Synthetic Cannabinoids (3.3%), LSD (3.6%), and Marijuana (35.7 %).

Emergency room data concerning young MDMA users may generally support the Commission's concerns about MDMA's effect on teens and young adults. Current data, however, continues to show that cocaine, which carries a significantly smaller Guidelines penalty, results in a much greater percentage of serious bodily injury and emergency room visits. MDMA-related emergency room visits increased by 114% from 2004 through 2010.[29] The increase was gradual from 2004-2010, but "appear[s] to [have] stabilize[d] between 2009 and 2010."[30] Estimates for 2011 MDMA-related

---

[27] Lloyd D. Johnston et al., *Monitoring the Future national survey results on drug use, 1975–2013: Volume 2, College students and adults ages 19–55* (Ann Arbor: Institute for Social Research, The University of Michigan, 2014), Table 2.3.

[28] *See* National Institute on Drug Abuse, *Monitoring the Future 2019 Survey Results: Overall Findings*.

[29] U.S. DEP'T OF HEALTH & HUMAN SERVS., SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., DRUG ABUSE WARNING NETWORK 2010: NAT'L ESTIMATES OF DRUG-RELATED EMERGENCY DEP'T VISITSSS (2012), *available at* http:// www.samhsa.gov/data/2k13/DAWN2k10ED/DAWN2k10ED.pdf [hereinafter DAWN]. There were 10,227 MDMA-related Emergency Room visits in 2004, compared to 21,836 in 2010.

[30] DAWN, *supra* note 17, at 39.

emergency room visits also support the notion that this number is stabilizing.[31] The vast majority of these MDMA-related emergency room visits occurred among 12 to 24 year-olds, while the majority of cocaine-related visits occurred among those who were 25 years of age and older.[32]

Compared to users of other drugs, however, MDMA users present to the emergency room *much* less frequently.[33] The Commission itself noted that "emergency room admission and deaths attributed to use of [MDMA] continue to be less frequent than with other drugs of abuse."[34] In fact, MDMA-related emergency room visits comprise only 1.9% of drug-related emergency room visits.[35] Cocaine-related emergency room visits, on the other hand, were much more frequent than MDMA-related emergency room visits.[36] In people twenty-one years of age or older, cocaine-related visits comprised 210.7 visits per 100,000 population, as opposed to MDMA-related visits which comprised only 4.7 visits per 100,000 people.[37] In people who were twenty years of age or younger, cocaine-related ER visits comprised 23.8 visits per 100,000 people as opposed to MDMA-related visits which comprised only 12.9 visits per 100,000 people.[38] Even heroin-related visits surpassed MDMA-related visits, with 93 visits per 100,000 people who were twenty-one years of age or older and 21.2 visits per 100,000 people twenty years of age or younger.[39] MDMA-related emergency room visits

---

[31] DAWN, *supra* note 17.
[32] *Id*. at 34, tbl. 6 (12-24 year-olds comprised 72.3% of MDMA-related emergency room visits while 86% of cocaine-related emergency room visits involved patients who were 25 years of age or older).
[33] *Id.* at 34, tbl. 6.
[34] U.S. SENT. COMM'N, REP. TO THE CONGRESS: MDMA DRUG OFFENSES EXPLANATION OF RECENT GUIDELINE AMENDMENTS 5, n.1 (2001) [hereinafter GUIDELINE AMENDMENTS] at 11.
[35] DAWN, *supra* note 17 at 4, fig.1.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

also occur much less frequently than emergency room visits related to alcohol, amphetamines, marijuana and PCP.[40] In conclusion, emergency-room related data, while supporting the Commission's concerns, does not support the Commission's treatment of MDMA relative to other illicit drugs.

### G. The Commission's concern about increases in drug trafficking of illegal MDMA are undermined by subsequent decreases in MDMA trafficking data.

The Sentencing Commission, through its report, expressed concern about the increase of illegal MDMA trafficking and importation by both individuals and drug trafficking organizations.[41] While MDMA trafficking declined immediately after the MDMA Guidelines were established, there was a significant increase in MDMA trafficking from 2007 through 2010. Data from 2007 through 2010 "shows high levels of MDMA seizures" in the United States, with more than 15.1 million MDMA dosage units seized.[42]

However, according to the DEA's 2013 National Drug Threat Assessment Report, MDMA trafficking declined significantly thereafter.[43] The DEA reported that only 173,749 dosage units and 390 kilograms of MDMA were seized in 2012, which was "significantly less than the approximately 1.9 million dosage units and 675 kilograms seized in 2011." *Id.*, at 17. The DEA summarized its MDMA findings by concluding that

---

[40] *Id.* PCP, or phencyclidine, is an illegal drug that can cause illusions, auditory hallucinations, "feelings of strength, anxiety, aggression, ... hostility, ... delusions, paranoia, and catatonia." NAT'L DRUG INTEL. CTR., INTEL. BULLETIN: PCP: INCREASING AVAILABILITY AND ABUSE (2004), *available at* http://www.justice.gov/archive/ndic/pubs8/8180/.

[41] GUIDELINE AMENDMENTS, *supra* note 22, at 12.

[42] NAT'L DRUG INTEL. CTR., NAT'L DRUG THREAT ASSESSMENT 2011, 31 (2011), *available at* http://www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf [hereinafter NAT'L DRUG ASSESSMENT 2011].

[43] DRUG ENFORCEMENT ADMIN., NAT'L DRUG THREAT ASSESSMENT 2013, at p. 17 (2013), Retrieved from http://www.justice.gov/dea/resource-center/DIR-017-13%20NDTA%20Summary%20final.pdf on April 16, 2015.

"surveys, seizure and treatment data suggest availability and abuse of [MDMA] may have peaked." *Id.*, at 17. The DEA's 2013 data also indicated a low level of MDMA availability throughout the United States. *Id.*, at 17. This recent data indicates that the Commission's concerns about future increases in MDMA trafficking, even if valid in 2000, are no longer supported.

In short, the feared MDMA epidemic never came to fruition, and the data shows that such an epidemic is even less likely to occur today. The Commission's exaggerated fears of an MDMA epidemic, which it inherited from Congress along with a directive to increase penalties, as well as the unsubstantiated and now repudiated reports of the drug's physiological dangers, the disproportionate penalty compared to cocaine, which is far more harmful, and to marijuana, which is used by far more youth, demonstrate that this excessively punitive 500:1 MDMA to marijuana ratio is unsupportable and should be rejected by the Court.

## H. Recent advancements in the important therapeutic uses of MDMA to treat Post-Traumatic Stress Disorder (PTSD) further undermine the outdated policy reasons behind the 2001 MDMA Guidelines.

In addition to the outdated and repudiated policy reasons underlying the MDMA Guidelines, significant scientific advancements in important therapeutic uses of MDMA to treat Post-Traumatic Stress Disorder (PTSD) further support Mr. Doyle's argument that the guidelines are outdated and should be rejected by this Court.

PTSD is a common and debilitating condition with immeasurable social and economic costs that affects the lives of hundreds of millions of people annually. There are a number of environmental and biological risk factors that contribute to the development of PTSD, and poor PTSD treatment outcomes are associated with several

comorbid conditions that include childhood trauma[44], alcohol and substance use disorders[45], depression[46], suicidal ideation[47], and dissociation.[48] Recognizing the devastating impact of PTSD, scientists have long tried to identify a therapeutic that is beneficial in those individuals with the comorbidities that typically confer treatment resistance.

The selective serotonin reuptake inhibitors (SSRIs) sertraline and paroxetine are Food and Drug Administration (FDA)-approved first-line therapeutics for the treatment of PTSD. However, an estimated 40–60% of patients do not respond to these compounds.[49] Likewise, although evidenced-based trauma-focused psychotherapies such as prolonged exposure and cognitive behavioral therapy are considered to be the gold standard treatments for PTSD[50], many participants fail to respond or continue to have significant symptoms[51], and dropout rates are high.[52] Novel cost-effective therapeutics are therefore desperately needed.

Research into the use of MDMA as a therapeutic agent stopped in the mid-1980s when the United States made the drug illegal. Clinical research picked up again with a

[44] Widom, C. S. *Posttraumatic stress disorder in abused and neglected children grown up*. Am. J. Psychiatry 156, 1223–1229 (1999).

[45] Kessler, R. C., Sonnega, A., Bromet, E., Hughes, M. & Nelson, C. B. *Posttraumatic stress disorder in the National Comorbidity Survey. Arch. Gen. Psychiatry* 52, 1048–1060 (1995).

[46] Hegel, M. T. et al. *Impact of comorbid panic and posttraumatic stress disorder on outcomes of collaborative care for late-life depression in primary care.* Am. J. Geriatr. Psychiatry 13, 48–58 (2005).

[47] Tarrier, N., Taylor, K. & Gooding, P. *Cognitive-behavioral interventions to reduce suicide behavior: a systematic review and meta-analysis.* Behav. Modif. 32, 77–108 (2008).

[48] Wolf, E. J., Lunney, C. A. & Schnurr, P. P. *The influence of the dissociative subtype of posttraumatic stress disorder on treatment efficacy in female veterans and active duty service members.* J. Consult. Clin. Psychol. 84, 95–100 (2016).

[49] Steenkamp, M. M., Litz, B. T., Hoge, C. W. & Marmar, C. R. *Psychotherapy for military-related PTSD: a review of randomized clinical trials.* JAMA 314, 489–500 (2015).

[50] Watkins, L. E., Sprang, K. R. & Rothbaum, B. O. Treating PTSD: a review of evidence-based psychotherapy interventions. *Front Behav. Neurosci.* 12, 258 (2018).

[51] Bisson, J. I., Roberts, N. P., Andrew, M., Cooper, R. & Lewis, C. Psychological therapies for chronic post-traumatic stress disorder (PTSD) in adults. *Cochrane Database Syst. Rev.* 2013 (12), CD003388 (2013).

[52] Gutner, C. A., Gallagher, M. W., Baker, A. S., Sloan, D. M. & Resick, P. A. Time course of treatment dropout in cognitive-behavioral therapies for posttraumatic stress disorder. *Psychol. Trauma* 8, 115–121 (2016).

study published in 2010, and after successful Phase 2 clinical trials showed huge improvements in the symptoms of PTSD.[53]

Specifically, pooled analysis of six phase 2 trials of MDMA-assisted therapy for PTSD showed promising safety and efficacy findings.[54] As a result, in August 2017, the Food and Drug Administration (FDA) granted Breakthrough Therapy Designation (BTD) to MDMA for the treatment of Post-Traumatic Stress Disorder (PTSD).[55] The FDA grants BTD for treatments that (1) are intended alone or in combination with one or more other drugs to treat a serious or life-threatening disease or condition; and (2) preliminary clinical evidence indicates may demonstrate substantial improvement over existing therapies.[56] By granting BTD, the FDA agreed that MDMA treatment may have a meaningful advantage and greater compliance over available medications for PTSD.

The non-profit Multidisciplinary Association for Psychedelic Studies (MAPS), which studies the benefits of MDMA-assisted psychotherapy, published the following data about the devastating effects of PTSD in a press release dated August 26, 2017:

> PTSD is a serious, long-lasting, and life-threatening condition when not adequately treated, highlighting the need for expedited approval of new therapies. PTSD sufferers may relive their traumatic experiences through nightmares and flashbacks, have difficulty sleeping, and feel detached from daily life. Approximately 7% of the U.S. population, and 11-17% of U.S. military veterans, will have PTSD sometime in their life. As of June 2016, more than 868,000 veterans were receiving disability compensation for PTSD, with an estimated taxpayer cost of $17 billion per year. PTSD is

---

[53] Jerome L, Feduccia AA, Wang JB, Hamilton S, Yazar-Klosinski B, Emerson A, et al. *Long-term follow-up outcomes of MDMA-assisted psychotherapy for treatment of PTSD: a longitudinal pooled analysis of six phase 2 trials.* Psychopharmacology. 2020.

[54] Mithoefer, M. C. et al. MDMA-assisted psychotherapy for treatment of PTSD: study design and rationale for phase 3 trials based on pooled analysis of six phase 2 randomized controlled trials. *Psychopharmacology (Berl.)* 236, 2735–2745 (2019).

[55] PRESS RELEASE: FDA Agrees to Expanded Access Program for MDMA-Assisted Psychotherapy for PTSD [press release]. January 17 2020. (located at: https://maps.org/news/media/6786-press-release-fda-grants-breakthrough-therapy-designation-for-mdma-assisted-psychotherapy-for-ptsd,-agrees-on-special-protocol-assessment-for-phase-3-trials (last updated Aug 26, 2017).

[56] *Id.*

a stress-related condition associated with reduced cognitive and psychosocial functioning, fractured relationships, inability to maintain employment, substance abuse, and increased risk of depression and suicide. In the general population, 27% of suicides are associated with PTSD.[57]

Traditional pharmacotherapy treatment protocols for PTSD, which include the use of two medications, paroxetine hydrocholride (Paxil) and sertraline hydrochloride (Zoloft), have been found to have only small to moderate effects when compared with placebo.[58] In MAPS' Phase 2 trials, with 107 participants, 56% no longer qualified for PTSD after treatment with MDMA-assisted psychotherapy, measured two months following treatment.[59] At the 12-month follow-up, 68% no longer had PTSD. Most subjects received just 2-3 sessions of MDMA-assisted psychotherapy.[60] All participants had chronic, treatment-resistant PTSD, and had suffered from PTSD for an average of 17.8 years.[61] These initial studies found that MDMA transiently increases heart rate, blood pressure, and body temperature in a dose-dependent manner that is generally not problematic for physically healthy individuals.[62] Serious adverse events involving administration of MDMA in initial MAPS studies were uncommon and non-life threatening.[63]

The first of two Phase 3 trials, "A Randomized, Double-Blind, Placebo-Controlled, Multi-Site Phase 3 Study of the Efficacy and Safety of Manualized MDMA-Assisted Psychotherapy for the Treatment of Severe Posttraumatic Stress Disorder," facilitated

---

[57] *Id.*

[58] Feduccia, A., et. al, *Breakthrough for Trauma Treatment: Safety and Efficacy of MDMA-Assisted Psychotherapy Compared to Paroxetine and Setraline*, Frontiers in Psychiatry, vol. 10, Article 650, Sept. 12, 2019.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

by MAPS with approval by the FDA, began enrolling subjects in the Spring of 2018. The results were published in Nature Medicine on May 10, 2021, and are attached hereto as Exhibit G. The study found that "MDMA-assisted therapy is highly efficacious in individuals with severe PTSD, and treatment is safe and well-tolerated, even in those with comorbidities."[64] Specifically, of the 90 people who took part in the study, those who received MDMA during therapy experienced "a significantly greater reduction in the severity of their symptoms compared with those who received therapy and an inactive placebo."[65] Two months after treatment, "67 percent of participants in the MDMA group no longer qualified for a diagnosis of PTSD, compared with 32 percent in the placebo group."[66] Importantly, the study showed MDMA produced no serious adverse side effects.[67]

The study concluded that MDMA-assisted therapy "represents a potential breakthrough treatment that merits expedited clinical evaluation." Additional Phase 3 trials are currently underway in the United States, Canada, and Israel. These trials are the final stage before the FDA decides if it will approve MDMA to be prescribed for use alongside psychotherapy as a way of treating PTSD.

The significant therapeutic effects of MDMA as a way to effectively treat PTSD were unknown to the Commission in 2001 when the MDMA Guidelines were put in place, and strongly weigh in favor of revisiting the appropriateness of applying the MDMA Guidelines in this case.

---

[64] Ex. A at p 1031.
[65] Nuwer, R., *A Psychedelic Drug Passes a Big Test for PTSD Treatment*, New York Times, May 3, 2021 (updated November 11, 2021) (located at https://www.nytimes.com/2021/05/03/health/mdma-approval.html).
[66] *Id.*
[67] *Id.*

III.     **Additional Grounds for Variance in Accordance with 18 U.S.C. § 3553.**

As the Court is well aware, it must begin with a calculation of Mr. Doyle's

applicable guideline range, but this is only a first step. The guidelines are advisory only,

and the Court may not presume a guideline sentence is a reasonable sentence. *Gall v.*

*United States*, 552 U.S. 38, 50 (2007); *Rita v. United States*, 551 U.S. 338, 351(2007).

In using the Guideline range as the starting point in the analysis, the Court must do so

without placing a "thumb on the scale favoring a guideline sentence." *Freeman v. United*

*States*, 131 S. Ct. 2685, 2692, 180 L. Ed. 2d 519 (2011). There is "no longer a limit

[previously applicable to departures] on the variances from guideline ranges that a

district court may find justified under the sentencing factors set forth in [section

3553(a)]." *Irizzarry v. United States*, 553 U.S. 708, 715 (2008).

After calculating the sentencing guideline range, the Court must consider what

sentence is appropriate for the individual defendant in light of the statutory sentencing

factors in 18 U.S.C. § 3553(a). *Nelson v. United States*, 555 U.S. 350, 129 S.Ct. 890

(2009). The Court must impose a sentence sufficient but not greater than necessary to

comply with the purposes of 18 U.S.C. §3553(a)(2). The Court must also recognize that

imprisonment is not an appropriate means of promoting correction and rehabilitation. 18

U.S.C. §3582(a).

The factors the court must consider under 18 U.S.C. §3553(a)(2) include: (1) the

nature and circumstances of the offense; (2) the history and characteristics of the

defendant; (3) the need for the sentence imposed to reflect the seriousness of the

offense, promote respect for the law, provide just punishment for the offense, afford

adequate deterrence, protect the public; and provide the defendant with needed

educational or vocational training, medical care or other correctional treatment in the most effective manner; (4)  pertinent guidelines; (5)  pertinent policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution.

**History and Characteristics of the Defendant**

Much of Mr. Doyle's history is accurately summarized in the PSR. (Doc. 45 at pp. 7-12). Additionally, Mr. Doyle has abundant support in his community that include many friends and family members. As evidence of that support, attached hereto are seven letters attesting to Mr. Doyle's history and character outside the scope of this case. (Exs. H to N). In those letters, Mr. Doyle is described as someone with an "unusually high EQ and empathy that has enabled him to serve as not only a patient friend, but also a mentor." (Ex. H, letter from Michael Polcari). He is described as a "stalwart friend," (Ex. I, letter from Jennifer Polcari), "bright and optimistic," (Ex. J, letter from Robert Polcari), a "highly engaged young man capable of producing a strong body of work," (Ex. K, letter from Jason Mangler), "warm, respectful, and [who] speaks enthusiastically about his life and goals," (Ex. L, letter from Kristin Hoppman), and someone who feels "remorseful" concerning the conduct that brings him before this Court. (Ex. M, letter from Jhamba Sherpa). Mr. Doyle's parents, James and Beth Doyle, articulate the trauma he endured as a child witness to his twin brother's accident, which resulted in his sustaining a serious spinal cord injury. (Ex. N, letter from James and Beth Doyle).

Since his brother's accident rendering him a paraplegic, Mr. Doyle's mental health issues substantially increased and he began to self-medicate with illicit substances.  As a result of relying on illegal drugs to deal with his emotional issues, he

began to engage in some drug trafficking activities to ensure his access to the substances.  Mr. Doyle admits that this activity lead him down a dark and dangerous path which ultimately resulted in the position he finds himself today.  Instead of his drug use treating his mental health problems, it made it worse resulting in a spiral that could only result in a self-destructive end.  Mr. Doyle fully appreciates the seriousness of his conduct and accepts that a serious punishment must follow.  Regardless if the Court credits Mr. Doyle's variance argument based on the relative seriousness of MDMA to other controlled substances, he faces a substantial period of incarceration which will no doubt afford deterrence to other engaging in the same criminal conduct and provide just punishment for his offense.  Mr. Doyle looks forward to availing himself of Bureau of Prisons treatment programs during his incarceration, specifically the Residential Drug Abuse Program (RDAP).

Mr. Doyle has also suffered several events since his incarceration that will affect him for a long time to come.  Early in his confinement he found his cell mate unconscious in an attempt to hang himself.  Mr. Doyle sought help and save his cellmate, only have him successfully hang himself several months later with Mr. Doyle being the first person to find him.  This, in part, has been the source of Mr. Doyle's diagnosed PTSD.  Further, Mr. Doyle has had to weather the COVID-19 pandemic in what can only be described as the least socially distanced setting imaginable.  He has contracted COVID-19 twice and believes he continues to suffer on-going "long hauler" respiratory symptoms.

**Deterrence and The Need to Avoid Unwarranted Sentencing Disparities**

A lengthy sentence to incarceration is unnecessary "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). As Mr. Doyle's friends and family confirm in their letters of support, he feels deep shame and remorse for the crimes he has committed.  Far from returning to drug use and distribution, Mr. Doyle is laser focused on priming and refining his skills in the arena of cyber security so that upon release from incarceration he can put his skills to work in a productive and law abiding pursuit.

It is difficult to compare the sentences of similarly situated defendants in the District of Colorado who have pleaded guilty distribution of MDMA due to an abundance of restricted pleadings.   Although, the Sentencing Commissions recently released Judiciary Sentencing Information (JSIN) data tool which allows one to search defendants sentenced between 2016 to 2020 for various offenses.  A search of JSIN for similarly situated defendant to Mr. Doyle (i.e. criminal history category I, Final Offense Level 29, and for an "other drug[68]") resulted in 143 offender.  Within those parameters, the JSIN states, "For the 139 offenders (97%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 60 month(s) and the median length of imprisonment imposed was 60 month(s)." JSIN, *See* https://jsin.ussc.gov/analytics/saw.Dll?Dashboard.

## IV.     Conclusion

This Court is empowered to reject the MDMA Guidelines, and should do so in this case. The 500:1 ratio is unreasonably high since it lacks an empirical basis, ignores

---

[68] The JSIN gives the following options for drugs: powder cocaine, crack cocaine, heroin, marijuana, methamphetamine, or other.

sound determinations of relative harm, fails to consider recent development in the therapeutic uses of MDMA, and ultimately produces a sentence greater than necessary to achieve the statutory purposes of sentencing.

The Sentencing Commission seriously overestimated the harmfulness of MDMA at a time when little was known about the substance. National experience and scientific research in the intervening years demonstrate that MDMA is far less harmful than both the Commission and Congress had predicted and the current MDMA Guideline is unduly severe. The Commission's conclusions about the harmfulness of MDMA — and in particular the Commission's conclusion that MDMA is more harmful than cocaine — is simply incorrect and do not comport with empirical evidence and national experience. Moreover, significant recent developments surrounding the therapeutic benefits of MDMA-assisted psychotherapy to treat PTSD may well lead to the legalization of the drug for therapeutic reasons in the next two years.

Mr. Doyle submits that taking into consideration the sentencing factors cited in 18 U.S.C. Section 3553(a), including the offense conduct, his personal history and characteristics, the need for just punishment, deterrence, protection of the public, as well the flawed and overly punitive 500: 1 MDMA to marijuana guideline ratio, the circumstances in this case warrant a non-guideline sentence below the advisory guideline.

//

//

//

//

**WHEREFORE**, considering all the relevant factors enumerated by 18 U.S.C. §3553(a), Mr. Doyle respectfully requests that the Court impose a sentence of 72 months incarceration and 3 years of supervised release.

Respectfully submitted,

Dated: November 22, 2021

By: s/Martin Stuart
MARTIN STUART, *counsel for Mr. Doyle*
McDermott Stuart & Ward, LLP
140 E. 19th Ave., Suite 300
Denver, CO 80203
Phone 303-832-8888
mstuart@mswdenver.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


/s/ Martin Stuart
Martin Stuart