WASHINGTON
LEGISLATIVE OFFICE



<span style="color:red">EXHIBIT D</span>

March 19, 2012

Honorable Patti B. Saris, Chair
United States Sentencing Commission
One Columbus Circle, N.E.
Suite 2-500, South Lobby
Washington, D.C. 2002-8002

**Re:  ACLU Comments on Proposed Amendments to Sentencing Guidelines, Policy Statements, and Commentary due on March 19, 2012**

**AMERICAN CIVIL
LIBERTIES UNION**

WASHINGTON
LEGISLATIVE OFFICE
915 15th Street, NW, 6ᵀᴴ FL
WASHINGTON, DC 20005
T/202.544.1681
F/202.546.0738
WWW.ACLU.ORG

LAURA W. MURPHY
*DIRECTOR*

NATIONAL OFFICE
125 BROAD STREET, 18ᵀᴴ FL.
NEW YORK, NY 10004-2400
T/212.549.2500

**OFFICERS AND DIRECTORS**
SUSAN N. HERMAN
*PRESIDENT*

ANTHONY D. ROMERO
*EXECUTIVE DIRECTOR*

ROBERT REMAR
*TREASURER*

Dear Judge Saris:

 With this letter the American Civil Liberties Union ("ACLU") provides commentary on the Amendments to the U.S. Sentencing Guidelines ("Guidelines") proposed by the Commission on January 19, 2012. The American Civil Liberties Union is a non-partisan organization with more than half a million members, countless additional activists and supporters, and 53 affiliates nationwide dedicated to the principles of liberty, equality, and justice embodied in our Constitution and our civil rights laws.

 These comments address four issues that the Commission has asked for public comment on by March 19, 2012. First, the ACLU encourages the Commission to reject the adoption of the 500:1 MDMA marijuana equivalency ratio for N-Benzylpiperazine, also known as BZP, (BZP) and make substantial downward revisions to the MDMA marijuana equivalency ratio. Also, we urge the Commission to respect the principles of proportionality and due process in deciding how and whether to amend the Guideline for unlawfully entering or remaining in the country.  In addition, the ACLU opposes an approach to documentation used in the modified categorical analysis that is not related to the *Taylor-Shepard* line of Supreme Court cases; as well as an expansion of the definition of "crimes of violence" to include burglaries of non-dwellings.

 *I.     Issue for Comment: Whether The Commission Should Adopt The Same 500:1 Marijuana Equivalency for BZP That It Has Adopted for MDMA.*

 As the Commission contemplates whether to amend the Sentencing Guidelines applicable to offenses involving N-Benzylpiperazine or BZP, and if so whether to specify a marijuana equivalency for BZP in combination with other substances that reflects the current 500:1 marijuana equivalency ratio for MDMA (Ecstasy), the ACLU urges the Commission not only to reject the adoption of the 500:1 MDMA marijuana equivalency ratio but to furthermore make significant downward revisions of  the MDMA marijuana equivalency ratio to accurately reflect the current state of MDMA empirical research. As

several district courts have recently recognized,[1] scientific research now demonstrates that the 500:1 ratio is empirically unsound and grossly overstates the harms of MDMA.  As a result, adopting the same ratio for BZP as currently exists for MDMA would simply compound an existing problem with the Drug Equivalency Table.  Therefore, in determining whether MDMA is in fact the most analogous drug to BZP, the Commission should take this opportunity to revisit its scientifically flawed 500:1 MDMA marijuana equivalency ratio.

The MDMA Guideline is not based on empirical evidence but rather on erroneous and now-discredited beliefs about the harmfulness of MDMA.  The Commission did not take into account past sentencing practices when formulating the current MDMA Guideline.  Instead, as with the crack cocaine Guideline that the Supreme Court considered in *Kimbrough v. United States,*[2] the MDMA Guideline is the result of the Commission's response to a congressional directive issued in the midst of an uninformed panic about MDMA.

There are strong and unsettling parallels between the formulation of the Guidelines for MDMA and crack cocaine, respectively.  Guidelines for both substances were set in response to congressional directives rather than empirical evidence.  With respect to crack cocaine, Congress established harsh mandatory minimums to which the Commission keyed its crack cocaine Guideline, resulting in the much-maligned 100-to-1 crack-powder disparity that has since been abandoned.[3]  With respect to MDMA, Congress promulgated the MDMA Anti-Proliferation Act, which directed the Commission to increase penalties for MDMA.[4]

In both instances, emotional public frenzies drove Congress to act.  The "crack epidemic" was widely associated in the public mind with rising violent crime, "crack babies," and rampant addiction and overdose.  Just over a decade later, the sudden appearance of MDMA among teenagers and the development of a new "rave culture" sparked a similar, if less widely publicized, panic.[5]  The potential harms from MDMA were so drastically forecast that Congress directed the Commission to promulgate an "emergency amendment" to the MDMA Guideline, and the Commission, in its haste to respond, "shifted resources from other important policy development areas, such as implementing other congressional directives regarding stalking and sexual offenses against children."[6]

---

[1] *U.S. v. McCarthy*, 2011 WL 1991146 (S.D.N.Y. May 19, 2011) (rejecting the Commission's 500:1 MDMA-to-marijuana ratio); *U.S. v. Qayyem*, 2012 WL 92287 (S.D.N.Y. Jan. 11, 2012) (same); *U.S. v. Sanudo*, S.D. Fla., Case Number 11-cr-20559-Seitz (same); *U.S. v. Phan*, W.D. Wa., Case Number 2:10-cr-00027-RSM (same).

[2] 552 U.S. 85 (2007).

[3] *See Kimbrough*, 552 U.S. at 96-97.

[4] *See* MDMA Anti-Proliferation Act, Pub. L. No. 106-310 (2000).

[5] *See* Marsha Rosenbaum, *Ecstasy: America's New "Reefer Madness," Journal of Psychoactive Drugs* (Apr.-Jun. 2002); *Guidelines Stiffened for Selling MDMA*, Associated Press, Mar. 21, 2001 (quoting the acting director of the Office of National Drug Control Policy: "We never again want another 'crack epidemic' to blindside the nation").

[6] *America at Risk: The MDMA Threat, Hearing on MDMA Abuse Before the S. Comm. On Int'l Narcotics Trafficking*, 107th Cong. 46-47 (2001) (statement of Diana E. Murphy, Chair of the U.S. Sentencing Commission).

The Commission formulated the penalty increase by making policy judgments about the comparative harmfulness of cocaine, MDMA, and heroin, and concluded that MDMA's harmfulness fell somewhere in between that of cocaine and heroin.[7]  Based on this conclusion, the Commission amended the Drug Equivalency Tables in U.S.S.G. 2D1.1 to increase sentences for MDMA dramatically.   Prior to the amendment, one gram of MDMA was treated as equivalent to 35 grams of marijuana.  The 2001 amendment made the ratio *more than 14 times greater* by setting one gram of MDMA equal to 500 grams of marijuana.[8]  As a result, the length of the average MDMA sentence more than doubled.[9]  Disturbingly, this drastic change was not the product of careful empirical study, but rather the fuzzily-reasoned consequence of a congressional directive born out of a groundless and transient public hysteria.  Indeed, we know now that the dangers of MDMA were grossly overstated and founded on studies that have since been undermined.

As set forth in the Commission's 2001 Report to Congress, the current MDMA ratio is based on the fundamental premise that MDMA is more harmful than cocaine.  The Commission set the MDMA marijuana-equivalency ratio in the 2001 Guideline by explicit reference to the ratio for cocaine—200:1.

In December 2010, four expert MDMA witnesses testified about these premises in an extensive and unprecedented evidentiary hearing before U.S. District Judge Pauley for the Southern District of New York.[10]  At the evidentiary hearing, experts from both sides rejected outright the Commission's premise that MDMA is more harmful than cocaine.  As a result, the district court varied downward, rejecting the Commission's unsupportable 500:1 ratio.[11]  After the two-day hearing, the district court concluded that "the Commission's [2001] analysis of [MDMA's] impacts—particularly as compared to cocaine—was selective and incomplete."[12]  "[T]he Commission ignored several effects of cocaine that render it significantly *more* harmful than MDMA."[13]  The court explained that the evidence presented to it demonstrates that "[c]ocaine is [] far more addictive than MDMA."[14]  A government expert testified that "MDMA is 'one of the *least* addictive drugs.'"[15]  In addition, MDMA does not cause cardiovascular effects, respiratory effects, or neurological effects.[16]  By contrast, the Commission has found that cocaine causes all of these side effects.[17]

---

[7] *See* U.S. Sentencing Comm'n, *Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments* 5 (2001) [*hereinafter* MDMA Report].

[8] *Id.* at 5-6.

[9] *See id.* at 6 (noting increase in average sentence from just under 3 years to just over 6 years).

[10] *U.S. v. McCarthy*, 2011 WL 1991146 (S.D.N.Y. May 19, 2011).

[11] *Id.* at *5.

[12] *Id.* at *3.

[13] *Id.* (emphasis added).

[14] *Id.*; *see also* David Nutt et al., *Development of a rational scale to assess the harm of drugs of potential misuse*, 369 THE LANCET 1047, 1051 (2007).

[15] *Id.* (emphasis added).

[16] *Id.*

[17] United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* ("Cocaine Report") 65 (2007).

Furthermore, the court concluded that "the Commission's statement that cocaine is only a stimulant, while MDMA is both a stimulant and a hallucinogen, is without factual support and largely irrelevant.  Experts for both parties testified that MDMA is not properly characterized as a 'hallucinogen.'"[18]  The court added that "comparing pharmacological properties using broad descriptors like 'stimulant' and 'hallucinogen' says little—if anything—about the relative harm posed by a drug."[19]  Indeed, one of the experts at the *McCarthy* hearing testified that "[The Ecstasy Report] almost read[s] like this was supposed to be some sort of arithmetic; cocaine gets a score of one [because] it's a stimulant and then MDMA gets a score of two because it's a stimulant and a hallucinogen. . . . [T]hat's not using good science."[20]

Recent emergency room data confirms the district court's conclusion that MDMA is not more harmful than cocaine.  In fact, "cocaine is responsible for far more emergency room visits per year than MDMA."[21]  According to the U.S. Department of Health and Human Services, cocaine abuse was responsible for 553,530 emergency room visits, or 29.4% of drug-or alcohol-related emergency room visits in 2007, while MDMA was responsible for only 12,748 visits, or 0.7%.[22]  In *McCarthy*, the district court explained that "[e]ven controlling for the fact that cocaine is more commonly used than MDMA, cocaine is still approximately 16 times more likely to lead to hospitalization." [23]  A government witness in *McCarthy* testified that "MDMA fatalities are 'rare.'"[24]  In addition, in contrast to MDMA, cocaine trafficking is associated with substantial violence."[25]  MDMA is also less prevalent and therefore less threatening to society than cocaine.  As the district court observed, "there are far more cocaine-related cases in the federal criminal justice system than MDMA-related cases."[26]

The district court concluded that the Commission's 2001 MDMA analysis "disregard[ed] several significant factors suggesting that [MDMA] is in fact *less* harmful [than cocaine]."[27]  The court characterized the Commission's analysis as "opportunistic rummaging," commenting that it "is particularly stark when viewed against the Commission's rationale for adopting lighter sentences for MDMA than for heroin."[28]  As compared to heroin, the Commission concluded that five factors weighed in favor of lighter sentences for MDMA: (1) number of cases in the federal criminal justice system, (2) addiction potential, (3) emergency room visits, (4) violence

---

[18] *McCarthy*, 2011 WL 1991146  at *3.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] U.S. Department of Health and Human Services, *Drug Abuse Warning Network 2007: National Estimates of Drug–Related Emergency Department Visits* ("DAWN") 22 (2010).

[23] *McCarthy*, 2011 WL 1991146 at *3, *comparing* DAWN 22 with U.S. Department of Health and Human Services, *Results from the 2007 National Survey on Drug Use and Health* 252 (2008) (finding that 5,738,000 people over the age of 12 used cocaine in 2007, while 2,132,000 people used MDMA.).

[24] *Id.*

[25] *Id.* at *4.

[26] *Id. citing See* U.S. Department of Justice, Bureau of Justice Statistics, *2008 Statistical Tables* 9 (2008), *available at* http:// bjs.ojp.usdoj.gov/content/pub/html/fjsst/2008/fjs08st.pdf.

[27] *Id.* (emphasis in original).

[28] *Id.*

associated with use and distribution, and (5) secondary health effects.[29]  In *McCarthy*, the district court concluded that four of these five factors "also weigh in favor of lower sentences for MDMA than for cocaine."[30]  With respect to the remaining factor—secondary health effects— "MDMA and cocaine are similar."[31]  Thus, when evaluated against these objective criteria, the 500:1 MDMA-to-marijuana ratio—more than double the 200:1 cocaine-to-marijuana ratio—"is incompatible with the goal of uniform sentencing based on empirical data."[32]

Reviewing the record in *McCarthy* and conducting its own analysis of the evidence, another the district court came to the same conclusion in *U.S. v. Qayyem.*[33]  "[T]he 500:1 marijuana equivalency ultimately chosen by the Commission does not accurately reflect the then-existing research, or is it supported by more recent evidence."[34]

Despite overwhelming evidence that MDMA is less harmful than cocaine, the district courts in both *McCarthy* and *Qayyem* adopted the same marijuana equivalency ratio for MDMA as the Guidelines establish for cocaine—200:1.[35]  While these variances were a significant step in the right direction, contemporary empirical knowledge as explained in this extensive evidentiary record demonstrates that even 200:1 is far too great insofar as it does not accurately reflect the current state of MDMA research.  A 2007 study in *The Lancet*, a prominent British medical journal, assessed the relative harmfulness of illicit drugs based on the harmfulness of the drug to the individual user, the tendency of the drug to induce dependence, and the effect of drug use on society.[36]  MDMA ranked as the eighteenth most harmful out of twenty drugs, whereas heroin and cocaine ranked as first and second, respectively.[37]  Marijuana and ketamine (which the Guidelines treat as equivalent to marijuana for sentencing purposes[38]) also ranked as more harmful than MDMA, at eleventh and sixth, respectively.[39]  *The Lancet* study suggests that an empirically sound MDMA marijuana equivalency ratio would be 1:1.

It is clear that in formulating the current MDMA Guideline, the Commission seriously overestimated the harmfulness of MDMA at a time when little was known about the substance. Because the current MDMA Guideline is not based on empirical evidence and is instead the product of unsubstantiated fears and old research, the sentences recommended by the MDMA Guideline do not approximate sentences that are tailored to achieve the sentencing objectives in 18 U.S.C. § 3553(a).  National experience and scientific research in the intervening years

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at *3.

[32] *Id.* at *4.

[33] *U.S. v. Qayyem*, 2012 WL 92287, at *5 (S.D.N.Y. Jan. 11, 2012).

[34] *Id.*

[35] *McCarthy*, 2011 WL 1991146 at *5; *Qayyem*, 2012 WL 92287, at *8.

[36] David Nutt et al.*, Development of a rational scale to assess the harm of drugs of potential misuse*, 369 THE LANCET 1047 (2007).

[37] *Id.* at 1049-50.

[38] U.S. Sentencing Guidelines Manual § 2D1.1, app. note 10(E), at 543 (2009).

[39] *See* Nutt, 369 THE LANCET at 1049-50.

demonstrate that MDMA is less harmful than both the Commission and Congress had predicted and that the current MDMA Guideline sentencing ranges are unduly severe.

In sum, the ACLU would oppose the Commission's adoption of the 500:1 MDMA marijuana equivalency ratio for BZP because the MDMA ratio is itself empirically unsound and exceptionally problematic. As the Commission considers whether to equate BZP with MDMA for the purposes of determining its marijuana equivalency ratio, the ACLU urges the Commission to take this opportunity to ensure that the MDMA ratio is grounded in empirical evidence and reflects accurately contemporary understanding in the scientific community of MDMA. Specifically, the empirical evidence supports a 1:1 marijuana equivalency ratio, and we therefore recommend that the Commission at the very least adopt the pre-2001 ratio of 35:1.

"Congress established the Commission to formulate and *constantly refine* national sentencing standards."[40] In light of this responsibility, a significant downward variance from the draconian and scientifically unsupportable 500:1 marijuana equivalency ratio for MDMA is warranted in the interest of science, and of justice, and thus ACLU strongly encourages the Commission to revisit its MDMA ratio before expanding the reach of this flawed aspect of the Sentencing Guidelines.

**II.      *Issue for Comment: Proposed Amendment to Guideline for Unlawfully Entering or Remaining in the United States to Respond to a Circuit Conflict over Application of the Term "sentence imposed" in that Guideline when the Defendant Incurred Additional Sentencing After the Defendant was Deported.***

The ACLU also urges the Commission to respect the principles of proportionality and due process in deciding how and whether to amend Guideline § 2L1.2, "Unlawfully Entering or Remaining in the United States." The Commission's request for comment comes at a time of fiscal restraint when hundreds of millions of dollars are spent annually by the Departments of Justice and Homeland Security to carry out Operation Streamline, which requires criminal prosecution for immigration violators in designated sectors of the country. Streamline, estimated to cost $320 million annually in federal detention costs for Texas alone, has resulted in an explosion of resources used to punish people, most of whom could be deported at far lower cost and without a significant impact on public safety. As a result, Latinos have become the majority of convicted felons sent to federal prison.[41] The rate of criminal prosecutions for Border Patrol-referred immigration violations has increased eightfold since 2006.[42]

---

[40] *Kimbrough,* 552 U.S. at 108 (emphasis added).
[41] National Immigration Forum, *Border Enforcement Resource Guide*. (2011), 22, available at http://www.immigrationforum.org/images/uploads/2011/2011BorderEnforcementResourceGuide.pdf; Garance Burke, "Hispanics new majority sentenced to federal prison." Associated Press (Sept. 6, 2011).
[42] "Illegal Reentry Becomes Top Criminal Charge." TRAC Immigration (June 10, 2011), available at http://trac.syr.edu/immigration/reports/251/

As federal judges have observed, these prosecutions and sentences divert resources from the major drug and gun cases that are real border priorities. In Tucson, where the District of Arizona was forced last year to declare a judicial emergency because of its Streamline-heavy caseload, Judge Bernardo P. Velasco decried the $50,000 a week spent on mass hearings.[43] Judge Ruben Castillo, who served on this Commission, concluded that Streamline is "a use of criminal justice resources that doesn't make sense. . . . Are we just running numbers so it appears we're doing more on immigration and drug offenses or are we doing anything worthwhile? My question would be are we spending the money the right way, and there I would have a lot of concerns."[44]

The Commission should keep this context in mind when considering three of the proposed Guideline amendments which would reinforce the unnecessarily harsh and wasteful impact of Operation Streamline prosecutions. *First*, the Commission should follow the four circuit Courts of Appeals which have concluded with respect to Guideline § 2L1.2's Application Note 1(B)(vii) that "sentence imposed" does not include consequences, such as revocation of probation or supervised release, that occur subsequent to deportation.[45] Currently, the Application Note states without elaboration that "[t]he length of the sentence imposed includes any term of imprisonment given upon revocation of probation, parole, or supervised release."

When the Second Circuit issued its lone outlier decision holding that "sentence imposed" can include terms of imprisonment imposed subsequent to deportation, that court had only one contrary opinion to consider rather than today's four.[46] Moreover, the Second Circuit relied on what it termed a Tenth Circuit "discussion," dicta which did not later prevent the Tenth Circuit from ruling the other way on this question. As the Fifth Circuit has cogently explained, the Second Circuit's rule would lead to unjust results because it considers conduct beyond the initial crime and sentencing that led to deportation, even though the statutory scheme focuses on the initial crime and sentencing as the basis for punishing illegal reentry. In addition, the Second Circuit's rule treats like cases with unequal severity:

> [A] defendant who was sentenced to probation and deported, and who later reentered illegally, could have his probation revoked by state authorities if they discovered that he had reentered illegally. If he were sentenced to more than thirteen months' imprisonment and were later found in state custody by ICE officials, he could then be charged with illegal reentry and have his offense level enhanced by sixteen levels under the Government's [and the Second Circuit's]

---

[43] Tom Roberts, "A 'maddening' system, from courtrooms to shelters." National Catholic Reporter (July 1, 2011).

[44] Garance Burke and Amanda Lee Myers, "Nearly half of those sent to federal prison are Latinos." Associated Press (June 4, 2011).

[45] *United States v. Guzman-Bera*, 216 F.3d 1019 (11th Cir. 2000) (per curiam); *United States v. Bustillos-Pena*, 612 F.3d 863 (5th Cir. 2010); *United States v. Lopez*, 634 F.3d 948 (7th Cir. 2011); *United States v. Rosales-Garcia*, __ F.3d __, 2012 WL 375518 (10th Cir. 2012); *see also United States v. Jimenez*, 258 F.3d 1120 (9th Cir. 2001) (aggregation of revocation sentence applies only if "both statutory elements of an aggravated felony [the fact of conviction and a 'sentence imposed' of a particular length] were met prior to his deportation").

[46] *United States v. Compres-Paulino*, 393 F.3d 116 (2d Cir. 2004)

interpretation.  Meanwhile, a second defendant with an identical criminal history who also illegally reentered, but was fortunate enough to be apprehended by ICE before the state authorities, would have a much lower sentence for his guideline range, even if the state later revoked his probation based on his federal conviction. In contrast, under Bustillos's interpretation, both defendants would receive identical guideline ranges.[47]

We urge the Commission to adopt its first option presented on this issue, which "follows the approach of the Fifth, Seventh, [Tenth,] and Eleventh Circuits and specifies that a post-revocation sentence increase is included, 'but only if the revocation occurred before the defendant was deported or unlawfully remained in the United States.'"

### III. Issue for Comment: Proposed Amendment Presenting Options for Specifying the Types of Documents that may be Considered in Determining Whether a Particular Prior Conviction Fits within a Particular Category of Crimes for Purposes of Specific Guideline Provisions, and Related Issues for Comment.

With respect to the Commission's proposals regarding acceptable documents to consult under the Supreme Court's *Taylor-Shepard* line of cases,[48] the Commission's proposals are unnecessary and will lead to greater confusion at sentencing and more litigation, not less.[49] Expanding the universe of acceptable documents under the modified categorical approach – which is permitted only for divisible statutes of conviction – well beyond the narrow range approved by the Supreme Court risks imposing onerous sentencing enhancements based on unreliable records of alleged predicate facts underpinning convictions.  For example, parts of prior record proceedings that are "uncontradicted," in the language of the Commission's proposed Options B and D, do not necessarily constitute "records of the convicting court approaching the certainty of the record of conviction in a generic crime State."[50]  Criminal defendants plead to charges, not to the record as a whole, and accepting this standard would unfairly punish defendants who choose not to challenge extraneous claims in their record of conviction, perhaps because they (or their attorneys) reasonably believe that such claims have no bearing on their punishment.  The proposal also runs squarely contrary to *Shepard*'s clear rejection of an argument that the government advanced "emphasizing that the records of the prior convictions used in this case are in each instance free from any inconsistent, competing evidence on the pivotal issue of fact separating generic from nongeneric burglary."[51]  Indeed, the options' language is drawn from Justice O'Connor's dissenting opinion in *Shepard*, which six members of the Court rejected.

---

[47] Bustillos-Pena, 612 F.3d at 868.

[48] *Taylor v. United States*, 495 U.S. 575 (1990); *Shepard v. United States*, 544 U.S. 13 (2005).

[49] See Marjorie Meyers, Chair, Federal Defender Guideline Committee, Written Statement (Mar. 14, 2012), 6. While the Commission's Option A echoes the Supreme Court's list of acceptable documents, it does not limit use of these *Taylor-Shepard* documents to divisible statutes and should therefore be rejected as written.

[50] *Shepard*, 544 U.S. at 23.

[51] *Id.* at 22.

Similarly, the inclusion in Options C and D of a standard approving use of "any other parts of the record from the prior conviction, provided that the information in such other parts of the record has sufficient indicia of reliability to support its probable accuracy" waters down the stringent *Taylor-Shepard* test beyond recognition. "Probable accuracy" is a far cry from the "approaching the certainty of the record of conviction in a generic crime State" standard which the Commission should require – as does the Supreme Court in the *Taylor-Shepard* line of cases – before applying enhancements based on the modified categorical approach. Given the massive increases in punishment often associated with enhancements, due process in this context supports a searching inquiry into whether documents adequately reflect certainty such as the unequivocal admission by a defendant in a guilty plea, or confirmation by jury verdict. The "probable accuracy" of records, such as long-ago police reports which have not been put through the rigors of cross-examination, must not be accepted as justification for sentencing enhancements.

In addition, creating inconsistency between modified categorical analyses under the Guidelines and *Taylor-Shepard*, which addressed the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), and has also been applied to immigration law,[52] would be bad policy and invite extensive litigation, fomenting the "collateral trials" which *Taylor* and *Shepard* were designed to avoid. The Commission should not implement any of its proposed amendments in this issue area.

### IV. Issue for Comment: Proposed Amendment to Sec. 4B1.2 (Definitions of Terms Used in Section 4B1.1) to Respond to Differences Among the Circuits on When, if at all, Burglary of a non-dwelling qualifies as a Crime of Violence for purposes of the Guidelines, and related issues for comment.

Finally*, the Commission should not expand the Guidelines' definition of burglary as a "crime of violence" to include burglary of non-dwellings. The 16-level enhancement applicable to "crimes of violence" is incongruous with such burglaries, which by no means regularly involve force or the threat of force. As Marjorie Meyers, Chair of the Federal Defender Guideline Committee, has pointed out, sentencing courts are already compensating for the disproportionately harsh consequences imposed by § 2L1.2's leading enhancement. For example, in the Southern District of Texas with its enormous immigration docket, "34 percent of defendants facing the 16-level enhancement received a non-government-requested below-guidelines sentence – a striking contrast with the relatively low rate of departures in that district across all prosecutions."[53] The Commission should heed this trend of downward departures and decline to add burglaries of non-dwellings to the Guidelines' list of most serious offenses.

The combination of Operation Streamline and the Guidelines' already-weighty consequences for unlawful entry has led to massive correctional resources being used on offenders who, in large proportion, returned to the United States not to engage in criminal activity but to be

---

[52] *See, e.g.*, *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007).

[53] Meyers, *supra*, at 20.

reunited with family members,(many of whom are U.S. citizens), and to seek employment. While the Commission may not engage in policy reform to mitigate the number of immigration prosecutions, it is incumbent upon its members to act in accordance with sound principles of sentencing, including proportionality and respect for due process.  The ACLU respectfully urges the Commission not to adopt amendments – namely the Second Circuit's understanding of "sentence imposed;" an approach to documentation used in the modified categorical analysis that is unmoored from the Supreme Court's *Taylor* and *Shepard* line of cases; and an expansion of "crimes of violence" to include burglaries of non-dwellings – that violate these tenets.

The ACLU appreciates the opportunity to comment on the proposed amendments and other commentary to the Guidelines. If there are any comments or questions, please feel free to contact to Senior Legislative Counsel Jesselyn McCurdy at (202) 675-2307 or jmccurdy@dcaclu.org.

Respectfully submitted,

Laura W. Murphy
Director
Washington Legislative Office

Jesselyn McCurdy,
Senior Legislative Counsel
Washington Legislative Office

Joanne Lin
Legislative Counsel
Washington Legislative Office

Emma Andersson
Staff Attorney
Criminal Law Reform Project