WASHINGTON
LEGISLATIVE OFFICE



EXHIBIT E

July 15, 2013


Honorable Patti B. Saris, Chair
United States Sentencing Commission
One Columbus Circle, N.E.
Suite 2-500, South Lobby
Washington, D.C. 2002-8002


**Re: ACLU Comments in Response to Notice for Proposed (78 FR 32533) from the U. S. Sentencing Commission (USSC) Amendments to the Sentencing Guidelines for the Cycle Ending in May 2014**

Dear Judge Saris:

With this letter the American Civil Liberties Union ("ACLU") provides commentary on the Notice of Proposed Priorities and Request for Public Comment for the amendment cycle ending May 1, 2014.  The ACLU is a non-partisan organization with more than a half million members, countless additional activists and supporters, and 53 affiliates nationwide dedicated to the principles of liberty, equality, and justice embodied in our Constitution and our civil rights laws.

These comments address several of the issues outlined by the Commission where the ACLU believes the Commission can take substantial steps toward improving the fairness and proportionality of the Guidelines, promoting individualized consideration of specific offense conduct, and mitigating excessively punitive provisions that have promoted not only racial disparities in sentencing but also a sustained and costly increase in the number of individuals in the Federal Bureau of Prisons system. Our comments are focused on areas of specific interest to our organization.

## I.  Severity and Scope of Mandatory Minimum Penalties

The continuing impact of mandatory minimum sentencing is a major contributor to growing the federal Bureau of Prison (BOP) prison population. Federal courts are overwhelmed with staggering immigration and criminal caseloads.  BOP is operating at almost 40% over capacity and currently is over 25 percent of the Department of Justice's (DOJ) budget.[1]

AMERICAN CIVIL
LIBERTIES UNION
WASHINGTON
LEGISLATIVE OFFICE
915 15th STREET, NW, 6TH FL
WASHINGTON, DC 20005
T/202.544.1681
F/202.546.0738
WWW.ACLU.ORG

LAURA W. MURPHY
DIRECTOR

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
SUSAN N. HERMAN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

ROBERT REMAR
TREASURER

---

[1] ...ulie Samuels, Urban Institute *The Growth & Increasing Cost of the Federal Prison System: ...al Solutions* pgs.1 and2  (2012) (hereinafter LaVigne Urban Institute Report).

Research by the Urban Institute found that increases in federal law enforcement activity contributed to about 13% of the growth in the federal prison population between 1998 and 2010, though the effects were not consistent across offense types and time.  For example, heightened immigration enforcement and increased investigation of weapons offenses contributed to approximately one-tenth of the population growth. [2] This Urban Institute report concluded that increases in expected time served, specifically for drug offense, contributed to half of the prison population growth between 1998 and 2010.[3]  A recent report by the Congressional Research Service (CRS) found that the increase in amount of time inmates were expected to serve was probably partially the result of inmates receiving longer sentences and partially the result of inmates being required to serve approximately 85% of their sentences after Congress eliminated parole for federal prisoners.[4] The increased time served by drug offenders accounted for almost one-third of the total federal prison population growth between 1998 and 2010.[5]  Drug offenders continued to make up 42% of the BOP population despite increases in the number of immigration and weapon offenders during the same time period. [6]

The CRS report concluded that mandatory minimums, the federal government prosecuting more criminal cases and elimination of federal parole are major contributors to BOP overcrowding.[7]  One of the few ways to address this unsustainable growth in the BOP prison population is to address the length of time offenders are serving sentences in the federal system. The proposed expansion of safety valve relief and amending the drug quantity table, two of the Commission's proposed 2014 priorities, would in fact be one way to reduce the length of sentences without jeopardizing public safety.

Criminal sentences should be based on the nature of the offense and on relevant personal characteristics and circumstances of the defendant. Thus, the ACLU opposes mandatory sentences or any other sentencing scheme that unduly restricts a judge's ability to engage in individualized sentencing.[8]  We agree generally, however, with the Commission, that "if Congress decides to exercise its power to direct sentencing policy by enacting mandatory minimum penalties . . . such penalties should (1) not be excessively severe, (2) be narrowly tailored to apply only to those offenders who warrant such punishment, and (3) be applied consistently."[9]  Beginning from our express opposition to all mandatory minimum penalties and our endorsement of the Commission's three basic principles regarding such penalties as fostering incremental improvement over the current system, we support the Commission's following specific recommendations regarding mandatory minimums:

---

[2] Nathan James, Congressional Research Service, *The Federal Prison Population Buildup: Overview, Policy Changes, Issues, and Options* pg. 9  (January 22, 2013) (hereinafter CRS report)

[3] LaVigne Urban Institute Report at *5*

[4] CRS Report at 8.

[5] Kamala Mallik-Kane, Barbara Parthasarathy, William Adams, Examining Growth in the Federal Prison Population, 1998 to 2010 pg. 3 (2012)

[6] *Id.*

[7] *CRS report at 51*

[8] *See generally* Federal Public Defender, Southern District of Texas, Public Comment on USSC Notice of Proposed Priorities for Amendment Cycle Ending May 1, 2012.

[9] U.S.S.C. Report to Congress, *Mandatory Minimum Penalties in the Federal Criminal Justice System*, October 2011, at 345.

- Expanding the safety valve at 18 U.S.C. § 3553(f) to include offenders who receive two, or perhaps three, criminal history points under the guidelines.[10] See additional discussion of this recommendation below.
- Mitigating the cumulative impact of criminal history by reassessing both the scope and severity of the recidivist provisions at 21 U.S.C. §§ 841 and 960, including more finely tailoring the current definition of "felony drug offenses" that triggers the heightened mandatory minimum penalties.[11]
- Amending the mandatory minimum penalties established at 18 U.S.C. § 924(c) for firearm offenses, particularly the penalties for "second or subsequent" violations of the statute, to lesser terms.[12]
- Amending 18 U.S.C. § 924(c) so that the increased mandatory minimum penalties for a "second or subsequent" offense apply only to *prior* convictions to reduce the potential for overly severe sentences for offenders who have not previously been convicted of an offense under section 924(c).[13]
- Amending 18 U.S.C. § 924(c) to give the sentencing court limited discretion to impose sentences for multiple violations of section 924(c) concurrently to provide the flexibility to impose sentences that appropriately reflect the gravity of the offense and reduce the risk that an offender will receive an excessively severe punishment.[14]
- Finely tailoring the definitions of the predicate offenses that trigger the Armed Career Criminal Act's mandatory minimum penalty.[15]

Moreover, in the absence of the abolition of mandatory minimum penalties, the ACLU encourages the Commission to recommend that Congress enact a new statutory "safety valve" mechanism similar to the one available for certain drug trafficking offenders at 18 U.S.C. § 3553(f) for offenders convicted of other offenses carrying mandatory minimum penalties. The ACLU commends the Commission for its longstanding advocacy against unjust mandatory minimum penalties and encourages the Commission to pursue Congressional action.

## II. <u>Expansion of Current Safety Valve Eligibility</u>

The ACLU agrees with the Commission's 2011 recommendation that "Congress should consider . . . expanding the safety valve at 18 U.S.C. § 3553(f) to include certain non-violent offenders who receive two, or perhaps three, criminal history points under the federal sentencing guidelines."[16] We urge the Commission to reiterate this recommendation to Congress and to support an expansion of safety valve eligibility for non-violent offenders with even more than

---

[10] *Id.* at 355-56.

[11] *Id.* at 356.

[12] *Id.* at 364.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 365.

[16] Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, October 2011 at xxxi.

three criminal history points. In the absence of sweeping reform to mandatory minimum sentences, this eligibility expansion would permit judges to sentence more defendants with studied and thoughtful care given to the 18 U.S.C. § 3553(a) factors and to avoid unjust sentences caused by Congress's mistaken conflation of drug quantity with culpability in the Anti-Drug Abuse Act of 1986.

The sentencing of Jamel Dossie demonstrates the need for expanding safety valve eligibility. As summarized by Judge Gleeson in *U.S. v. Dossie*:[17]

> Jamel Dossie is a young, small-time, street-level drug dealer's assistant. No one could reasonably characterize him as a leader or manager of anything, let alone of a drug business. Like many young men in our community, he was in the drug business because he is a drug user. Dossie was born in the Brownsville section of Brooklyn. His father's illegal drug use caused a split with his mother before Dossie was even born; Dossie saw his father only three times per year before his father died in 2009. Dossie's mother was (and still is) a bus driver and she raised Dossie and his two siblings by herself.

> Dossie criminal history included a 2008 simple marijuana possession conviction, and a 2010 misdemeanor conviction for possessing heroin and crack. His sentences for those misdemeanors were only seven days in custody and probation, respectively, but each conviction nevertheless earned Dossie a criminal history point, terminating any chance he had for safety-valve relief

> Dossie on four occasions was a go-between in hand-to-hand crack sales. . . . In sum, Dossie sold a total of 88.1 grams, or 3.1 ounces, of crack. His sole function was to ferry money to the supplier and crack to the informant on four occasions for a total gain to himself of $140.[18]

The government charged Mr. Dossie with a violation of 21 U.S.C. § 841(b)(1)(B), triggering a five year mandatory minimum sentence that Congress intended for "'serious' traffickers."[19]  Even though Mr. Dossie's criminal history was entirely non-violent, because of existing criminal history limitations he was ineligible for the safety valve and the district court judge was forced to sentence him to five years.

Because of stories like Mr. Dossie's, the ACLU agrees with Judge Gleeson that the Commission's 2011 recommendation to expand safety valve eligibility to include non-violent offenders with "two, or perhaps three, criminal history points"[20] is insufficient. As Judge Gleeson explained, "[t]his recommendation is too tepid, given how easy it is for non-violent offenders to rack up criminal history points."[21]

In 2010, of the 1,717,064 people arrested for drug abuse violations, 46% (784,021) were

---

[17] *U.S. v. Dossie*, 851 F.Supp.2d 478 (E.D. N.Y. 2012).
[18] *Id.* at 481-82 (internal footnotes omitted).
[19] Report to Congress: *Mandatory Minimum Penalties in the Federal Criminal Justice System*, October 2011 at 24.
[20] *Mandatory Minimum Penalties*, October 2011 at xxxi.
[21] *Dossie*, 851 F.Supp.2d at 482 n.5.

arrested for marijuana possession.[22] The ease with which non-violent offenders get saddled with criminal history points is particularly true among African Americans, who police often disproportionately target for low-level non-violent drug offenses, and who – as a result – are disproportionately ineligible for safety valve relief.[23]   As the Commission has reported to Congress, in fiscal year 2010, "[m]ore than 75 percent . . . of Black drug offenders convicted of a drug offense carrying a mandatory minimum penalty have a criminal history score of more than one point under the sentencing Guidelines, which disqualifies them from application of the safety valve."[24]   By contrast, 53.6% of Hispanic offenders, 60.5% of white offenders, and 51.6% of other offenders had more than one criminal history point, thereby disqualifying them from safety valve relief. Thus, in addition to subjecting non-serious traffickers to harsh mandatory minimums, the safety valve's criminal history eligibility requirement magnifies racially disproportionate enforcement dynamics that occur at both the state and federal levels. No reasonable justification exists for maintaining an overly narrow safety valve.  Under the current eligibility for the safety valve, someone like Mr. Dossie, with a criminal history that includes only misdemeanor offenses, is ineligible for safety valve relief, thus causing an excessive and unjust sentence.

In sum, we urge the Commission to support a  significant expansion of safety valve eligibility for non-violent offenders with more than one criminal history point. Such an expansion would permit judges – in appropriate situations – to avoid imposing lengthy sentences on offenders who do not need and whose conduct does not justify serving long sentences  in federal prison. The current criminal history eligibility requirement results in "too many non-violent, low-level, substance-abusing defendants like Jamel Dossie los[ing] their claim to a future . . . ."[25]

### III. Amending the Drug Quantity Table in Section 2D1.1  of the Sentencing Guidelines Across Drug Types

The Commission's successful implementation of a two base offense level decrease for crack cocaine in 2007 demonstrates the administrative ease of implementing reductions to the sentencing guidelines. A significant, across-the-board reduction would, first, mitigate some of the worst harms of the mandatory minimums and their emphasis on quantity rather than actual criminal conduct as a one-size-fits-all proxy for culpability.   Under the current Guidelines, quantity-driven minimums and drug conspiracy liability can lead to defendants with minor or moderate roles in a drug operation with decades of prison time based on quantities of drugs they never handled, saw, or even knew about.   A two-level reduction in guideline sentencing would

---

[22] *The War on Marijuana in Black and White,* p. 14, available at http://www.aclu.org/files/assets/061413-mj-report-rfs-rel4.pdf

[23] *See generally*, *The War on Marijuana in Black and White,* p. 4 (documenting that "on average, a Black person is 3.73 times more likely to be arrested for marijuana possession than a white person, even though Blacks and whites use marijuana at similar rates. Such racial disparities in marijuana possession arrests exist in all regions of the country, in counties large and small, urban and rural, wealthy and poor, and with large and small Black populations.").

[24] *Mandatory Minimum Penalties,* October 2011 at 159-160.

[25] *Dossie,* 851 F.Supp.2d at 478 (internal quotation marks omitted).

still be able to incorporate mandatory minimum sentences, while lowering existing penalties and reducing cost and population in the BOP.

Furthermore, the ACLU encourages the Commission to review and amend the Drug Quantity Table in 2D1.1 because "the Guidelines ranges for drug trafficking offenses are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more. Instead, they are driven by drug type and quantity, which are poor proxies for culpability."[26] The ACLU calls the Commission's attention to *U.S. v. Diaz*,[27] in which Judge Gleeson detailed the "deep[] and structural[] flaw[s]" of the drug trafficking guidelines for heroin, cocaine, and crack offenses.[28]

The Guidelines' ranges for drug trafficking offenses are flawed at their root because they are not based on empirical data and national experience. When Congress established the Commission in the Sentencing Reform Act ("SRA") of 1984, it instructed the new body "to establish Guidelines that would reconcile the multiple purposes of punishment while promoting the goals of uniformity and proportionality."[29] The Commission's first job and starting point was "to ascertain the average sentences imposed in pre-Guidelines cases for particular categories of offenses."[30] Although the SRA did not require the Commission to base the Guidelines on average sentences from the previous regime,[31] the original Commission decided to base the Guidelines primarily upon typical, or average, actual past practice by analyzing 10,500 actual past cases in detail . . . along with almost 100,000 other less detailed case histories."[32]

However, while the "empirical data on drug trafficking offenses were gathered, [] they had *no* role in the formulation of the Guidelines ranges for drug trafficking offenses."[33] Before the first Commission could finish the first version of the Guidelines, Congress enacted the Anti-Drug Abuse Act of 1986 ("ADAA"), which "established a two-tiered scheme of mandatory minimum and enhanced maximum sentences that have now become central features of the federal drug sentencing landscape. The ADAA's five-year mandatory minimum, with a maximum sentence enlarged from 20 to 40 years, was specifically intended for the managers of drug enterprises, while the ten-year mandatory minimum, with a maximum sentence of life, was intended for the organizers and leaders."[34] Congress made the infamous mistake of having drug type and quantity, rather than role, trigger these harsh mandatory minimums. The quantity-driven mandatory minimums "created a problem for the original Commission. Those sentences were far more severe than the average sentences previously meted out to drug trafficking offenders. . . . The problem for the Commission was that it might not look right for a defendant to have a Guidelines range significantly lower than the minimum sentences mandated by

---

[26] *U.S. v. Diaz,* 2013 WL 322243 at *1 (E.D. N.Y. January 28, 2013).

[27] *Id.*

[28] *Id.*

[29] *Id.* at *3 (footnotes omitted).

[30] *Id.* (internal quotation marks and footnotes omitted).

[31] 28 U.S.C. § 994(m).

[32] *Diaz,* 2013 WL 322243 at *4 (internal quotation marks and footnotes omitted).

[33] *Id.*

[34] *Id.*

Congress in the ADAA."[35]  In response , the Commission "jettisoned its data entirely and made the quantity-based sentences in the ADAA proportionately applicable to *every* drug trafficking offense."[36]  These Guidelines are therefore based neither on empirical data nor national experience.

The Commission's mistake compounded Congress's mistake: "the Commission's linkage of the Guidelines ranges for drug trafficking offenses to the ADAA's weight-driven [mandatory minimum] regime has resulted in a significantly more punitive sentencing grid than Congress intended."[37]  Since *Booker*, "[t]he degree to which sentencing judges vary downward [from the drug trafficking ranges] provides a clue" to "[h]ow far out of line" these Guidelines are.[38] "In the period from December 11, 2007 to September 30, 2010, the average reduction from the bottom end of the applicable sentencing range in non-government sponsored below-range sentences was 39 months for crack offenses (32.7% reduction) and 27 months for cocaine and heroin offenses (respectively, 33.7% and 37.2% reductions).[[39]]  As a result, the average sentence for *all* crack cases has consistently been about 30 months below the applicable Guidelines range minimum, and the average sentences in cocaine and heroin cases have just as consistently been about 20 months below the bottom end of the applicable range.[[40]]"[41]  In short, "[t]he drug trafficking offense guideline was *born* broken" and "[m]any judges will not respect it because as long as the sentences it produces are linked to the ADAA's mandatory minimums, they will be too severe."[42]

"Perhaps the best indication that the Guidelines ranges for drug trafficking offenses are excessively severe is the dramatic impact they have had on the federal prison population *despite* the fact that judges so frequently sentence well below them.  In 1984, when the Sentencing Reform Act was passed, the federal prison population was 34,263.[[43]]  By 1994, it was 95,034;[[44]] by 2004, it was 180,328.[[45]] In 2013, there are 219,122 prisoners in the custody of the

---

[35] *Id.* at *5.

[36] *Id.* at *6.

[37] *Id.*

[38] *Id.* at *9.

[39] Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n, Prepared Testimony Before the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, United States House of Representatives (Oct. 12, 2011), at 33, 36, 43, *available at* http:// www.ussc.gov/Legislat ive_and_Public_Affairs/Congressional_Testimony_ and_ Reports/Testimony/20111012_Saris_Testimony.pdf.

[40] *Id.* at app. A; *see also* U.S. SENTENCING COMM'N, PRELIMINARY QUARTERLY DATA REPORT: 3RD QUARTER RELEASE, PRELIMINARY FISCAL YEAR 2012 DATA, THROUGH JUNE 30, 2012 37, fig. H (2012) (depicting the average sentence in all drug trafficking cases from Fiscal Years 2007 to 2011 to be about 20 months below the bottom end of the average Guidelines range minimum).

[41] *Diaz*, 2013 WL 322243 at *9.

[42] *Id.*

[43] U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN STATE AND FEDERAL INSTITUTIONS ON DECEMBER 31, 1984 12 tbl. 1 (1987).

[44] U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES, 1994 66 tbl. 5.1 (1996).

[45] U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2004 3 tbl. 3 (2005).

federal government.[46]"[47]   Thus, these Guidelines' excessive severity has contributed to the crisis of mass incarceration in the United States, which exacts alarming human and economic tolls on our society.

"DOJ recently acknowledged and bemoaned the ballooning costs of our federal prison system. It observed that our present 'budgetary environment' means that 'the current trajectory of corrections spending will lead to . . . imbalances in the deployment of justice resources.'[48] The continued increase in the federal prison population has already required DOJ to allocate ever more resources towards prisons, at the expense of other public safety priorities.  In Fiscal Year 2012, DOJ found its 'budget directed toward incarceration and detention grew by several hundred million dollars,' and that '[t]o pay for this within the overall budget limits meant that aid to state and local law enforcement, grants for prevention and intervention programs, and resources for prisoner reentry all had to be cut by millions of dollars.'[49] It warned that we 'are now on a funding trajectory that will result in more federal money spent on imprisonment and less on police, investigators, prosecutors, reentry, and crime prevention.'"[50]"[51]

Accordingly, the ACLU endorses Judge Gleeson's recommendations that: (1) The Commission should "use its resources, knowledge, and expertise to fashion fair sentencing ranges for drug trafficking offenses"[52] by "de-link[ing] the drug trafficking sentencing grid from the ADAA's weight driven mandatory minimum sentences and reduce the Guidelines ranges for these offenses;"[53] and (2) "In the meantime, because real people, families, and communities are harmed by the current ranges, [the Commission] should immediately lower them by a third."[54] Indeed, Judge Gleeson's recommendations have also been endorsed by Judge Bennett in the Northern District of Iowa.  In *U.S. v. Hayes*,[55] Judge Bennett concluded that Judge Gleeson's "comprehensive policy disagreement with the Guidelines for heroin, cocaine, and crack offenses [] also applies to methamphetamine offenses."[56]   Accordingly, Judge Bennett "follow[ed] Judge Gleeson's recommendation of reducing the penalty by one third for methamphetamine offenses in response to the fundamental problems with the methamphetamine Guidelines range."[57]

---

[46] U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES 8 App'x tbl. 1 (2012).

[47] *Diaz*, 2013 WL 322243 at *10.

[48] Letter from Lanny A. Breuer, Assistant Attorney General & Jonathan J. Wroblewski, Director, Office of Policy and Legislation, to Hon. Patti B. Saris, Chair, U.S. Sentencing Comm'n 5 (July 23, 2012), *available at* http://wwwjustice.gov/criminal/foia/docs/2012–annual–letter–to–the– U.S. SentencingCommission.pdf.

[49] Matthew Axelrod, *Testimony on Behalf of the U.S. Department of Justice before the U.S. Sentencing Commission, February 16, 2012,* 24 FED. SENT'G REP. 348, 348 (2012).

[50] *Id.*

[51] *Diaz*, 2013 WL 322243 at *10.

[52] *Id.* at *9.

[53] *Id.* at *11.

[54] *Id.* at *9.

[55] *U.S. v. Hayes*, --- F.Supp.2d ----, 2013 WL 2468038 (N.D. Iowa June 7, 2013); *see also U.S. v. Woody,* 2010 WL 2884918, *10 (D. Neb. July 20, 2010) (affording less deference to methamphetamine Guidelines range since it was "promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" and varying downward where quantity does not accurately reflect culpability).

[56] *Id.* at *9.

[57] *Id.* at *21.

It is long past time for the Commission to amend the drug quantity table across drug types to correct the devastating mistake of linking the Guidelines ranges for drug trafficking offenses to the ADAA's weight-driven mandatory minimum regime.  We encourage the Commission to carefully develop amendments to the drug quantity table and to take immediate remedial action in the meantime that will reduce the human and economic harms caused by these excessive Guidelines.

## IV. Recommendations from the Commission's December 2012 Report, *The Continuing Impact of U.S. v. Booker on Federal Sentencing*

- *Appellate Review*

The ACLU joins the Federal Defenders in strenuously opposing the Commission's proposal to "[d]evelop more robust substantive appellate review by requiring a presumption of reasonableness on appellate review of within range sentences, greater justification for sentences further outside the guideline range, and heightened review of sentences based on policy disagreements with the guidelines."[58]  As the Federal Defenders have explained, the Commission's proposal "would make review of guideline sentences less 'robust' and review of non-guideline sentences more 'robust,' contrary to the Supreme Court's holding that that all sentences must be reviewed only for abuse of discretion, 'whether inside, just outside, or significantly outside the Guidelines range,'[59]] and whether based on individualized circumstances or on a conclusion that the guideline itself fails to achieve § 3553(a) objectives."[60]][61]

In its decision in *Gall v. U.S.* two years after *Booker*, the Court stated that "while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences – whether inside, just outside, or significantly outside the Guidelines range – under a deferential abuse-of- discretion standard."[62] The Court went on to provide more precise guidance, pointing out that, in any given case, the appellate courts have the authority – indeed, the legal obligation – to consider both procedural and substantive issues:

> Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range. Assuming that the

---

[58] U.S.S.C. December 2012 Report to Congress *The Continuing Impact of U.S. v. Booker on Federal Sentencing*, Part A, at 9.

[59] *Gall v. U.S.,* 552 U.S. 38, 41 (2007); *see also Kimbrough v. U.S.*, 552 U.S. 85, 110 (2007); *Rita,* 551 U.S. at 351; *U.S. v. Booker*, 543 U.S. 220, 261 (2005).

[60] *Kimbrough,* 552 U.S. at 110; *Gall,* 552 U.S. at 51-53, 59-60.

[61] Amy Baron-Evans & Jennifer Niles Coffin, The Commission's Proposals to Restore Mandatory Guidelines Through Appellate Review, at 1.

[62] 52 U.S. 38, 41 (2007).

district court's sentencing decision is procedurally sound, the appellate court should consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness.[63]

The Court based its decision regarding the appropriateness of the abuse-of-discretion standard, quite logically, on "related statutory language, the structure of the statute, and the 'sound administration of justice,'" as well as "the past two decades of appellate practice in cases involving departures."[64] While critics have complained that the review standard announced by the Court in *Booker* and *Gall* has "severely degrad[ed] [courts of appeals'] ability to correct even gross outlier sentences,"[65] a careful review of the Court's rationale in reaching its decision, as well as the historical context in which the decision was made, reveals the appropriateness and ultimate workability of the abuse-of-discretion standard.

To begin with, despite some commentators' lamentations that *Booker* "stripped the courts of appeals of the power of de novo sentencing review,"[66] the fact is that the de novo standard was not inserted into § 3742(e) until 2003, just two years before *Booker* was decided. In the two decades prior to that, under the mandatory regime, appellate courts were directed to determine whether a sentence was "unreasonable" in light of the factors articulated in § 3553(a) – an inquiry entirely consistent with the abuse-of-discretion standard the Court found implicit in the SRA, even after the removal of § 3553(b)(1).

Two basic principles underlie the application of the abuse-of-discretion standard.[67] First, where a court's ruling is based, in large part, on the judge's unique perspective as the finder of fact, due deference should be given to the court's decision on appeal.[68] Hence, the Supreme Court has recognized that "deference was owed to the 'judicial actor . . . better positioned than another to decide the issue in question.'"[69] In the sentencing context, the abuse-of- discretion standard and the attendant level of deference to the district court are particularly appropriate. In addition to being more intimately familiar with the facts of the case simply by virtue of presiding over the proceedings, the sentencing judge has the opportunity to assess the credibility of witnesses, both at trial and during the sentencing phase, and to observe and interact directly with the defendant. As such, it makes perfect sense for appellate courts to extend significant deference to the district court's decision.

That said, it is worth noting that, in some important ways, the current review standard

---

[63] *Gall,* 552 U.S. at 597.

[64] *Booker*, 543 U.S. at 260-261.

[65] Otis, William. "The Slow, Sad Swoon of the Sentencing Suggestions." Engage: Vol. 12, Issue 1, p. 30.

[66] *Id.*

[67] *U.S. v. Tomko*, 562 F.3d 558, 565 (3d Cir. 2009).

[68] *See Id.* (noting that "deferential review is used when the matter under review was decided by someone who is thought to have a better vantage point than we on the Court of Appeals to assess the matter.") (internal citation omitted).

[69] *Koon v. U.S.*, 518 U.S. 81, 98, 99 (1996) (quoting *Pierce v. Underwood*, 487 U.S. 552, 559-560 (1988).

provides appellate courts with even more opportunities to alter or correct sentencing decisions than did the original scheme. Under the SRA, appellate courts gave significant deference to sentences within the applicable Guideline range, reviewing only for procedural error. With regard to sentences outside the Guideline range, the SRA imposed a reasonableness standard, using the § 3553(a) factors as the central point of reference, and required due deference to the district court's decision for the traditional reasons articulated above. But as *Gall* makes clear, the reasonableness inquiry now applies to all sentences – whether inside or outside the guideline range – and includes both procedural and substantive aspects.

The second justification for the use of the abuse-of-discretion standard is "the sheer impracticability of formulating a rule of decision for the matter in issue."[70] That is, because of the fact-specific nature of any given case, the district court is better positioned to come to reasoned decision, including in the sentencing context, than is the appellate court.[71]

It is no surprise then that the Supreme Court has found, even prior to *Booker*, that "[a] district court's decision to depart from the [mandatory] Guidelines. . . will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court."[72] The Court in *Koon* went on to add that deference to the district court stems from that court's "refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing."[73] Moreover, a de novo standard of review in this context would not provide sentencing courts with any consistent guidance going forward. "[A] district court's departure decision involves the consideration of unique factors that are little susceptible . . . of useful generalization, and as a consequence, de novo review is unlikely to establish clear guidelines for lower courts."[74] For these same reasons, the Court, in light of *Booker*, has determined that the abuse-of-discretion standard continues to be the most appropriate in the sentencing realm, notwithstanding the fact that the Guidelines are no longer mandatory. The Court has made clear that "[t]he sentencing judge is in a superior position to find facts and judge their import under §3553(a) in the individual case.  The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record."[75] In addition, "district courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do."[76]

The reasonableness standard is a familiar concept for federal appeals courts charged with reviewing sentencing decisions. The courts relied on a reasonableness inquiry prior to *Booker*, with the exception of the short timeframe between passage of the Feeney Amendment in 2003 (establishing a de novo review standard) and the Court's decision in 2005. As expected, given the mandatory nature of the Guidelines at that time, a greater percentage of sentences reviewed

---

[70] *Pierce*, 487 U.S. at 561-562.

[71] *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("'Fact-bound resolutions cannot be made uniform through appellate review, de novo or otherwise.'") (quoting *Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 936 (7th Cir. 1989)).

[72] *Koon*, 518 U.S. at 98.

[73] *Id.*

[74] *Id*. at 99 (internal citations omitted).

[75] *Gall*, 552 U.S. at 51.

[76] *Id*. at 52. *See also Rita v. U.S.*, 551 U.S. 338, 357-358 (2007).

by appellate courts pre-*Booker* were within the applicable Guideline range, notwithstanding sentencing courts' ability to depart from the Guidelines under certain circumstances.[77] To the extent that there has been an increase in sentences outside the Guidelines range after *Booker*, appellate courts have embraced their increased opportunities to assess the reasonableness of sentencing court decisions, and indeed to strike down sentences outside the applicable range on the ground either that they were procedurally deficient or substantively unreasonable – a trend that has not been to the benefit of defendant-appellants. From a results-oriented perspective, the majority of sentences today end up within the Guideline range, just as they did pre-*Booker*.

Indeed, despite the suggestion that criminal offenders are receiving a windfall as a result of the changes to the appellate procedure, the abuse-of-discretion standard applies with equal force whether the court sentences a defendant above, below, or within the guideline range. Hence, to the extent that this standard of review renders the court's sentencing decision more difficult to overturn on appeal, all parties are on equal ground. The Commission reports that, of the 60 sentences the government appealed in fiscal year 2012,[78] it boasted a 66.6% success rate.[79] Defendants challenging their sentences have been much less successful. Of the 5,928 sentences appealed by defendants in fiscal year 2012, the defendant prevailed in just 14.4% of the cases.[80] Moreover, the majority of sentences in 2012 – 54.4% – fell within or above the now-advisory Guideline range,[81] which flies in the face of the notion that *Booker* and *Gall* have applied undue pressure on judges to give undeserving defendants the benefit of downward departures. And while 45.6% of total sentences fell below the Guideline range in 2012, approximately 61% of below Guidelines sentences were government sponsored.[82] These numbers suggest that, rather than giving defendants the upper hand, the current appellate review standard is working to the great advantage of the federal government.

The Court acknowledges that the "reasonableness" standard will not necessarily lead to the kind of uniformity in sentencing that Congress sought in enacting the SRA. However, "Congress wrote the language of the appellate provisions to correspond with the mandatory system it intended to create."[83] As such, and given that the Guidelines have been deemed advisory, the question becomes "which alternative adheres more closely to Congress's original objective: (1) retention of sentencing appeals, or (2) invalidation of the entire Act, including its appellate provisions?"[84] Although the former will not guarantee absolute uniformity in sentencing, appellate courts' reasonableness determination, based on an abuse-of- discretion standard, "would tend to iron out sentencing differences," while the latter would leave parties with no opportunity to appeal at all. Additionally, appellate review under the current standard

---

[77] Otis, at 28.

[78] United States Sentencing Commission, 2012 Sourcebook of Federal Sentencing Statistics, tbl. 56A. The 2012 Sourcebook notes that, of the 9.755 appeals cases, 3,788 were excluded due to one of the following reasons: type of appeal was "conviction only" (2,031), "Anders Brief" (1,636), or "unknown" (121). Of the 5,967 remaining cases, 5,907 were excluded as the appeal was by the defendant only.

[79] 2012 Sourcebook of Federal Sentencing Statistics, tbl. 56A.

[80] *Id.*, tbl. 56.

[81] *Id.*, tbl. N.

[82] *Id.*

[83] *Booker*, 543 U.S. at 263.

[84] *Id.*

works in tandem with the continued efforts of the Sentencing Commission to collect sentencing information from around the country, research salient legal issues, and revise the Guidelines as necessary, thus encouraging uniformity in sentencing while also allowing district courts to consider the specific circumstances and characteristics surrounding individual defendants.[85]

At bottom, the majority of defendants wishing to challenge their above- or within-Guidelines sentence continue to face very long odds on appeal given the current standard of review. Nevertheless, in light of the fact that the abuse-of-discretion standard gives significant weight to the sentencing courts' decisions, encourages adherence to the Guidelines by permitting appellate courts to maintain the presumption of reasonableness with regard to within-Guideline sentences, and thereby discourages frivolous appeals, it is difficult to quarrel with the Court's conclusion that the current standard is the most appropriate in this context.

While it is understandable (though ironic) that prosecutors and others may now, post-*Booker*, find the abuse-of-discretion standard to be a frustrating impediment to successful appeals – a frustration long endured by criminal defendants – the suggestion that the standard is therefore unworkable or unfair is not supported by the statistics.  Indeed, the better question seems to be how a *de novo* standard of review, as proposed by some critics, could be squared with the Court's consistent and well-reasoned conclusion, as highlighted above, that sentencing courts maintain a unique and significant advantage over appellate courts in determining the appropriate sentence for criminal defendants.  At best, such a standard would encourage duplicative efforts by district and appellate courts. At worst, it would allow appellate judges, far removed from the original proceedings and relying solely on a paper record, to substitute their judgment for that of the sentencing judge who had first-hand access to the proceedings, a phenomenon long frowned upon in our system of justice.  For these reasons, in addition to those discussed in great depth by the Federal Defenders,[86] the ACLU encourages the Commission to reconsider its appellate review proposal.

- ***Statutory Changes that Would Curtail Judicial Discretion at Sentencing***

The Commission seeks comment on three proposals it made to Congress in its December 2012 *Booker* Report: (1) That Congress should enact into law the three-step guideline the Commission promulgated in 2010, which states that the sentencing court *shall* consider in every case all of the policy statements and commentary prohibiting or discouraging sentences outside the Guideline range, and only then consider the §3553(a) factors taken as a whole;[87] (2) That courts be required to give the Guidelines "substantial weight;"[88] and (3) That Congress reconcile 28 U.S.C. § 994(d) and (e), which it interprets as requiring the Commission to restrict the manner in which certain offender characteristics can be considered in the guidelines with 18 U.S.C. § 3553(a), which the Supreme Court interprets as requiring courts to consider broadly offender

---

[85] *See Kimbrough v. U.S.,* 552 U.S. 85, 107 (2007) (citing *Booker* and noting that "advisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help to 'avoid excessive sentencing disparities.'").

[86] *See* Amy Baron-Evans & Jennifer Niles Coffin, *The Commission's Proposals to Restore Mandatory Guidelines Through Appellate Review.*

[87] U.S.S.C. December 2012 Report to Congress *The Continuing Impact of U.S. v. Booker on Federal Sentencing*, Part A at 114.

[88] *Id.*

characteristics.[89]

The ACLU joins the Federal Defenders[90] in opposing all three of these proposals. The Commission's "proposals would eviscerate judges' authority to consider the history and characteristics of the defendant and mitigating circumstances of the offense, and would suppress disagreement with the guidelines and policy statements, all contrary to Supreme Court law."[91] Working together, these three proposals would constrain judges far more than the Constitution permits: the Commission's proposals would create the equivalent of "the sentencing framework that the Supreme Court struck down."[92]  Indeed, Judges, probation officers, and practitioners overwhelmingly endorse the current advisory Guidelines system, which is characterized by far greater flexibility than the system that the Commission's proposals would create.

As the Federal Defenders documented, "[a]t the Commission's hearing in February 2012 on 'Federal Sentencing Options after *Booker*,' where its current proposals were previewed, nearly every witness, including witnesses for the Judicial Conference, and even some Commissioners, noted that the proposals posed significant constitutional problems and would engender disruptive and costly litigation.  No one was able to identify a benefit that would outweigh those problems.[[93]] Witnesses who commented on the Commission's proposals to prevent individualized sentencing said that such legislation would be unfair (particularly to racial minorities), bad public policy (in ignoring differences among defendants that are relevant to the need for incapacitation), and/or unconstitutional (on Sixth Amendment, separation of powers, and/or equal protection grounds).[[94]]"[95]

---

[89] *Id.* at 113.

[90] Amy Baron-Evans & Thomas W. Hillier, *The Commission's Legislative Agenda To Restore Mandatory Guidelines*, April 16, 2013.

[91] *Id.* at 1.

[92] *Id.* at 11.

[93] *See*, *e.g.*, Transcript of Public Hearing Before the U.S. Sentencing Comm'n, Washington, D.C., at 94-95 (Commissioner Friedrich); *id*. at 166-67 (Judge Howell); *id*. at 62 (Feb 16, 2012) (Judge Barbadoro); *id*. at 88-89, 95 (Associate Deputy Attorney General Matthew Axelrod); *id*. at 107-09, 167-69 (Professor Klein); *id*. at 169-71 (Judge Lynch); *id*. at 171 (Judge Davis); *id*. at 116-20, 171-73 (Federal Defender Henry Bemporad); *id*. at 363-72 (David Debold, Chair, Practitioners' Advisory Group); *id*. at 380-93 (James Felman, American Bar Association); Statement of Chief United States Circuit Judge Theodore McKee on Behalf of the Judicial Conference Before the U.S. Sent'g Comm'n, Washington, D.C., at 6-19 (Feb. 16, 2012).  *But see id*. at 174 (Matthew Miner acknowledging constitutional concerns but urging the Commission to "take some risks.").

[94] *See* Federal Sentencing Options Hearing Tr. at 154-56 ("I'd be surprised if a rational Congress would seriously do that.") (remarks of Judge Lynch); *id*. at 108, 141, 152-53 (explaining that it would raise a separation of powers problem if Congress told judges they could not consider matters important to judging) (remarks of Professor Klein); *id*. at 156 (opining that a pure "just deserts system" would lead the Court to change its selective prosecution doctrine) (remarks of Judge Davis); *id*. at 157-58 (such a system would leave "only the guidelines standing" and thus "raise Sixth Amendment issues") (remarks of Henry Bemporad).  *See also* Henry J. Bemporad, Fed. Pub. Defender for the W. Dist. of Tex., Statement Before the U.S. Sentencing Commission 4-10 (Feb. 16, 2012); Raymond Moore, Fed. Pub. Defender for the Dists. of Colo. and Wyo., Statement Before the U.S. Sentencing Commission 20-25 (Feb. 16, 2012); Susan R. Klein, Professor, Univ. of Tex., Statement Before the U.S. Sentencing Commission 9-11 (Feb. 16, 2012); David Debold, Chair, Practitioners Advisory Grp., Statement Before the U.S. Sentencing Commission 8-9 (Feb. 16, 2012); Lisa Wayne, President, Nat'l Ass'n of Criminal Def. Lawyers,

Thus, in opposing these three proposals, the ACLU joins a sizable chorus of dissenters who represent a diverse range of perspectives. In light of this overwhelming opposition, the Commission should abandon these proposed statutory changes. Instead, the Commission should urge federal district courts to harmonize *Kimbrough* and *Gall* and embrace the approach applied by a handful of courts around the country in which courts first determine whether they have any policy-based disagreements with the sentencing Guidelines as authorized by Kimbrough and, if so, determine a new sentencing range, and only then take into account individual offender characteristics under 18 U.S.C. § 3553(a). Such a process would serve a number of important purposes. It would (1) promote consistency within sentencing procedure and harmony within sentencing law; (2) ensure that the parties secure the benefits of the sentencing court's discretion along each of the dimensions the Supreme Court has identified as appropriate for judicial consideration in the new advisory-Guideline regime; and (3) encourage judicial clarity about the bases for variance, thus helping to identify areas of the Guidelines that judges believe need reform and facilitating the dialogue between courts and the Commission that Congress expected when it enacted the SRA, and that the Supreme Court has repeatedly emphasized as a worthy by-product of the advisory-Guideline system.[96]

## V.  Statutory and Guideline Definitions

The ACLU encourages the Commission to recommend that Congress make statutory changes to the definitions for "crime of violence,"[97] "violent felony,"[98] and "aggravated felony."[99] The existing definitions sweep far too broadly, capturing conduct that is not actually violent.[100] As a first step, Congress should narrow its definition of "violence" to exclude mere risk of force. Indeed, "[b]y defining 'violence' by reference to the risk of physical force against the property of another and the serious potential risk of physical injury to another, sections 16 and 924(e) of Title 18 represent an unprecedented expansion in the concept of violence.[[101]] Rather than focus on actual violence, or even threats of violence, the analysis turns on the risk of

---

Statement Before the U.S. Sentencing Commission 6-7 (Feb. 16, 2012); Michael Tonry, Professor of Law and Public Policy, U. of Minn., Statement Before the U.S. Sentencing Commission 1 (Feb. 16, 2012).

[95] *The Commission's Legislative Agenda To Restore Mandatory Guidelines* at 2.

[96] *See* Scott Michelman & Jay Rorty, *Doing* Kimbrough *Justice: Implementing Policy Disagreements With the Federal Sentencing Guidelines*, 45 SUFFOLK U. L. REV. 1083, 1089 (2012).

[97] 18 U.S.C. § 16 defines "crime of violence" as: "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[98] 18 U.S.C. § 924(e)(2)(B) defines "violent felony" as "any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that-- (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another. . . ."

[99] 8 U.S.C. § 1101(a)(43)(F), defining "aggravated felony" incorporates crimes of violence as defined in 18 U.S.C. § 16 (but not including a purely political offense) for which the term of imprisonment is at least one year.

[100] Federal Public Defender, Southern District of Texas, Public Comment on USSC Notice of Proposed Priorities for Amendment Cycle Ending May 1, 2013, at 11.

[101] *See* Alice Ristroph, *Criminal Law in the Shadow of Violence*, 62 ALLR 571 (2011).

violence. The net result has been an explosion in the crimes that qualify as 'violent,'[102]which in turn fuels the growth in the prison population."[103] The statutory definitions at issue should be limited to felonies that actually involve the use or attempted use of force against another person—the hypothetical risk of force against people or property should be excluded. These overbroad definitions result in excessively severe sentences that fail to reflect many defendants' actual conduct and culpability. Therefore, the Commission should recommend that Congress significantly narrow the definitions of these terms.

## VI. Amend the Policy Statement Pertaining to "Compassionate Release"

In the Sentencing Reform Act of 1984, Congress authorized the Federal Bureau of Prisons (BOP) to request that a federal judge reduce an inmate's sentence for "extraordinary and compelling" circumstances - also known as compassionate release. The request can be based on either medical or non-medical conditions that the judge could not reasonably have foreseen at the time of sentencing.

While it demands consistency and finality of sentences, the criminal justice system allows for judges to take a second look at the fairness of punishment to ensure that a criminal sentence continues to serve the purpose of justice. Even Congress recognized the importance of ensuring that justice be balanced with mercy when it created compassionate release.[104] This Commission was assigned the responsibility to determine the definition of "extraordinary and compelling" circumstances.

However, BOP has underutilized its compassionate release authority under 18 U.S.C. § 3582(c)(1)(A)(i). After this Commission recently promulgated a more expansive interpretation of "extraordinary and compelling," BOP issued regulations reiterating a very narrow "terminal illness/total disability" basis for seeking reduction of a prison term under this statute that is inconsistent with this Commission's definition. This Commission's definition does not require "total" disability and also allows for consideration of a family members death or inability to care for children as a basis for a sentencing reduction . In its policy statement, the Commission could once again clarify that terminal illness and total disability are not necessary for BOP to approve request for compassionate release.

---

[102] The focus on "risk" rather than actual force or threats of force in the violent crimes analysis has resulted in numerous state crimes being used to enhance federal sentences that would not be considered "violent" under any common sense use of the term. *See, e.g., United States v. Herrick,* 545 F.3d 53 (1st Cir. 2008) (homicide by negligent operation of motor vehicle); *United States v. Alderman,* 601 F.3d 949 (9th Cir. 2010) (Washington first degree theft a.k.a. "pick-pocketing"); *United States v. Mobley,* 40 F.3d 688 (4th Cir. 1994) (pickpocketing under District of Columbia statute); *Sykes v. United States,* 131 S. Ct. 2267 (2011) (fleeing a police officer by vehicle); *United States v. Alfaro-Gramajo,* 283 Fed. Appx. 677 (11th Cir. 2008) (burglary of a vehicle); *United States v. Lopez-DeLeon,* 513 F.3d 472 (5th Cir. 2008) (statutory rape).

[103] Federal Public Defender, Southern District of Texas, Public Comment on USSC Notice of Proposed Priorities for Amendment Cycle Ending May 1, 2013, at 15 (internal footnote omitted).

[104] FAMM and Human Rights Watch, THE ANSWER IS NO: Too Little Compassionate Release in US Federal Prisons (December 2012)

BOP has administered its far narrower test to return to court in fewer than 30 cases each year.[105]  BOP should provide sentencing judges with many more opportunities for resentencing under these circumstances, which would not only allow for resource saving sentence reductions, but spare the BOP medical care costs for prisoners who need no further incarceration.

Also, BOP's compassionate release policy could benefit from an improved process for basic procedures to ensure fair and reasoned decision-making.[106] In a recent report, the Department of Justice Office of Inspector General found that:

> BOP does not have clear standards on when compassionate release is warranted, resulting in *ad hoc* decision making. The BOP's regulations and Program Statement provide no criteria or standards to use in evaluating whether a medical or nonmedical circumstance qualifies for consideration. As a result, we found that BOP staff had varied and inconsistent understandings of the circumstances that warranted consideration for compassionate release.[107]

Although the Department of Justice (DOJ) recently shortened the process for approval of compassionate release motions by eliminating the need to have the regional BOP Director's approval,[108] there is still opportunity to improve the process, but BOP has to be willing to use its authority.

In addition, DOJ has consistently acknowledged that the ever-expanding BOP budget, approximately almost $6.2 billion, is unsustainable.  According to the Department's Inspector General, the growing and aging federal prison population will continue to consumes a larger portion of the Department's budget, contribute to overcrowding that jeopardizes the safety of prisoners, and may force budget cuts to other DOJ Divisions.[109]  One step that BOP can take to reduce federal prison expenditures would be to ensure that compassionate release is implemented as Congress intended.[110]

## VII.   Reduction of the MDMA-to-Marijuana Equivalency Ratio

The ACLU reiterates its recommendation that the Commission revisit its 500:1 MDMA marijuana equivalency ratio.  The MDMA ratio, as several district courts have recently recognized, is not empirically sound.[111]  The 500:1 MDMA ratio needs to be drastically reduced

---

[105] *Id* at 2

[106] *Id.* at 9

[107] U.S. Department of Justice Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013)

[108] U.S. Department of Justice Federal Bureau of Prisons Program Statement, *Compassionate Release; Procedures for Implementation of 18 U.S.C. 3582 (c)(1)(A) & 4205(g)* (April 22, 2013)

[109] FAMM and Human Rights Watch at 4

[110] *Id.*

[111] *U.S. v. McCarthy*, 2011 WL 1991146 (S.D.N.Y. May 19, 2011) (rejecting the Commission's 500:1 MDMA-to-marijuana ratio); *U.S. v. Qayyem*, 2012 WL 92287 (S.D.N.Y. Jan. 11, 2012) (same); *U.S. v. Sanudo*, S.D. Fla., Case Number 11-cr-20559-Seitz (same); *U.S. v. Phan*, W.D. Wa., Case Number 2:10-cr-00027-RSM (same).

in order to reflect the current state of MDMA research accurately and be grounded in empirical evidence.

The MDMA Guideline is not based on empirical evidence but rather on erroneous and now-discredited beliefs about the harmfulness of MDMA. The Commission did not take into account past sentencing practices when formulating the current MDMA Guideline. Instead, as with the crack cocaine Guideline that the Supreme Court considered in *Kimbrough v. United States*,[112] the MDMA Guideline is the result of the Commission's response to a congressional directive that was issued in the midst of an uninformed panic about MDMA.

There are strong parallels between the formulation of the Guidelines for MDMA and the development of the crack cocaine Guidelines. Guidelines for both substances were set in response to congressional directives, rather than empirical evidence. With respect to crack cocaine, Congress established harsh mandatory minimums for the substance, and the Commission keyed its crack cocaine Guideline to those mandatory minimums, resulting in the 100-to-1 crack-powder disparity.[113] With respect to MDMA, Congress promulgated the MDMA Anti-Proliferation Act, which directed the Commission to increase penalties for MDMA.[114]

Emotional public frenzies over crack cocaine and MDMA drove Congress to act. The "crack epidemic" was widely associated in the minds the public with rising violent crime, "crack babies," and rampant addiction and overdose. Just over a decade later, the sudden appearance of MDMA among teenagers and the development of a new "rave culture" sparked a similar panic.[115] The potential harms from MDMA were so drastically forecast that Congress directed the Commission to promulgate an "emergency amendment" to the MDMA Guideline, and the Commission, in its haste to respond, "shifted resources from other important policy development areas, such as implementing other congressional directives regarding stalking and sexual offenses against children."[116]

The Commission formulated the penalty increase by making policy judgments about the comparative harmfulness of cocaine, MDMA, and heroin, and it concluded that MDMA's harmfulness fell somewhere in between that of cocaine and heroin.[117] Based on this conclusion, the Commission amended the Drug Equivalency Tables in U.S.S.G. 2D1.1 to increase sentences for MDMA dramatically. Prior to the amendment, one gram of MDMA was treated as equivalent to 35 grams of marijuana; the 2001 amendment set one gram of MDMA equal to 500 grams of marijuana.[118] As a result, the length of the average MDMA sentence more than

---

[112] 552 U.S. 85 (2007).

[113] *See Kimbrough*, 552 U.S. at 96-97.

[114] *See* MDMA Anti-Proliferation Act, Pub. L. No. 106-310 (2000).

[115] *See* Marsha Rosenbaum, *Ecstasy: America's New "Reefer Madness," Journal of Psychoactive Drugs* (Apr.-Jun. 2002); *Guidelines Stiffened for Selling MDMA*, Associated Press, Mar. 21, 2001 (quoting the acting director of the Office of National Drug Control Policy: "We never again want another 'crack epidemic' to blindside the nation").

[116] *America at Risk: The MDMA Threat, Hearing on MDMA Abuse Before the S. Comm. On Int'l Narcotics Trafficking*, 107th Cong. 46-47 (2001) (statement of Diana E. Murphy, Chair of the U.S. Sentencing Commission).

[117] *See* U.S. Sentencing Comm'n, *Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments* 5 (2001) [*hereinafter* MDMA Report].

[118] *Id.* at 5-6.

doubled.[119]   This change was not the product of careful empirical study; it was the fuzzily-reasoned consequence of a congressional directive born out of a groundless and transient public frenzy.  The dangers of MDMA were grossly overstated and founded on studies that have since been undermined.

As set forth in the Commission's 2001 Report to Congress, the current MDMA ratio is based on the fundamental premise that MDMA is more harmful than cocaine.  The Commission set the MDMA marijuana equivalency ratio in the 2001 Guidelines by explicit reference to the ratio for cocaine—200:1.

In December 2010, four expert MDMA witnesses testified about these premises in an extensive evidentiary hearing before U.S. District Judge Pauley for the Southern District of New York.[120]   At the evidentiary hearing, experts from both sides rejected outright the Commission's premise that MDMA is more harmful than cocaine.  As a result, the district court varied downward, rejecting the Commission's unsupportable 500:1 ratio.[121]

After the two-day hearing, the district court concluded that "the Commission's [2001] analysis of [MDMA's] impacts—particularly as compared to cocaine—was selective and incomplete."[122]  "[T]he Commission ignored several effects of cocaine that render it significantly *more* harmful than MDMA."[123]

The court explained that the evidence presented to it demonstrates that "[c]ocaine is [] far more addictive than MDMA."[124]  A government expert testified that "MDMA is 'one of the *least* addictive drugs.'"[125]  In addition, MDMA does not cause cardiovascular effects, respiratory effects, or neurological effects.[126]  By contrast, the Commission has found that cocaine causes all of these side effects.[127]

Furthermore, the court concluded that "the Commission's statement that cocaine is only a stimulant, while MDMA is both a stimulant and a hallucinogen, is without factual support and largely irrelevant.  Experts for both parties testified that MDMA is not properly characterized as a 'hallucinogen.'"[128]  The court added that "comparing pharmacological properties using broad descriptors like 'stimulant' and 'hallucinogen' says little—if anything—about the relative harm posed by a drug."[129]  Indeed, one of the experts at the *McCarthy* hearing testified that  "[The Ecstasy Report] almost read[s] like this was supposed to be some sort of arithmetic; cocaine gets

---

[119] *See id.* at 6 (noting increase in average sentence from just under 3 years to just over 6 years).

[120] *U.S. v. McCarthy*, 2011 WL 1991146 (S.D.N.Y. May 19, 2011).

[121] *Id.* at *5.

[122] *Id.* at *3.

[123] *Id.* (emphasis added).

[124] *Id.*; *see also* David Nutt et al., *Development of a rational scale to assess the harm of drugs of potential misuse*, 369 THE LANCET 1047, 1051 (2007).

[125] *Id.* (emphasis added).

[126] *Id.*

[127] United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* ("Cocaine Report") 65 (2007).

[128] *McCarthy*, 2011 WL 1991146  at *3.

[129] *Id.*

a score of one [because] it's a stimulant and then MDMA gets a score of two because it's a stimulant and a hallucinogen. . . . [T]hat's not using good science."[130]

Recent emergency room data confirms the district court's conclusion that MDMA is not more harmful than cocaine. In fact, "cocaine is responsible for far more emergency room visits per year than MDMA."[131]   According to the U.S. Department of Health and Human Services, cocaine abuse was responsible for 553,530 emergency room visits, or 29.4% of drug-or alcohol-related emergency room visits in 2007, while MDMA was responsible for only 12,748 visits, or 0.7%.[132]   In *McCarthy*, the district court explained that "[e]ven controlling for the fact that cocaine is more commonly used than MDMA, cocaine is still approximately 16 times more likely to lead to hospitalization." [133]   A government witness in *McCarthy* testified that "MDMA fatalities are 'rare.'"[134]   MDMA is also less prevalent and therefore less threatening to society than cocaine.  As the district court observed, "there are far more cocaine-related cases in the federal criminal justice system than MDMA-related cases."[135]

The district court concluded that the Commission's 2001 MDMA analysis "disregard[ed] several significant factors suggesting that [MDMA] is in fact *less* harmful [than cocaine]."[136] The court characterized the Commission's analysis as "opportunistic rummaging," commenting that it "is particularly stark when viewed against the Commission's rationale for adopting lighter sentences for MDMA than for heroin."[137]   As compared to heroin, the Commission concluded that five factors weighed in favor of lighter sentences for MDMA: (1) number of cases in the federal criminal justice system, (2) addiction potential (3) emergency room visits (4) violence associated with use and distribution and (5) secondary health effects.[138]   In *McCarthy*, the district court concluded that four of these five factors "also weigh in favor of lower sentences for MDMA than for cocaine."[139] With respect to the remaining factor—secondary health effects— "MDMA and cocaine are similar."[140]   Thus, when evaluated against these objective criteria, the 500:1 MDMA-to-marijuana ratio—more than double the 200:1 cocaine-to-marijuana ratio—"is incompatible with the goal of uniform sentencing based on empirical data."[141]

---

[130] *Id.*

[131]  *Id.*

[132] U.S. Department of Health and Human Services, *Drug Abuse Warning Network 2007: National Estimates of Drug–Related Emergency Department Visits* ("DAWN") 22 (2010).

[133] *McCarthy*, 2011 WL 1991146 at *3, *comparing* DAWN 22 with U.S. Department of Health and Human Services, *Results from the 2007 National Survey on Drug Use and Health* 252 (2008) (finding that 5,738,000 people over the age of 12 used cocaine in 2007, while 2,132,000 people used MDMA.).

[134] *Id.*

[135] *Id. citing See* U.S. Department of Justice, Bureau of Justice Statistics, *2008 Statistical Tables* 9 (2008), *available at* http:// bjs.ojp.usdoj.gov/content/pub/html/fjsst/2008/fjs08st.pdf.

[136] *Id.* (emphasis in original).

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Id.* at *3.

[141] *Id.* at *4.

Reviewing the record in *McCarthy* and conducting its own analysis of the evidence, another the district court came to the same conclusion in *U.S. v. Qayyem*.[142] "[T]he 500:1 marijuana equivalency ultimately chosen by the Commission does not accurately reflect the then-existing research, nor is it supported by more recent evidence."[143]

Despite overwhelming evidence that MDMA is less harmful than cocaine, the district courts in both *McCarthy* and *Qayyem* adopted the same marijuana equivalency ratio for MDMA as the Guidelines establish for cocaine—200:1.[144]  While these variances were a significant step in the right direction, even 200:1 is too high insofar as it does not accurately reflect the current state of MDMA research.  A 2007 study in *The Lancet*, a prominent British medical journal, assessed the relative harmfulness of illicit drugs based on the harmfulness of the drug to the individual user, the tendency of the drug to induce dependence, and the effect of drug use on society.[145]  MDMA ranked as the eighteenth most harmful out of twenty drugs, whereas heroin and cocaine ranked as first and second, respectively.[146]  Marijuana and ketamine (which the Guidelines treat as equivalent to marijuana for sentencing purposes[147]) also ranked as more harmful than MDMA, at eleventh and sixth, respectively.[148]  *The Lancet* study suggests that an empirically sound MDMA marijuana equivalency ratio would be 1:1.

In formulating the current MDMA Guideline, the Commission seriously overestimated the harmfulness of MDMA at a time when little was known about the substance.  Because the MDMA Guideline is not based on empirical evidence and is instead the product of unsubstantiated fears and old research, the sentences recommended by the MDMA Guideline do not approximate sentences that are tailored to achieve the sentencing objectives in 18 U.S.C. § 3553(a).  National experience and scientific research in the intervening years demonstrate that MDMA is less harmful than the Commission and Congress had predicted and that the current MDMA Guideline sentencing ranges are unduly severe.

In light of these developments and the Commission's unique institutional role and expertise, the ACLU urges the Commission to revisit its MDMA marijuana equivalency ratio.  Indeed, two recent district court orders demonstrate that the Commission's leadership is critical to remedying this problem in a uniform way that is consistent with the goals of the Sentencing Reform Act.  In *U.S. v. Kamper*[149] and *U.S. v. Thompson*[150] district courts declined to adopt the reasoning in *McCarthy* and vary from the 500:1 MDMA ratio.  Both courts did so in part due to their institutional concerns that the Commission is best situated to undertake a comprehensive

---

[142] *U.S. v. Qayyem*, 2012 WL 92287, at *5 (S.D.N.Y. Jan. 11, 2012).

[143] *Id.*

[144] *McCarthy*, 2011 WL 1991146 at *5; *Qayyem*, 2012 WL 92287, at *8.

[145] David Nutt et al., *Development of a rational scale to assess the harm of drugs of potential misuse*, 369 THE LANCET 1047 (2007).

[146] *Id.* at 1049-50.

[147] U.S. Sentencing Guidelines Manual § 2D1.1, app. note 10(E), at 543 (2009).

[148] *See* Nutt, 369 THE LANCET at 1049-50.

[149] *U.S. v. Kamper*, 2012 WL 1618296 (E.D. Tenn. May 8, 2012).

[150] *U.S. v. Thompson*, 2012 WL 1884661 (S.D. Ill. May 23, 2012).

assessment of the current state of MDMA research and to determine a more accurate marijuana equivalency ratio.[151]

In addition, and at the very least, the Commission should facilitate the development of additional case law on the existing MDMA ratio by providing district courts with a quarterly statistical analysis of variances in MDMA cases.  As the district court in *Kamper* explained, "the Commission does not appear to have made available statistics for MDMA sentences.  Although the Commission tracks sentences imposed under USSG § 2D1.1 by drug, it does not specifically break out MDMA sentences.  Without this statistical information, the Court lacks an important metric—a measure of the sentencing practices of other federal judges dealing with this issue."[152]

In sum, because recent scientific research and federal case law indicates that the 500:1 MDMA marijuana equivalency ratio is empirically unsound and "Congress established the Commission to formulate and *constantly refine* national sentencing standards,"[153] the ACLU strongly encourages the Commission to revisit and revise this aspect of the Sentencing Guidelines and to provide district courts with a quarterly statistical analysis of variances in MDMA cases.

## VIII.   Conclusion

The ACLU appreciates the opportunity to comment on the Commission's proposed priorities for 2014.

Respectfully submitted,

Laura W. Murphy
Director
Washington Legislative Office

Jesselyn McCurdy,
Senior Legislative Counsel
Washington Legislative Office

---

[151] *Kamper, 2012* WL 1618296 at *8 (stating that "the Commission is in a better position than the Court to take into account all necessary empirical research and relevant value judgments to formulate a proper MDMA-to-marijuana ratio.  In brief, to the extent the MDMA-to-marijuana ratio should be studied and perhaps revised, the Commission—and neither this Court nor any other individual district court—should lead this effort); *Thompson*, 2012 WL 1884661 at *5 (explaining that "[t]he undersigned Judge has considerably less experience with MDMA cases than cocaine cases . . . . This relative inexperience does not decrease the Judge's discretion but is relevant in that the Judge may defer more to the Commission in less familiar territory.").

[152] *Kamper,* 2012 WL 1618296 at *10.

[153] *Kimbrough,* 552 U.S. at 108 (emphasis added).

Ezekiel Edwards
Director
Criminal Law Reform Project

Emma Andersson
Staff Attorney
Criminal Law Reform Project