IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-cr-394-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  PATRICK M. DOYLE,

      Defendant.

---

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR VARIANT SENTENCE

---

The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits the following response to the defendant's motion for a variant sentenced based primarily on what he believes to be empirical flaws in the MDMA Sentencing Guidelines.  However, the United States Sentencing Commission's May 2001 MDMA report to Congress and the resulting Guidelines ratio was the result of a lengthy, deliberative process in which the Commission solicited a variety of views and readily acknowledged areas of science that were then—and still are—unsettled.  In the 20 years that followed, the Commission has been kept apprised of the advancements in science and the relevant debates in academia and the judiciary and has, so far, elected not to disturb the 500:1 ratio.  Ultimately, the Sentencing Commission is better positioned than individual district courts to decide when—and whether—the MDMA Guidelines should be revisited.  For the reasons that follow, the Government urges this Court to apply the MDMA Guidelines as carefully considered by the United States

1

Sentencing Commission.

I.     **The MDMA Guidelines Were Based On A Thorough, Critical Examination Of A Variety Of Factors Related To MDMA's Harms**

In 2001, the United States Sentencing Commission (the "Commission") issued the current version of the United States Sentencing Guidelines for MDMA trafficking (the MDMA Guidelines") after the Commission's independent, critical examination of extensive public comment from a variety of disciplines and viewpoints regarding the harms of MDMA. After declining to treat MDMA as harshly as methamphetamine (as recommended by Congress), and heroin (as initially contemplated thereafter by the Commission itself), the Commission set a penalty structure whereby 1 gram of MDMA is equivalent to 500 grams of marijuana.  Importantly, the Commission's decision was reached after a thorough and complete process that acknowledged many of the uncertainties that persist today.

A.  **The Commission's Institutional Role and Decision-making Framework**

In Kimbrough v. United States, 552 U.S. 85 (2007), the Supreme Court recognized that the Commission "fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" Id. at 109 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, C.J., concurring)). The Commission acts within this "institutional role" when it follows the statutorily mandated procedures to consider a wide range of factors and viewpoints in formulating guidelines, as set forth in 28 U.S.C. § 994, as well as other Congressional directives such as those in the Ecstasy Anti-Proliferation Act of 2000, Public Law 106–310 (2000)

2

(the "Ecstasy Act").

Where, as with the MDMA Guidelines, the Commission acts within its "characteristic institutional role," by fully considering all factors and viewpoints, the resulting Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Rita v. United States, 551 U.S. 338, 350 (2007). Accordingly, a sentencing court's view of the Commission's policy underpinnings of a particular Guidelines must be informed by whether those policy underpinnings were arrived at through the Commission's exercise of its institutional role. See United States v. Cavera, 550 F.3d 180, 191 n.9 (2d Cir. 2008) (observing that the Supreme Court clearly "distinguished between cases where a district court disagrees with Guidelines that were formulated based on special expertise, study, and national experience and those that were not and therefore 'do not exemplify the Commission's exercise of its characteristic institutional role.'").  Put another way, "the Guidelines' claim on judicial respect derives from the fact that the Sentencing Commission 'has the capacity courts lack' to frame Guidelines on the basis of 'empirical data and national experience, guided by a professional staff with appropriate expertise.'" United States v. Jones, 531 F.3d 163, 171 n.8 (2d Cir. 2008) (quoting Kimbrough, 552 U.S. at 574). Where a particular Guideline was not formulated pursuant to that institutional role, it is accorded less deference by the sentencing court. Id.

The Commission's implementing legislation requires that it consider a host of factors in formulating Guidelines, including the public concern for the offense and deterrence principles. 28 U.S.C. § 994(c); see Mistretta v. United States, 488 U.S. 361, 375 (1989). The Commission is also directed to consult with authorities from a broad

range of viewpoints bearing upon appropriate sentences, including "prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others." Rita, 551 U.S. at 350; see 28 U.S.C. § 994(o).

In addition to this decision-making framework, Congress has often provided additional procedural and substantive direction to the Commission with respect to specific offenses. Most relevant here, Congress passed the Ecstasy Act "[t]o combat Ecstasy trafficking, distribution, and abuse in the United States." In the Ecstasy Act, Congress made specific findings regarding the substantial rise in MDMA importation into the United States, MDMA's physical harms, and particular effect of MDMA abuse among youth, particularly school-age children. Ecstasy Act, Section 2.

As a result of these concerns, Congress determined that there was a need, among other things, for increased "penalties associated with the manufacture, distribution, and use of Ecstasy"; "the education of young people on the negative health effects of Ecstasy, since the reputation of Ecstasy as a 'safe' drug is its most dangerous component"; and "reducing the number of deaths caused by Ecstasy use and its combined use with other 'club' drugs and alcohol." Id.

Section 3 of the Ecstasy Act accordingly provided specific guidance to the Commission to "review and amend the Federal sentencing guidelines to provide for increased penalties such that those penalties are comparable to the base offense levels for offenses involving any methamphetamine mixture." In 2000, when the Act was passed, 1 gram of methamphetamine was treated as equivalent to 2000 grams of marijuana, more than 50 times the 35-gram marijuana equivalent of Ecstasy. The Act also tasked the Commission with considering law enforcement objectives, the

4

increasing abuse of MDMA among youth, and the increase in illegal importation of MDMA. United States Sentencing Commission, Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments, May 2001 ("MDMA Report") at 3 (Def. Ex. A).

### B.  The Commission's Execution of Its Institutional Role in Formulating The MDMA Guidelines

The Commission implemented the Ecstasy Act by "reviewing the available scientific and popular literature on MDMA," and engaging relevant government entities, including the DEA, "to describe to the Commission the trafficking pattern of MDMA and the challenges faced by law enforcement" and the National Institute on Drug Abuse "to describe the pharmacological effects and health hazards associated with MDMA abuse." (MDMA Report at 3-4). The Commission "also went to great lengths to solicit and properly consider public input" by first inviting public comment on a preliminary proposal that would have set penalties for MDMA trafficking equivalent to those for heroin trafficking, *i.e.*, 1 gram of heroin equivalent to 1,000 grams of marijuana. The Commission "received literally hundreds of letters, e-mails, and other written submissions . . . from a diverse array of constituents, including clinicians, physicians, psychologists, academic researchers, users, defense attorneys, and other interest groups," in addition to the Department of Justice and the Federal Public and Community Defenders. Indeed, "the volume of public comment received on the proposed changes to the guidelines for MDMA trafficking far exceed[ed] that for any issue [the Commission had] addressed since taking office in November 1999." (MDMA Report at 4).

The Commission reviewed extensive comments from a variety of viewpoints and identified tensions and controversies related specifically to the types of harms inflicted

by MDMA, and the extent of those harms: "In reviewing the public comment and literature, and meeting with experts, the Commission noted that there were conflicting views about the extent of the physical and mental harm caused by MDMA." Indeed, "[a] number of researchers, clinicians, and other interest groups held the view that MDMA was non-addictive, did not produce violent behavior, and did not produce, in their opinions, either short-term or long-term harm to the human body." (MDMA Report at 17). The Commission also accounted for comments from many experts that "while posing some risks to the user, MDMA was generally less dangerous than other drugs." (Id. at 18).  For instance, the Commission heard and took into account live testimony and written statements from, among many others, Rick Doblin, the president and founder of the Multidisciplinary Association for Psychedelic Studies ("MAPS"), and David Nichols and Charles Grob, both of the National Association of Criminal Defense Lawyers. In 2001, Doblin, Nichols, Grob, and others advanced the very same claims that the defendant claims today: that the pharmacological and cognitive effects of MDMA are relatively benign—both standing alone and as compared to other drugs— and accordingly MDMA offenses should not be penalized heavily.[1]

Upon examining the public comment, the Commission decided against equating MDMA to heroin and instead set a penalty structure where it was made equivalent to 500 grams of marijuana, which was between the marijuana equivalencies for heroin (1000 grams) and cocaine (250 grams). The Commission stated that such a structure reflected "the unique pharmacological and physiological harms of ecstasy, the fact that

---

[1] U.S. Sentencing Commission, Transcript of U.S. Sentencing Commission 2001 Public Hearing 26 (Mar. 19, 2001), at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20001030/20010319-20_Testimony.pdf.

the drug is aggressively marketed to and used by our youth, and its importation and trafficking pattern." (MDMA Report at 5).

The Commission catalogued its observations regarding MDMA's harms, and explicitly acknowledged that there were ongoing debates in the scientific community about the nature and degree of those harms. Notably, the Commission did not come to any hard conclusions about those harms and certainly did not make any predictions of an MDMA "epidemic." Instead, as an initial matter, the Commission noted what scientists had observed to be the immediate effects of MDMA use, including those that are associated with fatalities. (MDMA Report at 7-8). Next, it detailed "a great concern [regarding] the effects of MDMA on serotonin sites within the brain." It cited reports of "depletion of serotonin levels and toxicity to serotonin neurons" that are associated with "mental status changes, hyperthermia, and other symptoms associated with serotonin syndrome." (Id. at 8).

Although the Commission stated that certain scientists "express[ed] concern that neither the amount of drug ingested nor the number of prior uses successfully predict the severity of the symptoms," it qualified these concerns by acknowledging that "the potential toxicity to serotonin neurons . . . has been the subject of some disagreement." (Id.). In so doing, the Commission also noted findings by George Ricaurte that "MDMA use results in lasting deficiencies in that portion of the serotonin nerve cell known as the axon" and that based on such findings and "a predictive model demonstrating that dosage levels producing serotonin toxicity in animal studies are clearly within the range of consumption reported by humans," Ricaurte "argued that MDMA related toxicity found across species provides support for a toxicity risk in human users." (MDMA

Report at 8-9).[2]

The Commission acknowledged, however, that according to some experts, "the brain's elasticity and redundancy may mean that any neurotoxicity caused by the drug may not be meaningful." (MDMA Report at 9). The Commission noted that it appeared that any impairments to memory through use of MDMA "were dose related; that is, greater impairment was associated with greater use." Citing a German study, the Commission also noted that although a MDMA user group and two control groups "performed within the normal range" on a series of memory and mental functioning tests," the MDMA user group did perform "more poorly" than the control groups on certain tests relating to "working memory" and that those results "likely related to the well-recognized neurotoxic potential of ecstasy." (MDMA Report at 9-10). Accordingly, the Commission fully acknowledged that while studies had found that MDMA use may not impair mental functioning outside the normal range of certain cognitive tests, there was significant evidence that it nonetheless was associated with poorer cognitive functioning. Finally, the Commission noted "[a]nother point of controversy" regarding the permanence of serotonin-related impairments from MDMA use. It cited a study where recovery from those impairments had been observed over time, and another where the damage persisted for several years after exposure to the drug. (MDMA Report at 10).

---

[2] In his motion, the defendant spent considerable time arguing that because one of Ricaurte's papers was later retracted due to methodological problems, the Commission's citation of Ricaurte's work renders the Guidelines suspect. (Def. Mot. at 6-7). This claim is misleadingly broad. First, the retracted paper, Severe dopaminergic neurotoxicity in primates after a common recreational dose regimen of MDMA ("ecstasy"), (2002) 297 Science 2260-63, was published after the Commission issued the MDMA Guidelines and, therefore, simply was not considered by the Commission.  In any event, the Commission readily acknowledged that Dr. Ricaurte's conclusions were disputed (MDMA Report at 8 n.15) (noting that Ricaurte's work was "severely criticized by several medical/research professionals" during public comments, but also acknowledging that his work "appeared in peer-reviewed scientific journals of excellent reputation"), and that there was a vigorous debate on the type and extent of serotonin-related damage of MDMA.

Accordingly, the Commission carefully considered the issues that the defendant claims now are fatal to the MDMA Guidelines.  In light of this uniquely extensive, critical examination by the Commission, this case is altogether unlike cases such as Kimbrough where the courts have found the Guidelines not entitled to their typical deference. In Kimbrough, the Supreme Court upheld a sentencing court's variance from the Guidelines based upon its disagreement with the 100-to-1 ratio between powder and crack cocaine. In so doing, the Supreme Court emphasized that "those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role" for multiple reasons. First, in formulating those Guidelines, the Commission "did not take account of "empirical data and national experience"; the Commission simply "looked to the mandatory minimum sentences set" by Congress." 552 U.S. at 109-110. Second, in the years following the promulgation of the crack Guidelines, the Commission itself repeatedly reported to Congress that the disparity failed to meet sentencing objectives. In particular, the Commission noted that crack cocaine and powder cocaine had similar if not identical physical harms, that crack cocaine use (as well as powder cocaine use) was not prevalent among youth, and that the 100-to-1 ratio grossly impacted the African-American population. Id. at 97-98. Accordingly, the Commission issued reports in 1997, 2002, and 2007 that urged Congress to change the 100-to-1 ratio. Id. at 109-110.

In stark and dispositive contrast, the Commission formulated the MDMA Guidelines upon a uniquely rigorous exercise of its institutional role. The Commission took great pains to collect, review and consider a wide range of viewpoints, and extensive empirical and scientific information bearing upon the proper sentencing range

for MDMA trafficking. The Commission, for good reason, in 20 years has never sought to revisit the MDMA Guidelines; indeed, the MDMA Guidelines are a product of the Commission's own disagreement with Congress's initial proposal that MDMA be treated as harshly as methamphetamine. The Commission's refusal to blindly increase penalties based upon Congressional directive, but rather only upon a careful empirical analysis consonant with its institutional role, sets this case far apart from Kimbrough. Accordingly, the MDMA Guidelines are entitled to substantial deference.

## II.    The Commission's Observations and Concerns Regarding MDMA's Harms Still Hold True

Notwithstanding the substantial deference due to the MDMA Guidelines, the Commission's observations of the harms associated with MDMA—and the unresolved debates regarding many of those harms—in no way have been undermined.  As the various debates among scientists that the defendant now relies upon to challenge the 500:1 ratio was acknowledged at the time the Guidelines were promulgated, there is no reason for this Court to now disturb the well-reasoned conclusion of the Commission.

### A.  There Is No Dispute Regarding The Immediate Effects of MDMA Use

In his Motion, the defendant cites to a December 6, 2010 evidentiary hearing—and attached as Exhibit B a 400-page transcript of the hearing—in United States v. McCarthy, et al., 09-cr-1136 (WHP) (SDNY).  All of the experts who testified at the hearing agreed with the Commission's observations that the MDMA has acute effects on most of the body's major functions: nervous, cardiovascular, endocrine, and digestive. The Commission identified a litany of severe physical problems, psychological harms, and dysphoric effects experienced by MDMA users in the acute stage, and none of these are subject to debate. (MDMA Report at 6-7).  Indeed, even the McCarthy

defense experts agreed that MDMA is "harmful" (Tr. at 11, 116), and "by no means a benign drug." (Tr. at 116). In particular, all experts testified that MDMA has immediate effects on the serotonin system, which regulates body temperature, various cognitive functions, and a host of other crucial body systems. There is no question that MDMA is a "powerful stimulant." (Tr. at 182). It causes a "rapid significant increase in blood pressure, in heart rate" to hypertensive levels, sometimes leading to severe cardiovascular problems such as arrhythmias, heart attacks, and strokes. (Tr. at 132, 182, 311).  In sum, the hearing confirmed that the Commission's observations and concerns regarding the immediate effects of MDMA use still hold true.

MDMA results in the "serotonin syndrome"—a panoply of symptoms which includes hyperthermia so severe it can be fatal, and a host of other physical and mental problems. (Tr. at 309-311). The massive serotonin release caused by MDMA can also result in liver damage. (Tr. at 311). All experts confirmed that MDMA use has resulted in fatalities in rare cases—caused by MDMA-induced hyperthermia or hyponatremia. (Tr. at 37, 122, 183, 309). MDMA, through the serotonin syndrome, also severely affects cognitive abilities in the acute stage, causing confusion and serious impairments in the user's motor abilities. (Tr. at 183). And in the days following use of the drug, users experience anxiety, hostility, depression, and increased aggression. (Tr. at 51-52, 57).

Other acute health problems caused by MDMA which are likewise undisputed include an inability to metabolize tryptophan properly, which is crucial toward moderating serotonin levels (Tr. at 55-56); a reduction in immune system cells needed to protect from disease; an excessive release of a "a whole range of hormones" including testosterone, progesterone, prolactin, (Tr. at 274); and an "extreme" 800

11

percent acute increase in cortisol levels (Tr. at 218-19), which over time can cause significant stress and damage to the body. (Tr. at 221). Finally, MDMA use can lead to a breakdown of the "blood-brain barrier," whereby foreign molecules may enter the brain and disrupt various bodily systems. (Tr. at 338).

The McCarthy testimony regarding the acute effects of MDMA accords with the Commission's observations in its MDMA Report. The Commission noted that among the acute effects of MDMA are dehydration, hyperthermia, and heart or kidney failure, that could result in fatalities. (MDMA Report at 7-8).  It is undisputed that the acute effects can have disastrous consequences, particularly in the hot, crowded rave party settings in which MDMA is typically used. (Tr. at 275-76).

The Commission also observed that MDMA users experience "[u]nwanted psychological effects" including confusion and depression. (MDMA Report at 7). This, too, has been confirmed by subsequent research. McCarthy defense expert Dr. Valerie Curran testified that her own research found that many MDMA users experienced clinical depression in the days following use of the drug. (Tr. at 49). In a 1997 paper, Dr. Curran found that in the several days following MDMA use, users experienced both significant deficits in working memory and clinical level depression, which her paper attributed to either serotonin depletion or serotonin neurotoxicity.[3] (Tr. at 49-51). Dr. Curran later extended these findings in a 2003 paper,[4] in which she found that fully half of all ecstasy users in the study who stopped taking the drug for mental health reasons

---

[3] Curran et al., Mood and Cognitive Effects of MDMA, Weekend High Followed by Mid Week Low, 92(7) Addiction (1997 July) 821-31, available at
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.554.9680&rep=rep1&type=pdf
[4] Curran et al., Quitting Ecstasy, an investigation of why people stop taking the drug and their subsequent mental health, 17(4) J. Psychopharmacology (2003 Dec.) 371-78, available at
https://journals.sagepub.com/doi/pdf/10.1177/0269881103174014.

were still experiencing depressed mood, anxiety, and hostility an average of three years later, and qualified for clinical depression. (Id. at 57-58). Dr. Curran's research also shows that MDMA users had significantly higher levels of aggression in the week following use; that in males, this change in aggression correlated with the amount of MDMA taken on the weekend; that women are more susceptible than men to midweek low mood following weekend use of MDMA; and that both men and women show increased self-rated aggression upon taking MDMA. (Tr. at 51-52).

These results—which were confirmed by the testimony of the Government's experts in McCarthy (Tr. at 297, 312)—are entirely consistent with the Commission's observations of the psychological and other mood effects of MDMA use.

### B.  Certain Effects of MDMA Are Still Subject to Substantial Debate

The December 2010 McCarthy hearing confirmed that the areas of debate noted by the Commission remained unresolved nearly 10 years after the Commission's MDMA Report—and nothing cited in the instant defendant's Motion another 10 years later demonstrates any concrete resolution. The Commission noted "disagreement" about toxicity to serotonin neurons, recognized the suggestion by some that neurotoxicity "may not be meaningful" in terms of cognitive impairment, and acknowledged the "controversy" surrounding the question whether loss of serotonin sites and any corresponding impairments are permanent. (MDMA Report at 10).

With respect to neurotoxicity, all four experts at the McCarthy hearing agreed that MDMA causes at least temporary damage to serotonin axons, but there was disagreement about whether this implies neuronal damage and the extent to which the axons would regenerate. On the issue of cognitive impairment, there was likewise broad

consensus at the hearing that MDMA causes statistically significant cognitive impairments but, as the Commission observed, disagreement remains on how these impairments manifest themselves in everyday life. Finally, as Government expert Dr. Andrew Parrott testified, the question of permanent deficits is "wide open," with himself and Government expert Dr. Glen Hanson of the view that the physiological and clinical effects of MDMA are long-lasting and very possibly permanent. (Tr. at 215).

### 1.  Studies Confirm That MDMA Is Associated With Serotonin-Related Damage In The Majority of The Brain

The Commission observed that "[t]he potential toxicity to serotonin neurons . . . has been the subject of some disagreement." (MDMA Report at 8). As support for the view that MDMA causes neuronal damage, the Commission cited three pieces of evidence: (1) the "acute neurotoxicity" exhibited in MDMA users as part of the serotonin syndrome; (2) studies showing damage to serotonin axons as measured by "significantly reduced number of serotonin transporters throughout the brain" in PET scans of MDMA users; and (3) "significant impairments in visual and verbal memory" as measured by performance on neurocognitive tests. The Commission also observed that "brain scan comparison of MDMA users with non-users indicated that users had a significantly reduced number of serotonin transporters . . ." (MDMA Report at 9). Importantly, the science reported by the Commission in this respect was subsequently confirmed by independent study.

A 2010 paper published by a University of Toronto research team led by Stephen Kish regarding the neurotoxic effects of MDMA confirmed just that finding.[5]  Kish

---

[5] Kish et al., Decreased cerebral cortical serotonin transporter binding in ecstasy users: a positron emission tomography/[(11)C]DASB and structural brain imaging study, 133 Brain (2010) 1779-97,

employed advanced computer imaging of the brain to determine MDMA's effects on various parts of the brain, and neuropsychological testing to determine the effect of MDMA use on serotonin transporters ("SERT") and whether those physiological effects related to behavioral deficits. (Tr. at 179-181). The subjects in Kish's study were "average" recreational MDMA users. (Tr. at 194). There was no dispute about what that study showed: a reduction in SERT in two large brain regions, the cerebral cortex (as Dr. Parrott observed, "the vast majority of the brain" (Tr. at 279) and hippocampus, caused by the loss of serotonin axons as a result of the use of MDMA. (Tr. at 36, 90-94 (Curran); Tr. at 179, 212 (Parrott) ("The Kish study shows reductions of 20 to 40 percent in different cortical brain regions, 50 percent loss in the insular which is an important brain region.")). These brain areas are responsible for the indispensable cognitive functions of attention, perceptual awareness, thought, language, consciousness, and memory. The study also found that SERT loss was 51 percent— "which is a very big reduction"—in the brain region known as the insula. (Tr. at 279). In addition, Kish found that "the 'typical'/low dose (one to two tablets/session) chronic ecstasy-polydrug user might display a highly selective mild to marked loss of serotonin transporter in cerebral cortex/hippocampus in the range of that observed in Parkinson's disease." Kish et al. at 1780.

Consistent with these physiological changes, Kish found that the same subjects experienced impairments in memory and other cognitive measures, which Kish found to be directly correlated to decreases in SERT in these major areas of the brain. (Tr. at 180; 212). The results of the Kish study confirmed prior studies showing significant

available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2912692/.

SERT reduction correlated to MDMA use, even where those prior studies had involved higher dosages of MDMA. (Tr. at 83, 316 (Hanson) ("lots of other studies show that there are axonal changes if you give sufficiently high doses"); Tr. at 255-56 (Parrott) (noting a number of studies that found "that the most consistent finding is a reduction of serotonin transporter density. So Cowan's review is that there are a number of studies confirming serotonin loss in the higher brain regions. Kish is consistent with that.").

The experts' testimony and studies since 2001 thus fully accord with the Commission's observation that MDMA causes "significantly reduced number of serotonin transporters throughout the brain and that . . . magnitude of the loss was associated with greater use of the drug." (MDMA Report at 9). As <u>McCarthy</u> Government expert Dr. Hanson explained, the reduction in serotonin transporters provides strong evidence that MDMA is causing damage to serotonin neurons: "This transporter protein is only found in serotonin neurons. So if the amount of the protein goes up or if it goes down, we assume that changes have taken place inside of the neuron, and we make an assumption that if it goes down, that we have lost pieces of that braincell." (Tr. at 315-16).

### 2. The Practical Consequences and Permanence of MDMA-Induced Deficits Are Still Subject to Debate

There is no debate that MDMA use causes significant impairments in a range of cognitive functions even days after MDMA use, even when the drug is no longer present in the body. But two real points of controversy exist, both of which were specifically acknowledged by the Commission: whether the cognitive impairments are large enough to be meaningful in everyday life and whether they are permanent. With respect to the former, the Commission noted that even if MDMA is neurotoxic, this "may not be

meaningful" in practical everyday terms. (MDMA Report at 8). The Commission also noted that whether any such "impairment is permanent" is a "point of controversy." (Id. at 9).

Studies aimed at determining the real-life implications of MDMA-related cognitive deficits have found that they have a profound effect on everyday life. For example, a 2007 study by the Rendell group attempted to gauge the effect of MDMA on users' prospective memory—*i.e.*, their memory for future intentions. Employing a board game-type test designed to assess a subject's ability to remember to perform scheduled tasks, the study found that MDMA users performed far more poorly than non-users, even after controlling for use of other drugs, preexisting mental health issues, and sleep quality. Accordingly, the study found that "ecstasy users experience generalized difficulties with prospective memory, suggesting that these deficits are likely to have important implications for day-to-day functioning."[6] Similarly, a 2010 study found that "in terms of real-world functioning, ecstasy users are impaired on tasks that require logical planning and selection of stimuli from a range of alternatives," or what is commonly called "executive functioning." The research group had more than two dozen MDMA users and the same number of non-users perform a "virtual reality executive function" in which they played the role of an office worker completing a series of predefined tasks, such as prioritizing different activities according to their importance, organizing the physical office environment, and managing outgoing mail. Compared to the non-user control

---

[6] Rendell et al., Prospective memory impairment in "ecstasy" (MDMA) users, 194 Psychopharmacology (2007) 497-504, available at https://www.researchgate.net/publication/6217783_Prospective_memory_impairment_in_ecstasy_MDMA _users.

group, the MDMA users had significant problems performing these tasks.[7]

The experts in <u>McCarthy</u> testified also testified about this topic at length, revealing that the Government's experts and the defense experts often disagreed about whether, as the Government's experts testified, the harms of MDMA will be "long lasting" and possibly permanent in some users. (Tr. at 322). But the Commission knew this in 2001, and the disagreement between experts simply confirmed the Commission's observation that permanency is a "point of controversy." (MDMA Report at 9).

### 3. MDMA Is Addictive

Although MDMA does not exhibit the same addictive properties as drugs like heroin and cocaine (a feature that the Commission readily acknowledged in 2001), there is substantial evidence that it does carry with it the danger of addiction. In Karl Jansen's 1998 case study of three MDMA users, each user displayed key phenomena of drug dependence. They developed clear tolerance to the effects of the drug, spent increasing amounts of time using and getting over the effects of using ecstasy, neglected other activities, perceived harms related to their use, attempted to cease use without success; and reported withdrawal symptoms. All three also had other drug use disorders and one had mental health problems.[8]

An early, broader-based Australian study found that among a sample of 185 regular users, 64 percent had met criteria for lifetime ecstasy dependence, as assessed by the Composite International Diagnostic Interview (CIDI), a measure developed by the

---

[7] Montgomery et al., Assessing the functional significance of ecstasy-related memory deficits using a virtual paradigm, 25 Human Psychopharmacology (2010) 318-325, available at https://onlinelibrary.wiley.com/doi/10.1002/hup.1119.

[8] Jansen, Ecstasy (MDMA) dependence, 53 Drug and Alcohol Dependence (1999) 121-124, available at https://maps.org/images/pdf/1999_jansen_1.pdf.

World Health Organization to assess mental health disorders, including drug addiction.[9] Dependent persons typically met criteria for dependence during their heaviest use period. The frequency of such use was not necessarily high: during this heaviest period, 66 percent were using only one or two days per week, and 25 percent were using between one to three days per month. However, reported withdrawal symptoms were highly prevalent. Those who met criteria for dependence reported greater levels of financial, relationship and social problems; more anxieties about their drug use; higher levels of criminal behavior; and higher health risk behaviors than those who were not dependent.

In another example, a research group led by Linda Cottler of Washington University used the CIDI to assess MDMA dependence found that among 52 users, 43 percent met criteria for lifetime dependence upon the drug. Very high self-reported rates of withdrawal symptoms (59%) and "continued use despite knowledge of harm" (63%) were found.[10] Cottler conducted more extended follow-up studies, including one most recently where 593 MDMA users from Miami, St. Louis, and Sydney, Australia were asked a series of questions associated with DSM-IV psychiatric criteria. In the end, 59 percent of those interviewees qualified for MDMA dependence. The most common reported diagnostic criteria for MDMA dependence were withdrawal (68 percent) and continued use despite knowledge of physical or psychological problems from the drug (83 percent). 37 percent of the subjects reported that they were "using more [of the

---

[9] Topp et al., Is there a dependence syndrome for ecstasy? National Drug and Alcohol Research Centre, University of New South Wales, Sydney, Australia, NDARC Technical Report No. 51 (1997), available at https://ndarc.med.unsw.edu.au/sites/default/files/ndarc/resources/TR.051.pdf.
[10] Cottler et al., Ecstasy abuse and dependence among adolescents and young adults: applicability and reliability of DSM-IV criteria, 16(8) Human Psychopharmacology: Clinical and Experimental (2001) 599-606, available at https://onlinelibrary.wiley.com/doi/epdf/10.1002/hup.343.

drug] than intended." Based on these findings, Cottler recommended that MDMA should have its own place in the DSM-IV, as opposed to being included generally among hallucinogens.[11]   The Cottler group's peer-reviewed findings and conclusions over the decade after the MDMA Report regarding the addictive features of MDMA support the Commission's observations in 2001, and constitute an important harm from MDMA use.

### C.  The Commission's Placement of MDMA Relative to Other Drugs Is Justified by a Variety of Factors

In his Motion, the defendant spends much time comparing MDMA to other drugs such as cocaine, ketamine, and marijuana.  The Commission specifically addressed the concern with respect to cocaine, noting: "(1) unlike MDMA, powder cocaine is not neurotoxic, (2) powder cocaine is not aggressively marketed to youth in the same manner as MDMA, and (3) powder cocaine is only a stimulant, but MDMA acts as both a stimulant and a hallucinogen." (MDMA Report at 5).

Cocaine is not neurotoxic (Tr. at 339 (Hanson)), while the neurotoxicity of MDMA has been well-established. Moreover, as Dr. Parrott observed, "MDMA is a far more subtle drug, so the dangers of MDMA are more pervasive on a wider range of functions." (Tr. at 291). With regard to pharmacology, cocaine does not have the immediate and longer-term serotonin effects. MDMA, unlike cocaine, results in a "general lowering of cognition and bodily functioning." (Tr. at 296). While the marketing of MDMA was not an issue at the McCarthy hearing, Dr. Hanson explained that the third factor—MDMA's combination of stimulant and hallucinogenic properties—makes MDMA

---

[11] Cottler et al., Test-re-test reliability of DSM-IV adopted criteria for 3,4-methylenedioxymethamphetamine (MDMA) abuse and dependence: a cross-national study, 104(10) Addiction (2009 Oct.) 1679-90, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2891907/.

uniquely attractive to young people looking for both the energizing effect as well as a "psychedelic enhancing of sensory elements," that no other drug exhibits. (Id. at 370-71, 387 (this unique duality of MDMA was "the intent of the Commission" in emphasizing the drug's stimulant and hallucinogenic properties)). The Commission itself recognized that these two properties yielded MDMA's reputation as "the hug drug" and were inextricably tied to the drug's unique popularity and prevalence of abuse among youth. (MDMA Report at 15).

The defendant also cites cocaine's relatively high rate of overdose deaths as compared to MDMA.  In particular, he notes that drug overdoses "*involving* cocaine" have been on the rise since 2010.  (Def. Mot. at 16).  Unfortunately, contributing to this rise in cocaine overdose deaths is that cocaine is increasingly—and, to users, often unknowingly—laced with fentanyl.[12]  Contrary to the defendant's insistence, it is impossible to say just from increasing cocaine overdoses that cocaine is, by itself, more harmful than MDMA.

Nor is it useful to compare MDMA to ketamine and marijuana. Ketamine has a medically approved purpose: it is used as an anesthetic for human beings, including children, and has been since the 1970s.[13]  Moreover, by any measure, abuse of ketamine is a diminutive fraction of MDMA abuse, and is not targeted specifically toward youth.  For example, in 2007, ketamine was associated with approximately two percent of the number of emergency room visits associated with MDMA. (Tr. at 42 ("The

---

[12] Inside Fentanyl's Mounting Death Toll: 'This Is Poison,'
https://www.nytimes.com/2021/11/20/nyregion/fentanyl-opioid-deaths.html ("In 2015, just 17 of [New York City's] overdose deaths involved cocaine and fentanyl, without heroin; that number rose to 183 in 2019.");
https://www.dea.gov/sites/default/files/2018-07/BUL-039-18.pdf
[13] Kurdi, Theerth, Deva, Ketamine: Current applications in anesthesia, pain, and critical care,
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4258981.

problems of recreational ketamine use are fairly minor")).

The defendant argues that recent advances in therapeutic uses of MDMA to treat PTSD similarly undermines the Commission's 2001 findings.  While science may be advancing in a way that will eventually allow physicians to prescribe MDMA as a treatment for PTSD, the studies appear to be in their infancy—as opposed to ketamine's long-standing, accepted medical use.[14]  There is no reason to believe that, should MDMA's therapeutic uses approach those of ketamine, that the Commission would not consider revisiting the MDMA Guidelines.  But, for now, there is no reason for this court to use MDMA's potential as a treatment for PTSD to abandon the Commission's longstanding and well-reasoned conclusions.

The comparison to marijuana is likewise entirely specious: marijuana causes none of the severe acute affects and damage to the serotonin system that have been demonstrated with respect to MDMA. Indeed, the McCarthy defense experts acknowledged the far more serious harm presented by MDMA. (Tr. at 161) (Halpern: "In some ways, we could say that MDMA is more dangerous than marijuana, for example, the dose predicted to be lethal in marijuana is much, much higher than it is with MDMA. It is only theoretical in marijuana.").  Moreover, since the McCarthy hearing in 2010, nearly half of the U.S. states have legalized recreational marijuana, and more have legalized marijuana for medical purposes.  None have legalized MDMA, for any purpose.

Another crucial distinction between MDMA and other drugs—though not cited by

---

[14] Mitchell, et al., MDMA-assisted therapy for severe PTSD: a randomized, double-blind placebo-controlled phase 3 trial, https://www.nature.com/articles/s41591-021-01336-3 (noting that MDMA-assisted therapy represents a potential breakthrough treatment that merits expedited clinical evaluation).

the Commission—is that the statutory penalties build in limits to the severity of sentences for MDMA offenses. Cocaine is subject to mandatory minimum sentences (5 years for 500 grams or more and 10 years for 5 kilograms or more) and far more severe maximum sentences (40 years and life imprisonment, respectively). 21 U.S.C. §§ 841(b)(1)(B) and (A). In contrast, there is no mandatory minimum sentence for MDMA offenses, and the maximum sentence is 20 years. 21 U.S.C. § 841(b)(1)(C). The same distinction applies to marijuana and heroin.

Cataloguing these other drugs begs the question: if indeed they are as harmful or more harmful than MDMA, why should the marijuana equivalency for MDMA be scaled down to their equivalencies, and not vice versa?  Since the Commission's concerns regarding MDMA were well-founded in 2001—and continue to be now, 20 years later—the Court need not answer that question as there is no basis to disturb the current marijuana equivalency for MDMA.

### III.    The Commission's Concerns Regarding MDMA Abuse, Trafficking, And Their Focus On the Youth Demographic Apply With Equal Force Today

With respect to MDMA abuse, the Commission made plain that its main concern when formulating the MDMA Guidelines was not the drug's abuse trends generally, but on a particular group that warranted focused protection and was uniquely impacted by the drug: youth. The Commission observed that "MDMA is estimated to be the fastest growing abused drug in the United States," citing the University of Michigan's "Monitoring the Future" project that "1.3 million of the nation's high school student [had] experimented] with MDMA at least once and 450.000 students [admitted] to current use." (MDMA Report at 10). In addition, the Commission was concerned with the targeted marketing of MDMA toward youth (and increasing availability) in the rave party

circuit and schools. It found that the marketing of MDMA toward youth as a "feel good" or "hug drug" was consistent with its pharmacological effects as a stimulant and hallucinogen. (MDMA Report at 15). It also found that the drug was attractive to youth because certain types of MDMA were given "brand names." (Id.). MDMA abuse trends over the last 10 years have validated the Commission's concerns and have shown that MDMA continues its hold on youth.

### A.  MDMA Abuse Continues to be Uniquely Prevalent Among Youth

Statistics on MDMA abuse show that in the years immediately following the promulgation of the MDMA Guidelines, abuse among youth dropped dramatically but then began rising again.  As Dr. Hanson observed at the McCarthy hearing, based on the University of Michigan's "Monitoring the Future" surveys, in 2001, "9 percent of our youth were trying and experimenting with this drug," and thereafter, the percentage dropped to "about 3 percent" over a 3-to-4-year period. He then testified that there had been a "resurgence" to approximately 4.5 percent. (Tr. at 382).

According to the 2009 National Survey on Drug Use and Health, there were approximately 676,000 MDMA users in 2002, which decreased to 450,000 in 2004. That number increased to 555,000 in 2008 and again to 760,000 in 2009.[15]  There was a significant increase in the number of first-time users of Ecstasy between 2008 and 2009, from 894,000 to 1.1 million. Put in greater perspective, there were approximately 1.2 million first-time users in 2002, which declined to 642,000 in 2003, and then nearly doubled between 2005 (615,000) and 2009. (Id. at 4). With respect to the youth

---

[15] Results From The National Survey on Drug Use and Health 2009 at 15, http://www.oas.samhsa.gov/NSDUH/2k9NSDUH/2k9ResultsP.pdf.

demographic, in 2009, among persons aged 12 or older, the number of first-time Ecstasy users who initiated use prior to the age of 18 was 375,000. This estimate was significantly higher than the estimate of 209,000 in 2005.

 The most recent National Survey on Drug Use and Health, from 2019, combines several drugs, including MDMA, into a category including other hallucinogens.[16]  The survey data show that, among people aged 12 and older, the percentage who were past-year hallucinogen users increased from 1.8% (or 4.7 million people) in 2015 to 2.2% (or 6 million people) in 2019.  The drop in youth abuse and subsequent recent rise is attributable to changes in the youth demographic's perception of the risk associated with MDMA abuse, and a "generational forgetting of the dangers of ecstasy use." (Univ. of Mich., Monitoring the Future: A Continuing Study of American Youth (2009) at 34). According to the "Monitoring the Future" studies, 12th graders' perceived risk of MDMA jumped dramatically in 2001 and 2002, in the aftermath of the MDMA Guidelines. Since 2004, however, that perceived risk has dropped, most sharply among 8th graders," which "leaves the younger age groups more vulnerable to a possible rebound in ecstasy use." (Id.). In contrast, cocaine use among school children has been declining steadily since the 1990s.  According to the 2019 National Survey on Drug Use and Health, among youth aged 12 to 17, the number of previous year initiates of cocaine used declined from 310,000 in 2002 to 59,000 in 2019.[17]

 The above-describe trends among the youth demographic are further

---

[16] Results from the 2019 National Survey on Drug Use and Health at 18, https://www.samhsa.gov/data/sites/default/files/reports/rpt29393/2019NSDUHFFRPDFWHTML/2019NSDUHFFR1PDFW090120.pdf
[17] Results from the 2019 National Survey on Drug Use and Health at 28, https://www.samhsa.gov/data/sites/default/files/reports/rpt29393/2019NSDUHFFRPDFWHTML/2019NSDUHFFR1PDFW090120.pdf

substantiated by the number of emergency room visits associated with MDMA use. As

the defense has claimed, there are far more cocaine users than MDMA users, and

cocaine use is associated with a greater incidence of emergency room visits. The

Commission recognized as much in 2001. (MDMA Report at 11 ("Although increasing,

emergency room admission and deaths attributed to use of [MDMA] continue to be less

frequent than with other drugs of abuse."). To reiterate, however, the Commission was

less concerned with MDMA's effect on the general population that it was with the effect

on youth. In that context, the emergency room visit data is quite telling. As Dr. Hanson

observed at the McCarthy hearing:

> If you look at the data, you will also see that those that end up in
> emergency rooms because of Ecstasy use tend to be significantly
> younger than those who end up in emergency rooms because of
> cocaine and they also tend to be healthier which goes to the issue
> of there is this unique young population that's particularly attracted
> to this drug and they get into trouble with it sometimes.

(Tr. at 374).

From 2005 to 2011, the number of MDMA-related emergency visits among youth

(under 21 years old) increased dramatically year to year: 4,460 in 2005; 8,556 in 2006;

4,873 in 2007; 7,208 in 2008; 11,062 in 2009; 11,316 in 2010; and 10,176 in 2011.[18]

These figures further substantiate that MDMA has and continues to be a drug uniquely

targeted at and abused by teens and young adults, a demographic group that served as

the Commission's focal point in issuing the MDMA Guidelines.

---

[18] Substance Abuse and Mental Health Services Administration,
https://www.samhsa.gov/data/sites/default/files/spot127-youth-ecstasy-2013/spot127-youth-ecstasy-2013.pdf

**B.  The Commission's Concerns Regarding MDMA Trafficking Patterns Have Been Realized**

The Commission also based its decision on its observations regarding the increase in MDMA importation and trafficking. It noted a dramatic increase in MDMA pills seized throughout the 1990s and noted the DEA's concerns that drug trafficking organizations all over the world would become increasingly involved in MDMA because of its "easy manufacture, relatively benign reputation, and huge markup." (MDMA Report at 12-13). Although MDMA trafficking experienced a decline in the immediate aftermath of the MDMA Guidelines, it experienced a subsequent resurgence a decade later.[19]  In particular, "[t]he smuggling of MDMA into the United States from Canada fueled an increase in the availability of the drug that began in 2005." (Id. at 40). The amount of MDMA seized at the U.S.-Canada border increased 156 percent from 2007 to 2008. (Id.). Although on a smaller scale than along the U.S.'s northern border, MDMA seizures have increased steadily along the border with Mexico, with a more than threefold increase in pills seized from 2006 to 2009.

This resurgence in MDMA trafficking has been propelled by the rise of Asian criminal organizations over the last two decades, who are trafficking multimillion-dosage-unit quantities of MDMA, primarily from Canada to various points throughout the U.S. These Asian organizations, who previously trafficked high-quality heroin, have become increasingly involved in MDMA because of its low criminal penalties, *i.e.*, the statutory maximum of 20 years' imprisonment for MDMA trafficking offenses and the

---

[19] National Drug Intelligence Center, National Drug Threat Assessment 2010, https://www.justice.gov/archive/ndic/pubs38/38661/38661p.pdf).

absence of mandatory minimum sentence, and the high profit margins.  Law enforcement agencies have reported that the threat posed by Asian drug trafficking organizations is increasing as they expand and improve their criminal transportation and communication networks in the United States and are expanding their working relationships with other drug trafficking organizations in order to increase their MDMA trafficking operations.[20]  More recently, according to the 2020 National Drug Threat Assessment, Asian drug trafficking operations based in Europe export MDMA to the United States.[21]

The instant case is a prime example of the above-described trafficking trends. The defendant here is charged with importing kilogram-quantities of MDMA from various European countries and re-distributing it in the United States.  The defendant engaged in this conduct for years, wholly supporting himself by trafficking MDMA.  There should be no question, then, that MDMA imported from Europe remains a problem in the United States.  While the MDMA Guidelines served to successfully deter MDMA use and trafficking in the several years following their promulgation, it is clear that both underwent a resurgence in the decades that followed. The Commission's concerns accordingly are as well-supported and relevant as ever.

## IV.    Other Courts Have Rejected The Defendant's Arguments

The defendant's challenge to the MDMA Guidelines is not novel.  Rather, it has

---

[20] National Drug Intelligence Center, National Drug Threat Assessment 2010, https://www.justice.gov/archive/ndic/pubs38/38661/38661p.pdf) and National Drug Intelligence Center, National Drug Threat Assessment 2020, https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.
[21] National Drug Intelligence Center, National Drug Threat Assessment 2020 at 79, https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

been considered by numerous courts.  While some courts, such as the <u>McCarthy</u> court, agreed in part with the defendant and adopted a new MDMA Guidelines ratio, other courts—such as Chief Judge Brimmer in <u>United States v. Bender</u>—have rejected defendant's arguments outright.

### A.  Chief Judge Brimmer Rejected The Same Arguments In <u>United States v. Bender</u>

Though the defendant cites some cases in which courts have, at least to some extent, applied a different MDMA ratio than recommended by the Commission, plenty of courts have taken a contrary view and applied the Guidelines as written.

Most recently, on August 13, 2021, the Hon. Philip A. Brimmer, in <u>United States v. Bender</u>, 19-cr-96-PAB, rejected the defendant's arguments that the 500:1 MDMA ratio is not justified.  The defendant in <u>Bender</u> advanced many of the same arguments as the defendant in the instant case.  For instance, in <u>Bender</u>, the defendant argued that the "pharmacological and/or physiological harm" of MDMA is "less significant than initially thought in 2001;" MDMA is not particularly addictive; and MDMA results in comparatively few emergency room visits and overdose deaths only rarely.  (<u>Bender</u> ECF #65 at 17-19).  As with the instant defendant, Bender noted that the Commission's MDMA Report relied on studies by George Ricaurte and contended that Ricaurte's subsequent work was discredited—but failed to describe that the work relied on by the Commission was never discredited, as discussed above.  Bender, too, spent considerable time on the <u>McCarthy</u> case, but failed to address the many ways in which the Commission's findings remain relevant today.  (<u>Bender</u> ECF #65 at 19-20).

Ultimately, Chief Judge Brimmer rejected the defendant's arguments.  He noted that, of course, science is subject to change, which is why the "Sentencing Commission

has hearings."  But, Chief Judge Brimmer continued: "it's really best for the Sentencing

Commission with its processes to come up with the appropriate drug equivalency for

MDMA, not for an individual court who is not as well situated to sort through the science

on that particular topic."  (Bender Sentencing Transcript at 12 (attached as

Government's Exhibit 1).  Chief Judge Brimmer also observed that the "drug

equivalency for MDMA has existed for a long time," including for the 10 years since the

McCarthy decision in the Southern District of New York.  (Id.).  Ultimately, Chief Judge

Brimmer elected to follow the MDMA Guidelines as promulgated and sentenced the

defendant to a below-Guidelines variant sentence for reasons relevant to the particular

case and personal to the defendant.  (Id. at 39).

Chief Judge Brimmer got it right.  We can be assured that the Commission is

aware of what has happened in the last 20 years with respect to the science and other

relevant data regarding MDMA.  In fact, we *know* the Commission has been lobbied on

the defendant's precise points by the ACLU, both in 2012 (Def. Ex. D) and 2013 (Def.

Ex. E).  Together, these ACLU letters put before the Commission the arguments the

defendant makes before this Court—that is, that the 500:1 ratio lacks scientific

foundation; the ratio overstates the harms associated with MDMA; cocaine is more

harmful than MDMA; and the MDMA Guidelines overstate the social harms.  At bottom,

the Commission has had 20 years to revisit the MDMA Guidelines and, even though it is

fully aware of the state of the science, has elected not to do so.  After just a week's

worth of hasty briefing on this matter, this Court should decline to overrule the

Commission's long-standing and carefully considered decision.

### B. Other Courts Have Similarly Declined to Adopt An Alternative MDMA Guidelines Ratio

In <u>United States v. Kamper</u>, 860 F.Supp.2d 596 (E.D. Tenn. 2012), another district court also considered the same arguments advanced here.  In <u>Kamper</u>, the court characterized the defendant's argument as a request to "in essence ask[] the Court to step into the shoes of Congress and the Commission and legislate a change to the drug equivalency table under the Guidelines."  <u>Id</u>. at 599.  The court declined to do so, noting that even if the "scientific support justifying the current" MDMA-to-marijuana ratio has eroded since 2001, the court's role is not to "legislate sentencing policy or promulgate amendments to the guidelines."  <u>Id</u>. at 603.  Instead, the <u>Kamper</u> court correctly calculated the Guidelines range using the 500:1 ratio, and then determined whether a sentence within that range satisfied the purposes of 18 U.S.C. § 3553(a)—in other words, just as in every other case before the court for sentencing.  <u>Id</u>. at 605.  Among other things, the <u>Kamper</u> court noted that if every district court judge in each of the 94 federal districts in the country came up with their own MDMA-to-marijuana ratio, the result would be precisely the kinds of sentencing disparities that the Commission hoped to avoid.  <u>Id</u>.

The district court in <u>United States v. Silouangkhoth</u>, 10-cr-821-TS (D. Utah 2013) took a similar view.  There, the defendant made, again, all of the same arguments as in the instant case.  In rejecting the defendant's request for the court to adopt a different MDMA-to-marijuana ratio, the <u>Silouangkhoth</u> court cited approvingly to <u>Kamper</u>, and acknowledged the court's power to deviate from the Guidelines, but ultimately determined that rulemaking is best left to Congress and the commission. (<u>Silouangkhoth</u> Sentencing Tr. at 24 (D. Utah ECF #366)).  The Tenth Circuit affirmed

the district court, noting that the district court "concluded that the 500:1 ratio accurately represented the harms associated with MDMA," while "acknowledging that it could deviate from the Guidelines but explained that it was uncomfortable engaging in rulemaking by second-guessing the Guidelines on these issues." United States v. Silouangkhoth, 550 F. App'x 643, 645 (10th Cir. Dec. 20, 2013).

The Tenth Circuit also affirmed the district court's judgment in United States v. Ferguson, 447 F. App'x 898 (10th Cir Jan. 6, 2012). There, the district court applied the 500:1 MDMA ratio as prescribed by the Guidelines. In upholding the district court's decision, the Tenth Circuit reminded the defendant that while district court judges may deviate from the Guidelines, it does not follow "that it is an abuse of discretion for a judge to adhere to the equivalency table, policy critiques notwithstanding." Id. at 902. See also United States v. Thompson, 2021 WL 1883661 (S.D. Ill. May 23, 2021) (citing to Kamper and affording deference to the Commission on promulgation of sentencing Guidelines).

The Commission is well aware of the debate in the judiciary regarding the MDMA Guidelines—indeed, the ACLU cited to McCarthy in its 2012 letter to the Commission. (Def. Ex. D). This court should exercise its discretion, following cases such as Bender, Kemper, Silouangkhoth, Ferguson, and Thompson, and reject the notion that a single district court is better positioned than a well-informed Sentencing Commission in setting MDMA policy decisions.

## V. Conclusion

For the reasons outlined in this brief and in the Government's sentencing statement filed on November 17, 2021 [ECF #47], the Government respectfully asks the

court to apply the MDMA Guidelines as promulgated by the Commission, and sentence the defendant to the bottom of that Guidelines range.

Respectfully submitted this 30th day of November, 2021.

MATTHEW T. KIRSCH
Acting United States Attorney

By:     s/ Andrea Surratt
        Andrea Surratt
        Assistant United States Attorney
        U.S. Attorney's Office
        1801 California St., Suite 1600
        Denver, CO 80202
        Telephone: (303) 454-0100
        e-mail:  Andrea.Surratt@usdoj.gov