```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
   Criminal Action No. 19-CR-00096-PAB
 3
   UNITED STATES OF AMERICA,
 4
        Plaintiff,
 5
   vs.
 6
   CLINT BENDER,
 7
        Defendant.
 8 _____

 9                    REPORTER'S TRANSCRIPT
                          Sentencing
10 _____

11        Proceedings before the HONORABLE PHILIP A. BRIMMER,

12 Judge, United States District Court for the District of

13 Colorado, commencing at 9:06 a.m., on the 13th day of August,

14 2021, in Courtroom A701, United States Courthouse, Denver,

15 Colorado.

16                        APPEARANCES

17        Aaron Teitelbaum, U.S. Attorney's Office,

18 1801 California Street, Suite 1600, Denver, CO 80202, appearing

19 for the plaintiff.

20        Colette Tvedt of Colette Tvedt, LLC, 1660 Stout Street

21 ,Suite 1400, Denver, CO 80202, appearing for the defendant.

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
   Produced via Computer by Janet M. Coppock, 901 19th Street,
25    Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
 1                      PROCEEDINGS
 2          THE COURT:  The matter before the Court is United
 3  States of America versus Clint Bender.  This is Criminal Case
 4  19-CR-96.
 5          Mr. Teitelbaum is here on behalf of the United States.
 6  Good morning to you.
 7          MR. TEITELBAUM:  Good morning, Your Honor.
 8          THE COURT:  Ms. Tvedt is here on behalf of Mr. Bender.
 9  Mr. Bender is here.  He is on bond.  Good morning, Your Honor.
10          MS. TVEDT:  Good morning, Your Honor.
11          THE COURT:  We are here today for sentencing in this
12  matter.
13          Ms. Tvedt, have you had a chance to review the
14  Presentence Investigation Report and the addenda and talk to
15  Mr. Bender about it?
16          MS. TVEDT:  I have, Your Honor.
17          THE COURT:  And if you can stand while addressing the
18  Court.  I know that those microphones suggest that you -- you
19  don't have to go to the podium.
20          MS. TVEDT:  I just wanted to make sure the Court could
21  hear me and maybe I should go to the podium.
22          THE COURT:  No, you don't need to.  The microphones
23  are excellent, but somehow because they are short, somehow this
24  convinces people they should remain seated.
25          And you have filed on behalf of Mr. Bender the
```

1  following:  Objections to the Presentence Investigation Report,

2  Docket No. 63; a motion for a variant sentence, which is Docket

3  No. 65.  Any additional objections on behalf of Mr. Bender or

4  any additional filings on his behalf?

5          *MR. TEITELBAUM:*  No, Your Honor.

6          *THE COURT:*  And Mr. Teitelbaum, have you had a chance

7  to review the Presentence Investigation Report and the addenda

8  to it?

9          *MR. TEITELBAUM:*  I have, Your Honor.

10         *THE COURT:*  The United States filed a motion to

11 dismiss Count Two of the indictment with prejudice, which is

12 Docket No. 73.  The United States also filed a motion for an

13 additional one-level downward adjustment for acceptance of

14 responsibility, Docket No. 66; a motion for downward variance

15 based upon the fact that the guidelines don't reflect the

16 amendments regarding Section 3553(f).  That's Docket No. 67.

17 Also the United States filed an objection and the response to

18 the defendant's objections which is Docket No. 64.  And the

19 United States filed a response to the defendant's motion for a

20 downward variance, Docket No. 72.

21          Any additional objections on behalf of the United

22 States or additional filings on behalf of the United States?

23          *MR. TEITELBAUM:*  No, Your Honor.

24          *THE COURT:*  Thank you.  Why don't we begin by talking

25 about the objections.  And Ms. Tvedt, correct me if I'm wrong,

1    I think that the objection regarding identifying data, also the

2    charges and conviction, Paragraph 4, and also Paragraph 12

3    objection have either been addressed or I can say in response

4    to Paragraph 12 the Court will not take that into account in

5    any way to Mr. Bender's detriment.

6              Any need for the Court to make rulings on those

7    matters?

8              MS. TVEDT:  No, Your Honor.  I think we have briefed

9    those matters.  And I included it in the objections to the PSI

10   because -- the Presentence Report because I felt that it

11   indicated or was going towards the calculation, Your Honor.  I

12   don't know if the Court wants further argument specifically as

13   to Paragraph 12 regarding MDMA.

14             THE COURT:  I am not sure.  I mean --

15             MS. TVEDT:  Paragraph 17 and 18, I apologize, Your

16   Honor.

17             THE COURT:  Right.  Those are different.  I am just

18   talking about Paragraph 12.  Because I indicated I was not

19   going to hold that against Mr. Bender in any way, I don't think

20   I need to resolve that factual dispute.

21             MS. TVEDT:  I appreciate that, Your Honor.  And the

22   reason why we included it, Mr. Bender had not recalled that.

23   And there was just a brief mention in one of the reports, but

24   had never seen the actual text, so I appreciate the Court

25   taking that into consideration.

1          *THE COURT:*  So any additional argument in regard to

2     Paragraphs 17 and 18?  You, of course, indicate that the

3     probation office correctly calculated the guidelines.  This I

4     would agree is more in the way of a -- of argument for a

5     variant sentence.  And we can talk about it then, but you do

6     include it as an objection.  So any -- do you want to argue

7     that issue at this time or do you want to save it to the motion

8     for variant sentence?

9          *MS. TVEDT:*  Your Honor, what does the Court prefer?

10          *THE COURT:*  It's totally up to you.  Why don't we do

11     it now.  Go ahead.

12          *MS. TVEDT:*  Okay.  And, Your Honor, of course this

13     is -- the defense is seeking a variant sentence, so even with

14     the revised calculations we would be seeking a variant sentence

15     below that.  But I wanted to bring up the issue regarding the

16     500 to 1 marijuana equivalency regarding MDMA because it's been

17     the source of a lot of discussion.  The United States

18     Guidelines had asked for further comment in 2017.  And we know

19     that there have been a lot of changes in research since the

20     sentencing guidelines were established 20 years ago.

21          And as I've stated in my objections, as well as in the

22     motion for a variant sentence, it has been confirmed that when

23     they were doing the -- having the hearings in 2001, they were

24     relying upon scientists and experts who were testifying about

25     certain neurotoxic implications of MDMA and how dangerous the

1    drug was.

2            And in the 20 years since that, they have found that

3    the evidence and the testimony that were relied upon by the

4    United States Sentencing Commission in 2001 were substantially

5    undercut by scientific support.  What they found is that

6    cocaine -- they said that it was less harmful than cocaine and

7    the years since then they have found that cocaine is 14 times

8    more likely to cause damage and visits to the emergency room.

9            When they -- initially before the 2001 guidelines were

10   established, the 1 gram of MDMA was treated as equivalent to 35

11   grams of marijuana.  And then they had the hearing in 2001 and

12   they felt that that wasn't true and it went to 500 to 1.  Many

13   of the research that they were relying upon in 2001 was based

14   upon the research and the testimony of Dr. Ricaurte.  And

15   Dr. Ricaurte two years later took back some of these statements

16   that he had made and it turned out that the research he

17   provided the Sentencing Commission was based on faulty science.

18           In some of the evidence and experiments that he

19   discussed and testified to regarding experiments with rats and

20   monkeys, it turned out that he had mislabeled and had, in fact,

21   injected the monkeys and rats with methamphetamine.  He had

22   also in another experiment put higher dosage of MDMA that would

23   never be able to be sustained by human consumption.  And then

24   in the years since then there have been further studies that

25   were explained.  And in *United States v. McCarthy* that I

1    addendum as an exhibit, the Court in the Southern District

2    found out that the 500 to 1 MDMA marijuana equivalency gave

3    rise to a sentence that would be greater than necessary to

4    serve the objections.

5         They had a two-day hearing in the *McCarthy* case and

6    I've read through the testimony there, two experts called by

7    the defense and two experts that were called by the government.

8    And there was significant congruence within the testimony of

9    all four experts saying that the actual harms of MDMA were

10   greatly exaggerated and hence the reason for the request for a

11   lower sentence.

12        In the *McCarthy* case they relied upon *United States v.*

13   *Kimbrough*, which is at 552 U.S. 85, a 2007 case, which allows

14   the sentencing court's power to depart from the guidelines that

15   lack empirical basis.  And that is precisely the type of case

16   that the courts had in mind.  And similar to what they discuss

17   in *Kimbrough* with the crack cocaine issue, they have found that

18   in recent studies that the MDMA guidelines were not in comport

19   with science and did not survive an empirical basis.

20        I had also included, Your Honor -- and I know the

21   Court has read through the *McCarthy* case and some of the

22   briefing that I did, but very, very recently, Wednesday

23   afternoon I was speaking with a friend who is a psychiatrist

24   for the VA here in Colorado.  And I had mentioned to him that I

25   had read that there have been studies doing small micro-dosing

1    with MDMA to treat severe PTSD and how far did they come with

2    that.  And he said basically, "Stop.  I presented on this very

3    issue this morning."

4         And he provided the paper to me at 3:00 o'clock on

5    Wednesday.  And with all due respect, I apologize for being

6    late with the standard of practice by the Court, but I

7    contacted Mr. Teitelbaum and he had no objection for me

8    including that.  And the reason why I included that third phase

9    in the trials that were being conducted regarding the treatment

10   of MDMA was only to emphasize again that there have been

11   studies that the harm with MDMA is much lesser than what was

12   originally considered by the United States Sentencing

13   Commission.  And that in fact these studies that were conducted

14   over 18 weeks with controlled studies showed that there have

15   been successful and positive outlooks in the treatment of

16   severe PTSD with the conclusion that there was significant and

17   robust attenuation of the PTSD symptoms and the functional

18   impairment by the use of the micro-dosing of MDMA.

19        I share that with the Court only to say that when we

20   are looking at the sentencing guidelines as calculated by the

21   Probation Department, I know that the United States Sentencing

22   Commission had requested comments on the 2017.  There was some

23   hearings.  The guidelines have not yet changed and I kind of

24   was stymied in finding additional information about where they

25   are standing now, but I know it's still an active issue and

1    some of the courts have given the lower numbers of the 200 to 1

2    marijuana equation, Your Honor.

3            So I share that with the Court in an abundance of

4    caution to say that I think that the courts now should be

5    looking at some of the newer scientific research that has been

6    provided and to show that it does not have the neurotoxicity

7    and that we should benefit from that.  That being said, I am

8    still requesting a variant sentence, but I wanted to make that

9    record, Your Honor.

10           *THE COURT:*  Right.  Okay.

11           Mr. Teitelbaum, would you like to respond on any

12   issues raised in the objection, but also kind of globally the

13   issue about the drug equivalency standard that the Court should

14   apply?

15           *MR. TEITELBAUM:*  Yes, please, Your Honor.

16           I agree with Ms. Tvedt there are cases pointing in

17   both directions about how the courts have chosen to address

18   this.  It sounds like -- I agree with the defense that there is

19   maybe some indications to suggest that when that marijuana

20   equivalency was first adopted, it was not on the firmest

21   possible ground that it could be.  At the same time, it's now

22   been two decades since that equivalency was adopted.

23           And the Sentencing Commission if it chose to, while

24   we -- I still believe we don't have a quorum right now in the

25   Sentencing Commission, but obviously there have been quorums

1    for a long stretch of time in the past two decades.  The

2    Sentencing Commission is well positioned to revisit that

3    equivalency if it feels that it's appropriate.  It has the

4    ability to ask for additional data from scientific studies.  It

5    has the ability to consult experts and to take comment on these

6    issues.  And so the government agrees with the *Kamper* court's

7    rationale cited in the government's response to the motion for

8    downward variance that there are strong institutional reasons

9    for adhering to the Commission's marijuana equivalency as

10    opposed to attempting to fashion a new one.

11        I would also note that because of the amount of MDMA

12    in this case, even for the sake of argument if the Court were

13    to adopt the 200 to 1 equivalency, we would only be about

14    11.8 grams of MDMA shy of ending up at the same guideline range

15    because under the current calculation with the 500 to 1

16    equivalency, we are actually very, very close to the next

17    guideline up because we are in about 97 kilograms of converted

18    drug weight and the next cutoff is a hundred kilograms.

19        And so while perhaps if we were in a situation where

20    we were in a less borderline case, for instance, in terms of

21    where we were with offense levels and drug quantity, that case

22    might be a better opportunity to revisit this.  But given that

23    we are already so close to ending up in exactly the same place

24    in terms of offense level with 200 to 1 as opposed to 500 to 1,

25    the government would urge the Court to stick with the 500 to 1

1    equivalency for calculating the guidelines in this case.

2                 THE COURT:  Thank you, Mr. Teitelbaum.

3                 Ms. Tvedt, last word.  Go ahead.

4                 MS. TVEDT:  Your Honor, I think I have laid out in

5    both the objections as well as the motion for the variant

6    sentence what the recent studies have been and what the

7    McCarthy court and other courts have been analyzing now to

8    change the guideline, so I think I rest on my papers and my

9    oral argument, Your Honor.

10                THE COURT:  All right.  So the matter before the Court

11   is an issue that's not only raised in Docket No. 63, which are

12   characterized as objections to Paragraph 17 and 18, but are

13   really policy arguments.  And just quoting from Page 3 of

14   Docket No. 63, Mr. Bender notes that, "This is a correct

15   calculation based upon the current U.S. Sentencing Guidelines.

16   However, we are challenging the appropriateness of adhering to

17   the empirically flawed U.S. Sentencing Guideline for MDMA."

18                The motion for variant sentence contains, which is

19   Docket No. 65, contains a number of different arguments, but

20   one of the arguments that is raised is the same one which is

21   the equivalency.  And the argument that the U.S. Sentencing

22   Commission studies or at least the studies that the U.S.

23   Sentencing Commission based the drug ratio for MDMA on have

24   since that time been undermined by subsequent studies.

25                First of all, let me acknowledge that I have the

1   discretion to agree completely with Mr. Bender that despite the

2   fact that the guideline is what the guideline is, based upon

3   Mr. Bender's arguments I can come up with what I believe is a

4   more appropriate equivalency, not that that's policy.  I could

5   just in my mind decide to do that and then sentence Mr. Bender

6   accordingly.  I am not going to do that.

7         It's not unusual for the science to change.  That's

8   why the Sentencing Commission has hearings on these things.

9   That's why the Sentencing Commission has flagged MDMA as

10  something that should probably have a closer look now.  But I

11  do agree with Judge Curtis in the *Kamper* case, which is

12  reported at 860 F.Supp.2d 596, where he notes that it's really

13  best for the Sentencing Commission with its processes to come

14  up with the appropriate drug equivalency for MDMA, not for an

15  individual court who is not as well situated to sort through

16  the science on that particular topic.

17        As Mr. Teitelbaum said, the drug equivalency for MDMA

18  has existed for a long time.  The Southern District of New York

19  case came out in 2011.  Ten years have passed.  It's still the

20  same.  Perhaps it will change in the future.  Perhaps that will

21  be an appropriate thing to have happen, but at this time as

22  noted in the *Ferguson* case that the government cited, I am

23  choosing to follow the guideline range for MDMA and use that

24  equivalency ratio.  So the argument that the Court should vary

25  or differ from the guideline range for MDMA because of the

1    empirical flaws in the sentencing guidelines will be rejected.

2         All right.  So now let us -- I don't think that there

3    are any other objections to address, and as a result we come to

4    the sentencing arguments.  Mr. Bender has filed a motion for a

5    variant sentence.

6         Ms. Tvedt, would you like to argue your motion for

7    variant sentence separately or combine your arguments as to

8    that motion with your overall recommendation of a sentence in

9    this case?

10        *MS. TVEDT:*  I can combine them, Your Honor.

11        *THE COURT:*  Okay.  And Mr. Teitelbaum, any objection

12   to her doing so?

13        *MR. TEITELBAUM:*  None at all, Your Honor.

14        *THE COURT:*  Then we will proceed as follows.  I will

15   hear from Ms. Tvedt.

16        *MS. TVEDT:*  And Your Honor, I wanted to make sure that

17   the defense computer is connected.

18        *THE COURT:*  Yeah, I will give you a chance to make

19   sure you are all set up in a minute.  Let me just indicate how

20   we will proceed.  I will hear from you first.  After that I

21   will hear from Mr. Teitelbaum.  And after that I will give

22   Mr. Bender an opportunity to address the Court if he chooses to

23   do so.

24        *MS. TVEDT:*  Your Honor, Mr. Bender's father briefly

25   wants to address the Court if that's permissible.

1          THE COURT:  As long as it's brief.  I have a hearing

2     starting in 33 minutes and I have a lot going on today, so I

3     want to keep on track, but I have no problem with that.

4          MS. TVEDT:  Thank you, Your Honor.

5          THE COURT:  Go ahead.

6          MS. TVEDT:  Mr. Bender has been out of custody for the

7     last 27 months and a lot of changes have occurred in his life.

8     I just wanted to kind of walk through how he went from one --

9     from place A to place D.

10          As the Court is aware and as we have talked about in

11     the sentencing memorandum, if you could put my -- the computer

12     on, please -- from the time that Mr. Bender was a young man, he

13     was -- as we stated in the sentencing memorandum, he moved

14     around a lot so that his father, Tom Bender, would be getting

15     his chiropractic license.  He was home schooled to the age of

16     fifth grade, age 11.  His father is a retired marine.  From the

17     time he was a little boy he always wanted to go into the

18     military.  He read, as he would say, tons of books on the Navy

19     SEALs.

20          When he was getting into high school, he applied for

21     the military academy in Texas and was admitted.  And this is a

22     photograph of his mother and father, Amanda and Tom Bender with

23     him.  He was at the military academy for a year, but was

24     homesick and wanted to go back to Hartselle High School where

25     he actually ended up going for the last three years.

1          He was a son that was -- he is the oldest of eight

2     children and from the ages -- he is 26 years old, 24, 21, 19,

3     16, 13 and 11.  And as the oldest son, he was trying to when he

4     was growing up comport himself as his parents had always raised

5     him.  When he was in high school, he was a champion wrestler.

6     He was a local hero.  And I found article after article after

7     article talking about him winning all these championships, a

8     21-second pin, written up in local papers as well as the state

9     of Alabama.  He even received a commendation from the State of

10    Alabama, the Secretary of State, regarding the work that he did

11    in becoming a state wrestling champion.

12         When he graduated from high school, he was so

13    committed to getting into the Navy SEALs that he decided to

14    take a gap year.  And during that gap year -- this is one of

15    the pictures of his training that year -- he was running up to

16    11 miles a day four to five days a week.  He was swimming,

17    push-ups, pull ups.  He was training so desperately to get into

18    the Navy seals.  And after training both in high school and

19    during that gap year, he applied for the Navy SEALs boot camp

20    and was accepted.  He was the top 10 in that particular class.

21         As the Court may be well aware, the Navy SEALs is an

22    elite portion of the military.  It is brutal training that

23    takes place over 30 months.  From the first time that

24    Mr. Bender entered into the training, they were taught the

25    importance of teamwork.  And I share that with Your Honor

1    because it was working together with all of his fellow boot

2    camp people that was very important for him.

3            It was a stringent test that he had to pass.  They

4    have to take a written test so that they understand what the

5    Navy SEALs stands for and some of the issues regarding the

6    military and what would be demanded of them in addition to a

7    very strenuous 500-yard swim, 42 push-ups in two minutes, sit

8    ups, push-ups, pull ups and runs wearing full combat gear and

9    he passed.  And as he said, the day that he was initiated and

10   made it into the Navy SEALs was one of the years best years --

11   or days of his life.

12           The intensity of that training, they do all types of

13   coordination exercises.  The picture on the top right is they

14   sit in the -- they do their training in Coronado, San Diego,

15   and they have to sit in freezing cold water linking arms

16   without getting up.  They also do a training in which their

17   arms and legs are tied.  They are thrown into a 9-foot pool.

18   They have to float for five minutes, swim 100 meters, bob for

19   2 minutes, do forward/backward flips, swim to the bottom and

20   retrieve an object with their teeth and return to the surface

21   and do this again.

22           I share this with the Court because it was intense

23   physical and it was intense mental as well.  And in the fourth

24   week of the second part of his what's called bud's training,

25   there is a period where the men have to run on the beach

1    carrying these flotation devices and they are about 300 pounds.

2    And Mr. Bender was in the first part of -- was in the front of

3    the flotation when it smashed down on him and he received very,

4    very serious injuries.  He received an axial injury to his

5    head, cervical, thoracic, lumbar spine injuries, injuries to

6    his leg and his arm.

7           I have hundreds and hundreds of pages, I was going to

8    bring it demonstratively to the Court, but just to show that

9    during that time period where he was still in the Navy, he was

10   being transferred from place to place.  He was in the naval

11   medical facility in San Diego.  He was transferred to the Great

12   Lakes for physical therapy in Illinois, pain management in

13   Northwestern in Chicago, and he was in and out and in and out

14   and in and out.  And during that period of time he was told

15   that he would never be able to return to the SEALs because he

16   was too badly injured and that he would be placed on light desk

17   duty due to the extent of his injuries.

18          This is a picture of Mr. Bender when he was admitted

19   into the BUD/S training at the Navy SEALs.  This is where he --

20   this is kind of a recreation of what the flotation device that

21   he was using that fell on his back.  And then he was honorably

22   discharged from the Navy SEALs after they realized that he

23   would never physically be able to succeed with that.

24          The reason why I shared with you what was going on

25   when he was growing up is that many of us -- I wanted to be a

 1    lawyer since I was 11, fifth grade.  He wanted to be a Navy

 2    SEAL since he was in fifth grade.  So for his whole identity

 3    even in high school and going to the Navy SEALs was Navy SEALs,

 4    Navy SEALs, Navy SEALs.  I want to be deployed.  I want to

 5    fight for my country.  And when he was sent home after a year

 6    plus trying to get him healthy again as much as they could in

 7    the Navy SEALs, but being told he will never be able to do all

 8    those exercises, he won't be deployed as a Navy seal, he went

 9    back to his parents' home in Alabama.

10         And when he got back, he was simply untethered.  He

11    was a young man, had no future as far as he was concerned.  He

12    had exercised.  He was depressed.  He was suffering from

13    intense migraines daily.  He was under the care of a doctor at

14    that time and yet he felt like he had no reason to go on.  And

15    as he said to Dr. Bograd, there were times where I felt like I

16    wanted to kill myself.  But for my family and my siblings, I

17    didn't do that.

18         He went to a community college in Alabama.  He just

19    couldn't find his way.  Ended up in Colorado because he wanted

20    to be outside and thought that that would be healthy for him.

21    And at first it was.  He got a job doing work in the service

22    industry.  He was working at a hotel.  He met up with a

23    gentleman that was a real estate agent and he started to study

24    for his real estate exams.  But in the midst of all this stuff,

25    he didn't have a doctor in Colorado.  He was still suffering

1   from all the pain.  He still continues have pain in his

2   shoulder, his knee.  Unfortunately, he was in a head-on

3   collision, not his fault, hit-and-run in May of 2021.  He now

4   has issues with his spine and his neck.

5          So he has been continuing to have some medical issues.

6   And one of the biggest mistakes that he made at that point was

7   that he decided to self-medicate.  And he couldn't get any more

8   Percocets, which is Oxycodone, to treat the pain management,

9   and so he started to buy Percocets on the street.  And that was

10  like the beginning of the downhill for Clint Bender.

11         He went to an outdoors music festival and for the

12  first time he was introduced to MDMA.  And it's hard to explain

13  or he says it's hard to articulate because when he talks about

14  it or thinks about it now, it seems like a lifetime ago, but at

15  the first time that he took MDMA, it was the first time that he

16  felt euphoric.  He felt unafraid.  He had no anxiety.  He felt

17  open to the people around him.  And he felt like, oh, the sense

18  that this was going to make -- fix him, and then, of course, it

19  would dissipate and he would go back to using Percocets and

20  going to these concerts on and off.

21         Your Honor, this is a picture, if the Court can see,

22  of who Clint Bender was in 2019.  He had lost weight.  He was

23  breaking out.  He was using drugs.  He was hanging out with a

24  bad crowd.  And it was during that period of time where he was

25  arrested on the case in Illinois for selling a small amount of

1    MDMA to an undercover officer, and then he comes before this

2    Court for the much larger issue of selling MDMA.

3         One of the things that has been mentioned in the

4    probation -- the Presentence Report and Mr. Teitelbaum's motion

5    for a variant sentence is that the Court should penalize him

6    because he committed these two crimes so close in time and that

7    he hadn't learned his lesson.  And I just want to say -- and

8    I'll say it repeatedly and you will hear it again -- he is so

9    contrite for what he did and finds it difficult to articulate

10   how he got into that -- the Navy SEAL ended up with this crowd

11   of people involved in dealing drugs.

12        And in March of 2019 he was arrested and he was taken

13   to the FDC in Tacoma, Washington, after he was initially

14   detained in the Western District in Seattle.  And he was held

15   there and he didn't know what was going to happen with his

16   case.  He was told he was going to end up in Colorado, but his

17   journey from SeaTac in Tacoma, the FDC, to Colorado was a very,

18   very difficult journey.  One morning he was -- one afternoon he

19   was taken from the FDC in Tacoma and he was placed in a bus

20   outside.  And he was held there for hours and not told where he

21   was going.  And when it got dark out, the bus traveled to

22   California.

23        He got on a plane in California and he was flown to

24   Nevada where he was held in the Pahrump FDC in Nevada for

25   several weeks.  He was held in a pod with over 80 people in

1  this pod.  He was held in horrible conditions and did not know

2  what was happening.  He had no contact with his -- any lawyers.

3  His family didn't know what was going on or where to find him

4  and he was definitely afraid.  In addition, he was still

5  suffering from intense migraines, withdrawing from drugs and

6  not getting the help he needed.

7          He was placed on a bus again in Nevada and he was

8  taken to another airport and he was transported to the Grady

9  County facility in Oklahoma.  And this was one of the hardest

10 places where he was held for a few weeks because he was placed

11 in a solitary confinement in a small pod of about 12 people,

12 locked into his cell.  And he was -- every time he had a short

13 period of time there were like picnic tables.  And every time

14 he talked to an inmate two things went through his head.  I am

15 not going to survive this.  I am going to end up in jail for

16 the rest of my life.  I am going to get killed by these inmates

17 and he was terrified.  He had no contact again with his family.

18 He didn't know what was going on with his case.  And then seven

19 weeks later he ended up here in the state of Colorado.

20         Those weeks -- and for some people, they are like

21 that's nothing, you know, compared to what he is facing, but I

22 want to tell the Court how impactful that period of time was

23 for Mr. Bender because it scared the heck out of him.  He

24 returned home after he was released from detention here in

25 Colorado and he went back to live with his father.

1          And I think, Your Honor, if I was standing in front of

2     Your Honor in 2019 and I would say to the Honorable Justice

3     Brimmer please give him credit for time served, I wouldn't have

4     a leg to stand on.  But I can tell the Court in the last 27

5     months this man has changed tremendously.  In the last 27

6     months, I have had hours and hours of conversations with both

7     Mr. Bender, his father Tom, his mother Amanda, his friends and

8     his girlfriend.  His life has really turned around.

9          He ended up getting enrolled in the University of

10    Huntsville, Alabama, and initially was going to be studying to

11    be a nurse.  And we had conversations about that because I

12    said, you know, with your felony convictions licensing might be

13    an issue.  So he decided to change his major to business and it

14    was kind of a complete flip of a switch for him.  And I say

15    that because he wanted to be a marine or a Navy SEAL just like

16    his dad was.  At first he wanted to be a nurse so he could join

17    his father's chiropractic business, but then he had to really

18    start life and start on his own.  Who is he as a grown up?  Who

19    is he as a man?

20         And when he started taking these business courses, and

21    as I said legal environmental business studies, principles of

22    microeconomics, computer applications in business, principles

23    in marketing, infrasystems and organizations, math, English

24    literature, he forced me to read Victor Frankl's Man's Search

25    for Meaning because he said you've got to read this book that I

1    read.  And this really is what is keeping me going, that in the

2    dark places that I have, not to comport or compare the

3    concentration camps to what he was going through, but he said,

4    I realized that in those dark days that if I used positive

5    thinking and if I had the opportunity to get out, I am going to

6    take every advantage of doing that.

7         And he has done that, Your Honor.  On August 18th he

8    is entering his junior year of college.  He has started his own

9    business and -- I will go back to this, but Fence Pro -- and

10   that is where he -- in starting this business for fencing, he

11   had to get his LLC.  He had to learn to set up his books.  And

12   all of the skills he was learning at college were so wonderful

13   for him to start this business that has really taken off.

14        I will share a few pictures.  These are some of his

15   advertising and marketing he has learned from.  He has been

16   using -- he is making fences.  He is building decks from

17   scratch.  And so he has had some success in that.

18        In addition, Your Honor, going back a little bit,

19   Mr. Bender will tell you that when he came back to Alabama,

20   when he enrolled in a four-year college, when he became

21   straight, when he worked with his doctor, Dr. Mashburn, to be

22   evaluated for mental health issues, taking medication for

23   depression, anxiety, ADHD.  He takes medication that is

24   prescribed for him to treat his pain for his back.  He is in

25   physical therapy to help take care of all these ailments.  He

1    doesn't think about illegal drugs.  The only time he thinks

2    about illegal drugs is when he talks to his seven younger

3    siblings about what can happen to you if you use or abuse drugs

4    and find yourself in the criminal justice system.

5         He has a girlfriend, Emily Campbell, who graduated

6    from a four-year college, owns her own house, has an excellent

7    job.  She has been an incredibly positive influence on

8    Mr. Bender.  I attached to the motion for variant sentence the

9    letters from Lt. Mitchell Danner, who is present in the middle

10   of this picture, who has become a real mentor for Mr. Bender.

11   They talk about business.  They talk about the military.  They

12   talk about how to succeed.  They work out together.  His life

13   has changed dramatically.  That kid that was selling MDMA does

14   not exist anymore.

15        It's almost like you can never imagine that he would

16   be an outdoor -- this is his life now, hiking, yoga, going to

17   school, working out and starting a business, fishing.  And so

18   this is -- I share all these things because I know I am asking

19   for a big ask for the Court to say give Mr. Bender credit for

20   time be served and place him on a supervised release with

21   whatever conditions the Court deems appropriate.  I'd wrote in

22   my sentencing memorandum and hyperlink to studies about the

23   criminogenic effect of sending someone like Mr. Bender back to

24   prison at a time when his trajectory is going so high.

25        He has -- he is in school.  He has got a job.  He has

1   got a family.  He has got a girlfriend.  He has got support of

2   really good people.  He is seeing a doctor who is making sure

3   that he is taking his medication.  And he has successfully

4   completed -- he was on state Illinois probation at the same

5   time as federal pretrial release.  He has done everything that

6   he was supposed to do and in July he was released and his

7   probation was terminated from the state of Illinois.

8         So, Your Honor, for all of those reasons -- and if the

9   Court has any additional questions, you see I also attached the

10   letter from Major Danner, also the letter from Lucas Puckett

11   who has become a very strong mentor for him.  He has surrounded

12   himself with positive people.  He is starting his semester on

13   August 18th.  He hopes to graduate in the next year and to

14   completely have his business take off as well.

15         So you can take a chance on this man, Your Honor,

16   because you will not see him again.  And I know that no one can

17   ever promise that because things change, but even during COVID

18   when everything was locked down he continued to work hard.  He

19   continued to study.  He continued to make sure that he was on

20   the straight and narrow.  So I think the Court could feel

21   comfortable and confident that Mr. Bender will not be before

22   the Court.  And again I emphasize that he has complete

23   contrition for his acts and how it has impacted himself and his

24   family, Your Honor.

25         *THE COURT:*  All right.  Thank you, Ms. Tvedt.

1          Why don't we have Mr. Bender's father address the

2     Court at this time.

3          *MS. TVEDT:*  Thank you, Your Honor.

4          *THE COURT:*  Sir, if you can please state your first

5     and last name and spell your first name for the record.

6          *THE WITNESS:*  Thomas Bender, T-H-O-M-A-S.

7          *THE COURT:*  Go ahead.

8          *MR. BENDER:*  This is a letter that I had written.

9          Clint is the oldest of eight children.  He was raised

10    in an environment every child should have the benefit of being

11    raised in.  He played nearly every sport as a child, most of

12    which I coached.  He performed very well in school and was a

13    state champion wrestler senior year of high school.  He entered

14    the Navy on the special warfare contract.  He was injured in

15    BUD/S training and was medically discharged from the Navy.  He

16    gradually went downhill from there.

17         He left home and started hanging with a bad crowd.  I

18    have been a long-time reserve deputy on the local sheriff's

19    department and no amount of intervention at that time seemed to

20    help at all.  I felt like I had lost my strong disciplined son

21    who had such a promising career ahead of him.  And when he was

22    injured and discharged from the Navy, his whole identity seemed

23    to have been lost.

24         After being arrested and a seven-week journey from

25    jail to jail, he was being extradited back to Denver and did

1    that not only get the drugs out of his system, but allowed the

2    reality of his situation to sink in.  I truly believe this is

3    what he needed to break his downward spiral.

4         It had been nearly two and a half years since the

5    incident.  Clint to my knowledge has had no probation

6    violations.  He has remained enrolled in college and is now a

7    junior.  He has a girlfriend who has a college degree and has

8    been a great influence.  He has also started his own fencing

9    business on the side and it seems to be taking off well.  I

10   have seen such a remarkable change in Clint.  He has pride in

11   his work and has renewed self-confidence.  I have my son back.

12        I realize that you need to consider rehabilitation and

13   punishment for the person committing the offense.  Clint has

14   been in a good rhythm for over two and a half years now.  He is

15   on his way to having a four-year degree and a successful

16   business.  He is contributing to society in a positive way.  I

17   feel that any period of incarceration would only break his

18   upward momentum and would not help society in any way.  I am

19   asking you as his father, the one who has been there the whole

20   time for him through all of this, to allow Clint to continue

21   with his progress.

22        And then just one more thing I would like to say.  I

23   spent a long time in the Marine Corps, and like I said, I have

24   been a deputy for a long time on the local sheriff's

25   department, even worked with undercover drug task force, and so

1    I have been around a lot of men, seen the best and worst of

2    men.  And there is some people that you can punish or give any

3    type of reprimand to that are never going to do good.  They are

4    always going to go back.  And Clint is not one of those people.

5              That's all I have to say, Your Honor.

6              THE COURT:  Thank you, Mr. Bender.  I appreciate it.

7              Mr. Teitelbaum, go ahead.

8              MR. TEITELBAUM:  Thank you, Your Honor.  I will be

9    brief.

10             This is a very unfortunate case also from the

11   government's perspective because it is clear to me as well that

12   the defendant has the ability to make a positive contribution

13   to society.  And I think that the defendant's father actually

14   said it well as he is quoted in the Presentence Investigation

15   Report that sometimes the criminal justice system does

16   defendants a disservice, for instance, in Illinois by conveying

17   an impression that -- by giving a probationary sentence that

18   selling drugs just isn't that big of a deal, so if you get

19   caught, you're not facing significant jail time.  And people

20   take the wrong lesson from that and they go back to doing

21   exactly what it was they were doing or in this case doing

22   something significantly worse than selling very small amounts.

23             So I think I tend to agree with Ms. Tvedt that from a

24   specific deterrence standpoint, the defendant may very well

25   have learned his lesson at this point, particularly because of

1    the seven weeks that he spent being shuttled from one detention

2    center to another to arriving in Colorado.  But at the same

3    time there are other 3553 factors besides just specific

4    deterrence and rehabilitation.

5            So what the government is most concerned about in this

6    case is that a time served sentence would send a message

7    essentially that there is two chances to engage in drug

8    trafficking activity with very minimal consequences.  And even

9    after being arrested in Illinois, convicted and sentenced on a

10   felony and then continuing to sell in this case a very

11   significant distribution quantity of MDMA through the mail,

12   that even after all of that the prison sentence that results is

13   multiple weeks and nothing more.

14           So for those reasons on a general deterrence rationale

15   and because of the necessity to punish the defendant and not

16   just specifically deter and rehabilitate him, that's the reason

17   that the government is recommending the sentence that it's

18   recommending in this case.

19           THE COURT:  Thank you, Mr. Teitelbaum.

20           Ms. Tvedt, anything more from you?

21           MS. TVEDT:  No, Your Honor, other than to say, Your

22   Honor, I understand how this was a terrible incident, but as

23   the Court has to take the 3553 to the individual and that's the

24   difference in this case.  I would like Mr. Bender -- he does

25   want to address the Court as well, Your Honor.

1          THE COURT:  Okay, great.

2          Mr. Bender, if you could please go to the podium,

3   then.  Ms. Tvedt, you can stay put if you want.  It's up to

4   you.

5          THE DEFENDANT:  Thank you, Your Honor, for giving me

6   the opportunity to speak.

7          First of all, I want to say that I am sorry.  I am

8   standing here because I made terrible decisions that have led

9   me to inexcusable actions in the past.  I want to say to my

10  family and my dad who is here today that I was raised better

11  and that I should have set a better example for my seven

12  younger siblings.  I know that I let everyone down.

13         I was put on Illinois' probation and shortly after

14  arrested in Washington and that is why I am standing in front

15  of you today, Your Honor.  I would like to shed light on why I

16  continued my lifestyle after being placed on probation.  After

17  being placed on probation, I was addicted to Percocets that I

18  was initially prescribed for the injuries I incurred in the

19  navy.  I was taking them for back pain, but then I started to

20  rely on pills and took more and more, and then I got addicted

21  and started buying Percocets on the street.  At that point my

22  addiction was my main focus.  I didn't care about basic needs

23  such as food, sleep and hygiene.  All I cared about was feeding

24  my addiction.

25         As you have heard, Your Honor, during my time in the

1    Navy while I was trying to become a SEAL, I was badly injured

2    and the setback had more of an effect on me than I was willing

3    to admit.  After my discharge I was mentally and physically in

4    a very dark place.  It was during that time I went to a concert

5    and took MDMA, and initially when I took it my fears and

6    anxieties went away.  I never imagined that my lifestyle would

7    lead to selling MDMA and then finding myself in prison.  I did

8    not recognize that person who I was at that time anymore.

9         During the past two and a half years, I have been

10   completely clean and have had no urges to take illegal

11   substances and have associated them with negative experiences.

12   I have been clean since the day I was taken into custody and

13   vowed that I would never do drugs again.  I beat my addiction

14   by myself and I am completely confident I can sustain a

15   drug-free lifestyle for the rest of my life.

16        I enrolled in University of Alabama-Huntsville and I

17   am heading into my junior year.  I began my studies in nursing

18   and then switched to a major in business which has been a

19   wonderful course of education which has helped me start my own

20   construction business with a niche in fencing.  The city I am

21   living in has grown substantially in a very short time.

22   Construction is a perfect business to be in in my area.  I have

23   learned the skills to build fences, and I have invested in

24   equipment.  And the courses I am taking have helped me manage

25   the business side.

1          Even though I have a long way to go, I am proud of

2    what I accomplished so far.  I completely admit that I made

3    mistakes and that I am at fault.  I am not the same person that

4    I was at that time.  I have had ample time to reflect and I

5    have done so.  Moving forward I promise I will never do

6    anything illegal again or anything that could put me in

7    jeopardy of going back to jail.

8          My time incarcerated was the worst experience of my

9    entire life.  That experience still haunts me to this day.  The

10   main thing I want to build is a family with my girlfriend and

11   become an established contributing member of society.  I have

12   learned my lesson through mental fear and suffering while

13   incarcerated and the fear and anxiety leading up to today's

14   sentence.  In two and a half years since my arrest, I have

15   tried to prove that I am a different person and that I am very

16   sorry for my actions.

17         In closing, I want to apologize to you and tell you

18   that I feel terrible for what I have done.  I am very

19   embarrassed and ashamed for my actions.  I will never be in

20   your courtroom again, Your Honor.

21         Thank you, Your Honor, for taking the time to listen.

22         *THE COURT:*  All right.  Thank you very much,

23   Mr. Bender.  You may have a seat.

24         The United States Sentencing Commission Guidelines are

25   advisory.  The Court does not have to sentence within the

1  guidelines.  Nevertheless, the Court has taken the guidelines

2  into account in determining an appropriate sentence for

3  Mr. Bender.  The Court has also taken into account the

4  statutory factors which are set forth at 18, United States

5  Code, Section 3553(a).

6       The Court has already ruled on the objections to the

7  Presentence Report.  As to the remaining issues in the report,

8  neither the United States nor Mr. Bender has challenged them,

9  and therefore the remaining factual statements and guideline

10  applications in the Presentence Investigation Report are

11  adopted without objection as the Court's findings of fact

12  concerning sentencing.

13       The Court finds that the total offense level is 21.

14  The defendant's Criminal History Category is II.  And that

15  results in an imprisonment range of between 41 and 51 months

16  and a fine range of between $15,000 and $1 million.  The

17  supervised release range is between one and three years.

18       The Court does find that the defendant meets the

19  criteria in 18, United States Code, Section 3553(f)(1) through

20  (5), and therefore the Court will grant the government's motion

21  for a variance and sentence the defendant as if he were really

22  in offense level 19 between 33 and 41 months.  As is noted in

23  the Presentence Investigation Report, as the United States

24  noted and as Mr. Teitelbaum alluded to today, it's just a

25  factor of the guidelines not having been appropriately updated.

1           There is no question that this is a -- this is a

2    really tough case because Mr. Bender has since the time that he

3    was released on bond, he has just led an exemplary life.  I

4    mean, he has done everything, you know, he really could.  I

5    don't find that he is going to be a threat to society in the

6    future.  I don't think -- I agree with Mr. Teitelbaum, I don't

7    think he needs specific deterrence.  I think he has finally

8    learned his lesson, but there is some other factors that we

9    have to take into account, too, and this is what makes this

10   sentencing so hard.

11          I mean, here you have Mr. Bender who grows up, from

12   the time he is a little kid he wants to be like his dad and go

13   into the Marine Corps.  And he does -- and that's what he works

14   toward.  He goes off to the military school in Texas at least

15   for a while.  He gets into the Marine Corps.  He is in basic

16   training.  And as Ms. Tvedt said, in the military you are not

17   an individual.  You are a member of the team.  You are a member

18   of the Corps.  And you are doing everything to work together

19   even though it's brutally -- to go into the Navy SEALS is

20   brutally difficult.

21          And Mr. Bender is focused because no one gets through

22   that without being incredibly mentally focused and have

23   incredible will power and then through just no fault of his own

24   in a terrible accident Mr. Bender gets hurt.  Marine Corps does

25   not leave anyone behind.  But Mr. Bender has got to reconcile

1    himself to the fact that now because of his physical -- I will

2    call them disabilities he is going to get left behind.  He is

3    going to -- desk duty?  It's not what he had ever aspired

4    towards.

5         And I have no doubt that that would send one into a

6    tailspin.  I have no doubt that someone who was focused on that

7    type of a goal who now once again through no fault of his own

8    having it foreclosed to him because of physical problems that

9    he could not work his way out of.  This person who wanted to be

10   a marine and who's had the ability through strength of will and

11   through hard work could overcome things couldn't overcome those

12   things.  He couldn't any longer be a Navy SEAL or a marine and

13   that would be difficult.

14        On many occasions Mr. Bender when he has felt insecure

15   or when he has felt uncomfortable has gone back home.

16   Unfortunately, Mr. Bender left home.  He went to Colorado.

17   There may have been good reasons for him to do that type of

18   thing, but in retrospect it doesn't look so good.  And then he

19   started going to concerts.  A lot of people go to concerts, but

20   not that many people necessarily start using drugs as a result.

21        But Mr. Bender does start using drugs, and perhaps he

22   just thinks that MDMA is really making him feel a lot better.

23   Of course, most people take drugs because they feel that way.

24   But then there is just no explanation for why Mr. Bender starts

25   becoming a drug dealer.  He is using drugs, but now he is going

1    to sell drugs at a concert?  That's just like completely

2    inconsistent with the way that Mr. Bender was raised.  That's

3    ail big step.  That's -- you can take a poll on the streets of

4    Denver or any other city in the country and ask people what's

5    the difference between in terms of potential legal consequences

6    between being a drug user and being a drug dealer and they are

7    going to get it right every time.  Mr. Bender gets it wrong.

8         So what happens?  Mr. Bender gets arrested.  There is

9    no discussion in the materials that Mr. Bender has provided for

10   why that wasn't a wake-up call to him.  He comes from this good

11   family where everyone -- look at all the pictures.  That is

12   like a stereotypical great American family.  And Mr. Bender is

13   arrested for drug dealing and he doesn't get the message?

14        And, you know, the explanation that he is placed on

15   probation, maybe it doesn't -- maybe that was a disservice or

16   something, he was arrested for dealing drugs.  I mean, why

17   wouldn't a person like Mr. Bender who is getting arrested for

18   dealing drugs think, what am I doing?  What am I doing?  How

19   did I get here?  I mean, why isn't that the incredibly

20   embarrassing thing that shakes Mr. Bender out of it so that he

21   starts thinking straight and goes back home or does whatever he

22   needs to do.  But if that's not it, he gets convicted, not only

23   charged, he is convicted.  And maybe he is placed on probation.

24   Who cares?

25        I mean, you know, did Mr. Bender not have a mirror in

1    his apartment that he had to look in every day and think to

2    himself, how did I end up here?  I wanted to go into the Navy

3    SEALs and I get convicted of drug dealing.  There is just no

4    explanation in the materials whatsoever.  And I don't buy the

5    fact that -- I mean, maybe he did have some type of drug

6    dependency at that point in time, but why doesn't that -- why

7    didn't he get the message at that point in time?  This ends.  I

8    am in drug treatment.  I'm going back home.  I'm doing whatever

9    I need to do to straighten my life out.  I've made a terrible

10   mistake.

11           Mr. Bender's reaction?  A month later he is dealing

12   huge quantities of MDMA through using other people and having a

13   complex system to hide it, getting it from Slovenia -- I can't

14   remember -- Slovenia.  That's the problem here.  That's the

15   problem here.  There is no excuse for that.  And, you know,

16   when I look at 3553(a), one of the factors is the need to avoid

17   unwarranted sentencing disparities among defendants with

18   similar records who have been found guilty of similar conduct.

19           Why if you not only are committing the exact same

20   crime the second go-around but in a much, much bigger amount

21   and in a much, much more serious way do you get placed on

22   probation again?  I don't think so.  I don't think so.  And

23   it's too bad because, like I said, Mr. Bender has been

24   exemplary since that.

25           There is a comment in the materials about Mr. Bender

1    all of the sudden out of the blue the feds come and arrest him.

2    What do you expect when you're dealing drugs?  Do you expect

3    that they'll invite you down to the FBI's office or something

4    like that?  Of course you are by engaging in that type of

5    activity inviting your life to be ruined.  You are inviting

6    your family to be crying and distraught when you get sent off

7    to prison.  This is two plus two equals four type of stuff.

8    But Mr. Bender didn't -- don't ask me why, I still don't know,

9    but he wasn't thinking like that.  Instead, he was thinking

10   that he could evade the law, use the web, buy drugs overseas,

11   use the U.S. mail for that purpose, all these other things.

12   And guess what?  His world came crashing down.

13          And it's unfortunate that he had such a bad experience

14   getting transferred, but how many other people have bad

15   experiences eventually getting transferred out to the court

16   where they are going to be prosecuted?  I don't know.  That was

17   the wake-up call, but why wasn't the wake-up call when he got

18   arrested in Illinois?  That's when the wake-up call needed to

19   happen so Mr. Bender wouldn't end up here.

20          The other factor that Mr. Teitelbaum alluded to is

21   general deterrence.  It's related to some extent to that

22   sentencing disparity.  Like I said, specific deterrence,

23   whether it would deter Mr. Bender, I don't think Mr. Bender

24   needs specific deterrence.  I do think there is a need for

25   general deterrence.  It can't be as Mr. Teitelbaum alluded to

1   that we're going to have a situation where your first drug

2   dealing offense isn't going to count.  Second one, as long as

3   you seem to be doing good stuff, assuming you are lucky enough

4   to be released on bond like Mr. Bender, that, you know, then

5   it's okay to put you on probation too or no jail time or

6   something of that nature.  Like I said, I don't think so.  The

7   question is how much prison time would be appropriate for

8   Mr. Bender.

9        I think it is -- Mr. Bender was lucky.  No. 1, he got

10   released on bond.  I think it was perfectly appropriate, by the

11   way.  And there were lots of delays and here we are 27 months

12   later.  And Mr. Bender has done a lot of great stuff.  Like I

13   said, he has been exemplary.  I can take that into account.  I

14   am taking that into account.  And for that reason I think it's

15   appropriate to grant Mr. Bender a variant sentence, but I still

16   think that unfortunately it's necessary for him to go to prison

17   as well.

18        I think that a prison sentence of 18 months would be

19   sufficient, but not greater than necessary, to punish

20   Mr. Bender, that will get the point home to him, that will

21   provide general deterrence, and also it will not create an

22   undue sentencing disparity among similarly situated people.  As

23   I said before, there aren't very many people who have taken

24   advantage of the opportunities to really rehabilitate himself

25   since his arrest in this case the way that Mr. Bender has, and

1     I am giving him a significant amount of credit for that fact.

2             Therefore, pursuant to the Sentencing Reform Act of

3     1984, it is the judgment of the Court that the Defendant, Clint

4     Bender, is hereby committed to the custody of the Bureau of

5     Prisons to be imprisoned for a term of 18 months.

6             Upon release from imprisonment, Mr. Bender shall be

7     placed on supervised release for a term of three years.  Within

8     72 hours of release from the custody of the Bureau of Prisons,

9     the defendant shall report in person to the probation office in

10    the district to which the defendant is released.

11            While on supervision, Mr. Bender must not commit

12    another federal, state or local crime and must not unlawfully

13    possess a controlled substance.  Mr. Bender must refrain from

14    any unlawful use of a controlled substance.  And he must submit

15    to one drug test within 15 days of release from imprisonment

16    and a maximum of 20 tests per year of supervision thereafter.

17            Mr. Bender must cooperate in the collection of DNA as

18    directed by the probation officer, and he must comply with the

19    standard conditions that have been adopted by the Court in

20    General Order 2020-20.

21            The Court finds that the following special conditions

22    of supervision are determined to be reasonably related to the

23    factors that are enumerated in 18, United States Code, Section

24    3553(a) and Section 3563(b) or 3583(d).  Further, based upon

25    the nature and circumstances of the offense and the history and

1   characteristics of Mr. Bender, the following conditions do not

2   constitute a greater deprivation of liberty than reasonably

3   necessary to accomplish the goals of sentencing:

4        Namely, No. 1, Mr. Bender must participate in a

5   program of mental health treatment approved by the probation

6   officer and follow the rules and regulations of the treatment

7   program.  The probation officer in consultation with the

8   treatment provider will supervise his participation in the

9   program as to modality, duration and intensity.  Mr. Bender

10   must pay the cost of treatment based upon his ability to pay.

11        Second, Mr. Bender must participate in a program of

12   testing and or treatment for substance abuse approved by the

13   probation officer and follow the rules and regulations of the

14   treatment program.  The probation officer in consultation with

15   the treatment provider will supervise his participation in the

16   program as to modality, duration and intensity.  He must

17   abstain from the use of alcohol or other intoxicants during the

18   course of treatment, and he must not attempt to obstruct or

19   tamper with the testing methods.  He must pay for the cost of

20   testing and/or treatment based upon his ability to pay.

21        Third, Mr. Bender must submit his person, property,

22   house, residence, vehicles, papers, computers or other

23   electronic communications or data storage devices or media or

24   office to a search conducted by a United States probation

25   officer.  Failure to submit to search may be grounds for

1    revocation of release.  Mr. Bender must warn any other

2    occupants, such as his father if he is living with his father,

3    that the premises may be subject to searches pursuant to this

4    condition.  An officer may conduct a search pursuant to this

5    condition only when reasonable suspicion exists that Mr. Bender

6    has violated a condition of his supervision and that the areas

7    to be searched contain evidence of this violation.  Any search

8    must be conducted at a reasonable time and in a reasonable

9    manner.

10        I think that that condition is appropriate because

11   Mr. Bender demonstrated through the facts of this particular

12   crime a secretive means of dealing drugs, and it's appropriate

13   that his house or residence be subject to searches including

14   both computers or electronic communication devices.

15        Also the mental health component is justified based

16   upon the fact that the defendant is currently getting mental

17   health treatment and has found that to be of benefit to him.

18   And he also talked about his substance abuse and how he has

19   been working on that too.  Hopefully, he is not going to have

20   further problems with that, but it's appropriate to approve

21   that as a condition to make sure that that factor is

22   controlled.

23        Mr. Bender shall pay a special assessment of $100

24   which is due and payable immediately.  The Court finds that he

25   does not have the ability to pay a fine, so the Court will

1   waive a fine in this case.

2          I can't remember.  The defendant admitted to the

3   forfeiture violation; is that correct, Mr. Teitelbaum, at the

4   time of his change of plea?

5          *MR. TEITELBAUM:*  I believe so, Your Honor.  I also

6   don't believe the government has filed a motion for a

7   preliminary order of forfeiture.  I don't believe that's

8   necessary in this case.

9          *THE COURT:*  Does the United States request that I

10  include forfeiture findings in the judgment?

11         *MR. TEITELBAUM:*  There is no need, Your Honor.

12         *THE COURT:*  Okay.

13         And finally, Mr. Bender is advised of his right to

14  appeal the sentence in this case.  By providing this

15  advisement, I do not mean to suggest that his waivers of

16  certain appellate rights in his Plea Agreement are not fully

17  effective.  Rather, if Mr. Bender has any questions about what

18  appellate rights he may still have, he can either consult with

19  Ms. Tvedt or he can review his Plea Agreement.

20         The Court will grant various motions that were filed

21  by the United States.  And just for the record, I do grant

22  Mr. Bender's motion for a variant sentence in part and deny it

23  in part.  I will grant the government's motion to dismiss Count

24  Two of the indictment with prejudice and I will sign a written

25  order to that effect.  I grant the government's motion for an

1    additional one-level downward adjustment for acceptance of

2    responsibility as well.

3              MR. TEITELBAUM:  I apologize, Your Honor.  I may just

4    be forgetting, but will the Court also grant the government's

5    motion for a two-level downward variance?

6              THE COURT:  I ruled on that already and granted that

7    motion.

8              All right.  So the next issue is whether or not

9    Mr. Bender should be allowed to voluntarily surrender or

10   whether he should be taken into custody.  That brings up an

11   issue that we talked about before, namely whether there are

12   exceptional reasons under 18, United States Code, Section

13   3145(c).

14             Ms. Tvedt, would you like to address that issue?

15             MS. TVEDT:  Yes, Your Honor.  I would ask that the

16   Court allow him to self-surrender.  He has come to every --

17             THE COURT:  Could you stand?

18             MS. TVEDT:  I am so sorry, Your Honor.

19             THE COURT:  I know it's not -- you are not consciously

20   doing that.

21             MS. TVEDT:  It's been so hard, Your Honor, and I

22   apologize.  I mean no disrespect and I always prefer to stand.

23   And I really respect Your Honor, so --

24             THE COURT:  I see -- this happens all the time,

25   Ms. Tvedt, so I wouldn't draw any adverse inference whatsoever.

1          Go ahead.

2          *MS. TVEDT:*  Your Honor, I'd ask that Mr. Bender be

3     allowed to self-surrender.  He has a plane ticket to go home

4     this afternoon, Your Honor, to help him close out his

5     businesses, get his affairs in order and make sure that all of

6     his medications are -- that the Department of the Bureau of

7     Prisons has all that information.  He has come to Colorado from

8     Alabama on numerous occasions, including the day of his PSI

9     interview which was -- happened to coincide directly with the

10    beginning of shutdowns with COVID.  He came do my office.  He

11    was interviewed there and then he returned back to Alabama.

12         He came to do an interview with the United States

13    Probation Department and DEA agents and then flew back.  He has

14    come back and forth for meetings with counsel.  I think that

15    there is no danger that he will not show up.  He is not a

16    danger to himself or the community.  There is no history of him

17    failing to appear.  And I would ask the Court both to allow him

18    to self-surrender.  I'd also ask the Court to make a notation

19    that he be sent to a facility that would allow RDAP or some

20    type of drug treatment while he is incarcerated, Your Honor.

21         *THE COURT:*  Ms. Tvedt, none of the reasons that you

22    just mentioned are exceptional reasons.  In fact, the case law

23    is all against that.  That's a given that someone, you know,

24    would be showing up and all those good things.  So any other

25    argument that would create the exceptional reason?

1        *MS. TVEDT:*  I do think it's exceptional, Your Honor,

2   given -- especially with his medical conditions, and I really

3   want to make sure that -- that is exceptional to make sure that

4   all the paperwork is in place, that he has got the information

5   that he can give forth to the Bureau of Prisons and allow him

6   the time to -- I don't think there is any risk, Your Honor, and

7   I think that he should -- in other situations similarly

8   situated defendants have been allowed to self-surrender, and I

9   ask the Court to allow Mr. Bender to self-surrender.

10       *THE COURT:*  Thank you, Ms. Tvedt.

11       Mr. Teitelbaum?

12       *MR. TEITELBAUM:*  Your Honor, the government's inclined

13  to agree with the Court in terms of what constitutes

14  exceptional reasons.  I don't think -- it's not really a

15  question of whether it would be nice to let Mr. Bender

16  self-surrender.  I think the issue is what constitutes

17  exceptional reasons under 3145(c).  The government doesn't have

18  any concerns about him being a flight risk or a danger to the

19  community, but the exceptional part is what's missing.

20       *THE COURT:*  Ms. Tvedt, anything more from you on that?

21       *MS. TVEDT:*  If I could have one moment, Your Honor.

22       Your Honor, I would just echo the same arguments that

23  I have given, Your Honor.  I just ask for this opportunity.

24  And I know in other situations the Court has granted the

25  ability to self-surrender.  And given his background, I would

1    ask the Court to grant that, Your Honor, and allow him to

2    self-surrender.

3         *THE COURT:*  So the issue before the Court is whether

4    there are exceptional circumstances under 18, United States

5    Code, 3145(c).  The Court does find that there is clear and

6    convincing evidence that Mr. Bender is not a flight risk.  I

7    also agree by clear and convincing evidence that he is not a

8    danger to the community.  However, having been convicted of the

9    offense that he was convicted of, he is subject to being

10   remanded at the time of sentencing unless it is clearly shown

11   that there are exceptional reasons why such person's detention

12   would not be appropriate.

13        And courts have held -- the argument here is, No. 1,

14   Mr. Bender needs to wrap up some of his business dealings and

15   other things.  That's, of course, perfectly natural, but he

16   should have done that before he came here today.  The other

17   argument is that because of his physical condition.  The 10th

18   Circuit has held in *United States v. Wages*, which is reported

19   at 271 F. Appx. at 727 that it was unexceptional where a

20   53-year-old defendant used a wheelchair and needed special

21   mattresses to avoid pain and had a limited ability to hear was

22   concerned.  Also in *United States v. Brown*, an Eighth Circuit

23   opinion from 2004, the defendant who needed to undergo

24   treatment for depression was not deemed to be an exceptional

25   circumstance.

1           And Judge Browning from the District of New Mexico

2    found in *United States v. Rodella* reported at 101 F.Supp.3d at

3    1075 from 2015 that the defendant's poor health even when

4    combined with his need to provide for his family was not

5    sufficiently exceptional to warrant release.  There are a lot

6    of other cases.  A lot of those cases are detailed in another

7    of Judge Browning's opinions which is *United States v. Lopez*,

8    which is reported at 184 F.Supp.3d at 1189.

9           It's hard in these circumstances because I don't think

10   that he is a flight risk.  I don't think he is a danger to the

11   community.  But on the other hand, I am not going to ignore the

12   law, and I will remand the defendant at this time and order

13   that he remain here in the courtroom until the marshals come to

14   process him.

15          Mr. Teitelbaum, anything else on behalf of the United

16   States?

17          *MR. TEITELBAUM:*  No, Your Honor.

18          *THE COURT:*  Thank you.  I will include in the judgment

19   a recommendation that Mr. Bender be incarcerated in a facility

20   within the Bureau of Prisons that has the RDAP program.  I

21   think that that would be an excellent program for Mr. Bender.

22   I don't know -- actually, with a sentence of 18 months would he

23   be eligible?  I think that's right on the edge.

24          *PROBATION OFFICER:*  I think it's right on the line, so

25   there is a chance he might not be eligible.

1          *THE COURT:*  But maybe on the other hand he is.  So I

2     will make that recommendation, but Mr. Bender, I will advise

3     you that if not -- your sentence may not be long enough for you

4     to get into an RDAP program, but perhaps you may be able to

5     take it not for credit, but take classes as part of it.  Once

6     again, I commend your efforts to deal with your drug problem.

7     You are doing all the right things.  And so if there is a

8     program that will -- that you can take while in prison, that

9     would be a very good thing for you to do, all right?

10          Ms. Tvedt, anything else on behalf of Mr. Bender?

11          *MS. TVEDT:*  Yes, Your Honor.  In response to our

12    objections to the Presentence Investigation Report, I had

13    provided probation with a list of all of his medications, the

14    dosages.  And I just want to make sure that that be -- it would

15    be very, very terrible if he got -- if there wasn't a

16    continuation of that, so I just wanted to make sure that that

17    information is given to the Bureau of Prisons.

18          *THE COURT:*  Well, talk to Ms. Mills about that.  It's

19    tricky.  I do know those issues are always very tricky because

20    of different formularies and whatnot, but I appreciate your

21    efforts to do so.  Let me also commend the attorneys on both

22    sides for really excellent and insightful arguments today, all

23    right?

24          Mr. Bender will be remanded to the custody of the

25    United States Marshals.  His bond will be exonerated.  And the

1    Court will be -- one more thing.

2         *MS. TVEDT:*  I want to make sure he gets the credit for

3    the 50 days he was held.

4         *THE COURT:*  Credit for time served is calculated by

5    the Bureau of Prisons.

6         Mr. Bender will be remanded and the Court will be in

7    recess.  Thank you.

8       (Recess at 10:30 a.m.)

9                        REPORTER'S CERTIFICATE

10      I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.  Dated

12   at Denver, Colorado, this 27th day of November, 2021.

13

14                             S/Janet M. Coppock

15

16

17

18

19

20

21

22

23

24

25